FILED
JAMES BONINI
CLERK
2011 OCT 19 AM 11: 25

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DISTRICT

VIRGINIA LEFEVER, )
)
             Plaintiff. )
)
      vs. )
)
JAMES FERGUSON, )
OFFICER KEN BALLANTINE, )
OFFICER BILL HATFIELD, )
DR. ROBERT RAKER, )
CITY OF NEWARK, FRANKLIN COUNTY, )
LICKING COUNTY, and )
UNKNOWN EMPLOYEES OF THE CITY OF )
NEWARK, FRANKLIN COUNTY, and )
LICKING COUNTY, )
)
            Defendants. )

2:11 CV 935

JUDGE FROST

MAGISTRATE JUDGE DEAVERS

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, VIRGINIA LEFEVER, by and through her attorneys, LOEVY & LOEVY, complains of Defendants, and alleges as follows:

### Introduction

1.    Virginia LeFever spent over 20 years in prison after being wrongfully convicted of murdering her husband. Ms. LeFever's husband died of a self-inflicted drug overdose. He admitted, shortly before his death, that he had taken the prescription anti-depressant pills. Nevertheless, Defendant Ferguson, together with the other Defendants, concocted evidence to falsely accuse Ms. LeFever of poisoning her husband.

2. Numerous medical experts later debunked the fabricated evidence that was used to wrongfully convict Ms. LeFever, and Defendant Ferguson has since been convicted of perjury for falsifying his forensic credentials under oath.

3. Nearly two decades after her false arrest, Plaintiff's wrongful conviction was overturned based on newly-discovered evidence and she was released from prison.

4. Sadly, Ms. LeFever's exoneration did not come until after she was forced to spend over twenty years incarcerated as an innocent woman. Prison was a horrific experience for Ms. LeFever, a nurse who had never been arrested, let alone charged with a crime, before Defendants framed her for murder.

5. Even more tragic was the fact that Ms. LeFever was unjustly separated from her three young children and had to live behind bars while they grew up in foster care, having lost both their mother and father at the same time. Ms. LeFever must now attempt to make a life for herself without the benefit of over two decades of life experiences and relationships with her family. This lawsuit seeks redress for her injuries.

### Jurisdiction and Venue

6. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this Complaint occurred in this judicial district.

### The Parties

8. Virginia LeFever graduated from nursing school in 1980, and became a registered nurse. As a nurse, Ms. LeFever worked in specialized care units, including in a coronary care unit and in labor and delivery, performing fetal monitoring and assisting with C-section surgeries. Throughout her life, Ms. LeFever was regularly employed and had never been arrested or charged with any crime before being falsely accused of aggravated murder by the Defendants.

9. Defendant James L. Ferguson served as a forensic toxicologist for Franklin County, Ohio until 2003, when he was fired. Mr. Ferguson is sued in his individual capacity, and he acted under color of law and in the scope of his employment in engaging in the actions alleged in this Complaint.

10. Defendants Ken Ballantine and Bill Hatfield (hereinafter "Defendant Officers"), were at all relevant times officers with the Newark Police Department. Each of the Defendant Officers is sued in his individual capacity, and each acted under color of law and in the scope of his employment in engaging in the actions alleged in this Complaint.

3

11. Defendant Dr. Robert Raker is and was the Licking County coroner at all times relevant to this action. Dr. Raker is sued in his individual capacity, and acted under color of law and in the scope of his employment in engaging in the actions alleged in this Complaint. Defendant Officers, Defendant Ferguson, and Defendant Raker will collectively be referred to in this Complaint as "Individual Defendants."

12. Defendant City of Newark is a municipal entity in Ohio that employs or employed the Defendant Officers at the relevant times, including the as-of-yet unknown Defendants.

13. Defendant Franklin County is a governmental entity in Ohio that, at the relevant times, employed Defendant James Ferguson and as-of-yet unknown Defendants.

14. Defendant Licking County is a governmental entity in Ohio that employs Dr. Robert Raker and employed him and as-of-yet unknown Defendants at the relevant times.

### The LeFevers' Marriage

15. Virginia LeFever married William LeFever in 1977. Together they had four children, one of whom died months after her birth.

16. Soon after their marriage, Virginia noticed that William was developing alcohol and drug problems. In 1985, he was admitted to an in-patient treatment facility, where he

4

admitted to feelings of guilt and depression. William resumed his drug use immediately after he was released from treatment.

17.  Sometime around 1986, William's emotional patterns and lifestyle began to change dramatically. He would scream, throw objects, and slam doors. His drug use escalated, he had his ears pierced, and he began to hang out with younger crowds. He also became obsessed with killing rodents in the backyard.

18.  In addition, William regularly called in sick to his factory job and was routinely subject to unpaid suspensions as a result. William accumulated tens of thousands of dollars of debt.

19.  By 1988, William began physically abusing Virginia. On one occasion, he choked Virginia until she was unconscious. The next day, Virginia discovered cocaine paraphernalia in the house.

### The LeFevers' Separation

20.  On July 27, 1988, Virginia filed for divorce from William and obtained a restraining order against him.

21.  For their safety, Virginia took her children and moved out of their home. Virginia did not move back until William had vacated the premises and the children's school year began.

22.  When Virginia moved the children back into her home, she discovered that William had scrawled messages throughout the

house, including a message on a mirror stating: "There is no way I can live without you."

23.  In August 1988, William contacted a friend in California. He told the friend that he worried that Virginia would be moving away with the children. William also reported that he was not going to be able to live without Virginia.

24.  That same month, a woman whom William had paid for sex met him at a hotel room one evening. William was under the influence of drugs and alcohol, was very upset, and was screaming. He told the woman: "Fuck it, I'm going to kill myself," or words to that effect. William also attempted to choke the woman that night.

25. On August 24, 1988, a family court judge awarded Virginia full custody of the children.

26.  The judge then set a date for a hearing to finalize the divorce: September 27, 1988. The court stipulated that in the meantime William should be permitted to see his and Virginia's children.

27.  On September 20, 1988, William learned that his employer, American National Can Company, had been sold and that only key personnel would be relocated. Due to his repeat absenteeism and disciplinary suspensions, William feared that he would lose his job when the company moved.

**William LeFever's Overdose and Death**

28. The same day that William learned that his job was in jeopardy, and one week before the final divorce hearing, he came to Virginia's house to get the last of his things out of the garage. Virginia allowed him to stay for dinner and see the children per the court's order.

29. After dinner, William fell asleep on the living room couch and Virginia was unsuccessful in getting him to leave. It was a work and school night, so Virginia went upstairs to bed.

30. Later that night, Virginia's son Corey alerted her that William was up and acting strangely.

31. Corey and Virginia took William upstairs and put him in her bed to rest.

32. Throughout the night, William alternated between coherently communicating and appearing confused. Virginia stayed awake that night to ensure that William was okay. She suspected that William was high, and because William was not acting differently from other times that he had been high, Virginia did not call an ambulance. Moreover, William had previously threatened to beat Virginia if she called 911 when he was high.

33. The next day, September 21, 1988, Virginia discovered on her bedroom floor an old prescription bottle of antidepressant (amitriptyline) pills in which half a tablet remained. The prescription had been filled and last used years

7

before, after the death of the couple's daughter, and Virginia estimated that 20 pills had been left in the bottle when she had last opened it.

34.  At one point during the day, William became combative. Virginia called friends of William's who had experience with street drugs. When one of these friends offered to take responsibility with William for having the paramedics called, Virginia called EMS.

35.  At the hospital, William alternated between periods of calmness and lucidity and periods when he was combative and incoherent.

36.  Hospital staff gave William multiple intramuscular injections, including a shot of thiamine in his left buttock.

37.  The following day, William's condition and behavior worsened. But after he was given a drug to calm him down, he became lucid.

38.  During this lucid period, William did not state or suggest that Ms. LeFever had poisoned or hurt him in any way. Rather, William admitted to a nurse that he had taken Virginia's prescription anti-depressants. He told the nurse that he had not been able to cope anymore or handle his stress.

39.  Later that morning, William went into cardio-pulmonary arrest. He was pronounced dead at 11:37 a.m. on September 22, 1988.

**Defendants' Misconduct**

40.  After William's death, the Newark, Ohio police began an investigation.

41.  After Dr. Patrick Fardal of the Franklin County Coroner's Office concluded his autopsy, he could find no physiological or pathological cause of death. Any conclusion as to the cause of death was delayed pending toxicology.

42.  At the time, James Ferguson was the chief toxicologist for the Franklin County Coroner's Office, and he took on the toxicology analysis of William's body.

43.  Defendant Ferguson, along with the assistance of the other Individual Defendants, proceeded to manufacture false evidence and create a false theory that would convict Virginia of William's death.

44.  As one example of these fabrications, at different points Ferguson worked with Defendant Dr. Robert Raker and Defendants Ken Ballantine and Bill Hatfield of the Newark Police Department to examine William's body for injection markings and/or obtain various tissue samples from William's body.

45.  Defendant Ferguson then reported that he found increased levels of amitriptyline in a sample from William's left buttocks compared to other areas of William's body. In fact, a higher level in William's buttocks was consistent with the fact that hospital staff had injected thiamine there,

causing blood to pool at the site over the many hours that William lay on his back as well as the extended time following his death that his body was stored on its back. The pooled blood caused the amitriptyline levels to remain higher there than in other areas of William's body.

46. Instead of acknowledging this simple and obvious explanation, Defendant Ferguson devised a theory that William had been injected in the buttocks with amitriptyline.

47. To bolster his claim, Defendant Ferguson falsely reported that William's amitriptyline levels increased during William's hospitalization. This was absolutely untrue. Based on this contrived "fact," Ferguson claimed that the amitriptyline injection caused a pocket to form in the muscle underlying the injection site. Ferguson reported that the medication then leaked slowly from this pocket into William's bloodstream during his 18-hour hospital stay, thus making his amitriptyline levels rise over time.

48. Defendant Ferguson has since admitted that this "pocket theory" was a concocted one.

49. In addition, Ferguson's theory relied entirely on false data. As stated above, contrary to Ferguson's claim, William's amitriptyline levels did *not* increase during his hospitalization; they actually decreased. This fact was documented in Defendant Raker's notes, crucial exculpatory

evidence that Defendants Raker, Ferguson, Ballantine and Hatfield withheld from Ms. LeFever and her lawyers before and during her trial for murder.

50. The decrease in the amitriptyline levels was consistent with the normal elimination of the drug – which William had orally ingested – from William's body.

51. In addition, several scientific experts have negated the theory that William was injected with amitriptyline on numerous grounds. One of these grounds is that William did not experience any of the observable symptoms that would have resulted if he had been injected with the drug. For instance, if William had been injected with amitriptyline, there would have been talc crystals in his lungs, of which there were none. Also, the site of the supposed injection would have featured a golf-ball sized lump and obvious inflammation; there were no such features. In addition, it would have been virtually impossible for a person (even a nurse) to obtain injectible amitriptyline at the time of William's death, or to melt down tablets to use for injection.

52. Defendant Ferguson manufactured false reports about his claim that William was injected with amitriptyline, along with other supposedly scientific testing, theories and conclusions that he and the Defendants procured or devised. The Individual Defendants' manipulation of the evidence and the

11

manner in which that manipulation was undertaken was never disclosed to Ms. LeFever or her defense team.

### Defendant Ferguson's Proven Lies

53.   At Ms. LeFever's murder trial in 1990, Defendant Ferguson testified that he had received a college degree from Ohio State University in 1972. This was a lie. Ferguson did not receive any bachelor's degree until 16 years later, in December 1987.

54.   Until just months before Ferguson began investigating William LeFever's death, therefore, he had no college degree whatsoever, despite having represented for years in various courts that he was a qualified forensic scientist.

55.   In addition, Ferguson's academic record at Ohio State University was so poor that a veteran biochemistry professor there testified that someone with Ferguson's credentials should have had no chance of getting a degree.

56.   For example, Defendant Ferguson failed to take six of the 15 courses required for his degree. He failed chemistry courses seven times, and received D's in other classes. Defendant Ferguson was on academic probation for eight of his quarters at Ohio State.

57.   An investigation by a Columbus news outlet revealed that no one from Ohio State University could explain how

12

Defendant Ferguson ultimately received his science degree in light of his woeful academic record.

58. Since the 1960s, Ferguson has testified as an "expert witness" at hundreds of criminal trials, and in those trials he repeatedly lied under oath about his qualifications.

59. Defendant Ferguson also lied about his qualifications in his *curriculum vitae*, in a 1973 scientific article that he published, and in a letter to a superior, in which he falsely claimed that he was at the "master's degree level" and was pursuing a doctorate in forensic science that he expected to receive soon thereafter. He never received any graduate degree.

60. At his April 2008 deposition in a related case, Defendant Ferguson again lied under oath about his qualifications.

## Defendant Ferguson's Conviction for Falsifying His Qualifications as a Scientist

61. In April 2010, a prosecutor specially-appointed by the Licking County prosecutor filed two charges of falsification against Defendant Ferguson.

62. In response, Defendant Ferguson pleaded no contest.

63. Ferguson was convicted of lying under oath, and in May 2010 Judge Michael Higgins sentenced him to 180 days in jail, with 150 days suspended, and probation. At the hearing, Judge Higgins characterized Ferguson's lie as "a material fact" and

stated: "Through your lie, you deprived two parties of justice," referring to Ms. LeFever and to the State of Ohio.

64. Defendant Ferguson also lied under oath about his credentials as a scientist in many other trials, resulting in numerous wrongful convictions of criminal defendants in addition to Ms. LeFever.

65. For instance, Denni Frase was sentenced to 15 years to life in prison for poisoning her boyfriend after Defendant Ferguson opined under oath about the alleged levels of morphine in her boyfriend's body when he died. Defendant Ferguson lied about his credentials at that trial.

66. As another example, Benjamin Uselton was sentenced to more than ten years in prison after Defendant Ferguson testified that Mr. Uselton's friends, to whom he had sold Xanax, had taken enough of the drug to cause their fatal car crash. Ferguson's testimony contradicted the findings of a Cuyahoga County toxicologist, who had found that there was not enough of the drug in the friends' bodies to have caused their deaths. Defendant Ferguson lied about his credentials at that trial as well.

### Ms. LeFever's Trial

67. In 1990, fourteen months after Ms. LeFever was arrested, she stood trial on the charge of murdering William LeFever.

14

68. At trial, Defendant Ferguson testified to his concocted "pocket theory" that William was injected with amitriptyline, relying on the false data that William's amitriptyline levels increased during his hospitalization

69. Defendant Raker also testified at trial that William's amitriptyline levels were increasing at the hospital, and that this led to his conclusion that William had been injected with the drug.

70. Ms. LeFever could not rebut this damning contention because Defendants had hidden the fact that William's amitriptyline levels had actually decreased at the hospital. Without that evidence, at trial Ms. LeFever had no way to explain why William's amitriptyline levels would increase if he had not been injected with amitriptyline.

71. Although the State could not tie Ms. LeFever to any physical evidence or to a motive to kill William, Defendants' false scientific evidence was insurmountable. The prosecutor's closing focused on the centrality of the scientific evidence to Ms. LeFever's conviction: "We have the testimony, the medical testimony. We have [Defendant Raker's] testimony, and we have Dr. Fardal's testimony. We have the police, and everything is connected to one thing, and that is the testimony of Jim Ferguson."

72.  Ms. LeFever testified at trial protesting her innocence and describing William's troubled life and suicidal gestures. Although she also called multiple witnesses to corroborate her testimony, she was nevertheless wrongfully convicted of aggravated murder and sentenced to life in prison due to Defendants' misconduct.

### Ms. LeFever's Exoneration

73.  Throughout her incarceration, Ms. LeFever maintained her innocence, and she and her lawyers worked for years to try to prove it.

74.  In 1998, Federal Judge John D. Holschuh wrote that "if this Court were deciding the guilt or innocence of the Petitioner *de novo*, the Court would find there is reasonable doubt as to the Petitioner's guilt," but nonetheless her petition for *habeas corpus* was denied.

75.  Years later, armed with the evidence of Defendant Ferguson's lies, along with other evidence, Ms. LeFever petitioned for a new trial.

76.  Ms. LeFever had obtained new evidence through a civil action that she brought in 2005 to have William's official cause of death changed to reflect his actual cause of death. It was only through that case that she first uncovered Defendants' lies, including that that William's amitriptyline levels had actually been decreasing at the hospital, that Ferguson had been

lying about his credentials, and that Ferguson's theory of Ms.
LeFever's guilt was a complete fabrication.

77.  On November 22, 2010, the same judge who convicted Ms.
LeFever of murder more than 20 years before, Judge Wiest,
granted Ms. LeFever's motion for a new trial and ordered her
released from prison immediately.

78.  In April 2011, Licking County prosecutor Ken Oswalt,
who had prosecuted Ms. LeFever decades before, dismissed the
case against her.

### Ms. LeFever's Damages

79.  Ms. LeFever spent over 22 years in jail and prison for
a crime that she did not commit, suffering greatly.

80.  Most traumatically, Ms. LeFever's false incarceration
meant a devastating separation from her three young children.
While she was imprisoned based on false charges, these children
were placed in foster care. Over the next 22 years, Ms. LeFever
was rarely able to see or talk to any of her children.

81.  In prison, Ms. LeFever missed all of her children's
important milestones, including two marriages and the birth of
six grandchildren. She was unable to form relationships with any
of her grandchildren.

82.  Ms. LeFever also missed out on all the "ordinary"
stages of her children's lives that are precious to a parent.
She was unable to take her youngest child shopping for school

shoes, and never saw him off to kindergarten or, later, to high school. She missed all of her children's proms and graduations.

83. Tragically, both of Ms. LeFever's parents, along with a grandparent who helped raise her, died while she was in prison. She had to miss their funerals. Ms. LeFever did not hear from her brother or sister for the 22 years she was incarcerated.

84. Before she was wrongfully convicted, Ms. LeFever had devoted much of her life to building a nursing career, overcoming long odds to do so. She was only the second person in her family to get a high school degree, and the very first to go to college.

85. After her conviction, Ms. LeFever not only lost her career, but also her home, her car, and even her cat. She does not know what happened to her possessions while she was imprisoned; now, she cannot locate vital items like her diplomas or even her children's baby pictures.

86. The decades of prison, during which Ms. LeFever did not know if she would ever be released, were incredibly difficult and lonely for her. She almost never saw anyone she knew from her previous life. She was denied her fundamental freedom to live as an autonomous human being. Her physical health suffered. Some nights in prison, Ms. LeFever prayed that she would not wake up the next morning.

87.  At 60 years old, Ms. LeFever must now make a new life for herself, coping with the toll that prison took on her and the awareness that she lost more than two decades of rich life experiences and relationships.

### Count I - 42 U.S.C. § 1983
### Due Process

88.  Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

89.  As described more fully above, all of the Individual Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of her constitutional right to a fair trial.

90.  In the manner described more fully above, the Individual Defendants deliberately withheld exculpatory evidence, of which the exculpatory value was apparent, as well as knowingly procured and/or manufactured false reports and other evidence that was material to Plaintiff's criminal case, thereby misleading and misdirecting the criminal prosecution. Absent the totality of this misconduct, the prosecution of Plaintiff either could not and would not have been pursued, or the outcome of Plaintiff's trial would have been different.

91.  The Individual Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby

19

denying her constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

92.  As a result of this violation of her constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

93.  The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

94.  The misconduct described in this Count was undertaken pursuant to the policy and practice of the Newark Police Department to pursue wrongful convictions through profoundly flawed investigations and coerced evidence. In this way, the Defendant City of Newark violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

95.  These widespread practices, so well-settled as to constitute *de facto* policy in the Newark Police Department, were able to exist and thrive because municipal policymakers with authority over the Department exhibited deliberate indifference to the problem, thereby effectively ratifying it.

96.  The widespread practices described in the preceding paragraphs were allowed to flourish because the City of Newark declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment.

### Count II – 42 U.S.C. § 1983
### Fourth Amendment

97.  Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

98.  As described more fully above, all of the Individual Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of her constitutional right to be free from unreasonable seizure and detention.

99.  In the manner described more fully above, the Individual Defendants unreasonably seized and/or caused the continued detention of Plaintiff without probable cause, in violation of the Fourth Amendment to the United States Constitution.

100. As a result of this violation of her right to be free from unlawful seizure and detention, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

101. The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken

intentionally with willful indifference to Plaintiff's constitutional rights.

102. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Newark Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the Defendant City of Newark with final policymaking authority.

## Count III – 42 U.S.C. § 1983
## Malicious Prosecution

103. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

104. As described more fully above, all of the Individual Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of her constitutional right to be free from unlawful prosecution.

105. In the manner described more fully above, the Individual Defendants made, influenced and/or participated in the decision to prosecute Plaintiff for murder, for which prosecution there was no probable cause and which caused Plaintiff to suffer a deprivation of liberty. Their misconduct included falsifying evidence and withholding exculpatory evidence.

106. As more fully described above, the prosecution was resolved in Plaintiff's favor.

107. The Individual Defendants' misconduct directly resulted in the unlawful prosecution and deprivation of Plaintiff's liberty in violation of her constitutional rights.

108. As a result of this violation of her constitutional rights, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

109. The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Plaintiff's constitutional rights.

110. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Newark Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the Defendant City of Newark with final policymaking authority.

### Count IV – 42 U.S.C. § 1983
### Failure to Intervene

111. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

112. In the manner described above, during the constitutional violations described above, one or more of the

23

Individual Defendants stood by without intervening to prevent the misconduct.

113. These Individual Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

114. As a result of the Individual Defendants' misconduct, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

115. The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights, as well as under color of law and within the scope of their employment.

116. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Newark Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the Defendant City of Newark with final policymaking authority.

## Count V - 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

117. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

118. After the death of William LeFever, the Individual Defendants reached an agreement and plan amongst themselves to frame Plaintiff for the crime of murder, and to thereby deprive

24

Plaintiff of her constitutional rights, all as described in the various Paragraphs of this Complaint.

119. Independently, before and after Plaintiff's conviction, each of the Individual Defendants further conspired, and continues to conspire, to deprive Plaintiff of exculpatory materials to which she was lawfully entitled and which would have led to her more timely exoneration of the false charges as described in the various Paragraphs of this Complaint. Each Defendant shared in the objective of depriving Plaintiff of her constitutional rights in this way.

120. In this manner, the Individual Defendants, acting in concert with other unknown co-conspirators, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

121. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

122. As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

123. The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's

constitutional rights, as well as under color of law and within the scope of their employment.

124. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Newark Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the Defendant City of Newark with final policymaking authority.

## Count VI - State Law Claim
## Denial of Access to Courts

125. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

126. In the manner described above, each of the Individual Defendants, all while acting individually, jointly and in conspiracy, denied Plaintiff the right of access to courts by their wrongful suppression and destruction of information and evidence which deprived Plaintiff of constitutional claims against potential Defendants.

127. Other claims were diminished by the passage of years, and the accompanying erosion of evidence necessary to prove these claims against those Defendants.

128. These Individual Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

129. The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken

intentionally with willful indifference to Plaintiff's constitutional rights, as well as under color of law and within the scope of their employment.

### Count VII – State Law Claim
### Intentional Misrepresentation

130. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

131. As described more fully above, Defendants Ferguson and Raker made representations to the prosecution that there were medical and scientific facts proving that Ms. LeFever killed her husband, and Defendant Ferguson made representations to the prosecution that he was qualified and educated as a scientist in ways that he was not.

132. Defendants Ferguson's and Raker's statements were not true, but the prosecution relied on them nevertheless to prosecute and convict Ms. LeFever of the murder of her husband.

133. Defendants Ferguson and Raker knew that their statements were untrue and/or they were reckless in making that representation.

134. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by Defendants Ferguson and Raker within the scope of their employment and/or official responsibilities.

135. In addition, in making those representations, Defendants Ferguson and Raker intended to deceive the police and/or prosecution.

136. As a result of these misrepresentations, Plaintiff suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

### Count VIII — State Law Claim
### Intentional Infliction of Emotional Distress

137. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

138. In the manner described more fully above, by wrongfully inculpating Plaintiff in a crime she did not commit, Defendant Ferguson intended to cause emotional distress, or knew that his actions would result in serious emotional distress to Plaintiff.

139. In doing so, Defendant Ferguson's conduct was extreme and outrageous, going beyond all possible bounds of decency such that it was intolerable in a civilized community, and this conduct caused Plaintiff severe, debilitating emotional distress of a nature that no reasonable person can be expected to endure.

140. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by Defendant Ferguson within the scope of his employment and/or official responsibilities.

141. As a result of this misconduct, Plaintiff sustained injuries, including bodily harm and emotional pain and suffering, as is more fully alleged above.

### Count IX – State Law Claim
### Malicious Prosecution

142. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

143. Through their actions as described above, Individual Defendants caused Plaintiff to be improperly subjected to a prosecution for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor.

144. The Individual Defendants accused Plaintiff of criminal activities knowing those accusations to be without genuine probable cause, fabricated evidence and withheld the manner in which that evidence was fabricated, and Defendants Ferguson and Raker made statements and reports to the police and prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

145. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Individual Defendants within the scope of their employment and/or official responsibilities.

146. As a result of this misconduct, Plaintiff sustained injuries, including bodily harm and emotional pain and suffering, as more fully alleged above.

### Count X – State Law Claim
### False Imprisonment

147. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

148. As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, intentionally caused Plaintiff to be unlawfully detained.

149. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Individual Defendants within the scope of their employment and/or official responsibilities.

150. As a result of this misconduct, Plaintiff sustained injuries, including bodily harm and emotional pain and suffering, as more fully alleged above.

### County XI – State Law Claim
### Negligent Hiring, Supervision, and Retention

151. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

152. As described more fully above, Defendant Franklin County hired and/or employed Defendant James Ferguson despite

having actual or constructive knowledge of his incompetence to perform the job for which Defendant County employed him.

153. As a result of the County's misconduct in hiring and/or retaining Defendant Ferguson, Plaintiff sustained injuries, including bodily harm and emotional pain and suffering, as more fully alleged above.

### Count XII - State Law Claim
### Loss of Consortium

154. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

155. As a result of Defendants' bad acts and purposeful misconduct, Plaintiff suffered the loss of consortium with her children, including a loss of society, companionship, comfort, love, and solace between her and her children.

### Count XIII - State Law Claim
### Indemnification

156.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

157.  Ohio law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

158.  The Individual Defendants are or were employees of the City of Newark, Licking County, or Franklin County, and acted

31

within the scope of their employment in committing the
misconduct described herein.

## Count XIV – State Law Claim
### *Respondeat Superior*

159.   Each of the Paragraphs of this Complaint is
incorporated as if restated fully herein.

160.   In committing the acts alleged in the previous
paragraphs, Individual Defendants were members and agents of the
City of Newark, Licking County, or Franklin County, acting at
all relevant times within the scope of their employment.

161.   In committing the acts alleged in the previous
paragraphs, the behavior of the Individual Defendants was
calculated to facilitate and/or promote the business for which
they were employed by their respective employers, the City of
Newark, Licking County, or Franklin County.

162.   Defendants City of Newark, Licking County, and
Franklin County are liable as the principals for all torts
committed by their agents.

WHEREFORE, Plaintiff, VIRGINIA LEFEVER, respectfully requests that this Court enter judgment in her favor and against the Defendants, JAMES FERGUSON, ROBERT RAKER, KEN BALLANTINE, BILL HATFIELD, CITY OF NEWARK, FRANKLIN COUNTY, and LICKING COUNTY, and award compensatory damages, costs and attorneys' fees, along with punitive damages against each of the Individual Defendants in their individual capacities along with whatever additional relief this Court deems appropriate.

### JURY DEMAND

Plaintiff, VIRGINIA LEFEVER, hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

Arthur Loevy
Jon Loevy
Russell Ainsworth
Samantha Liskow
LOEVY & LOEVY
312 N. May Street
Suite 100
Chicago, IL 60607
Ph: (312) 243-5900
Fx: (312) 243-5902

Paula Brown
Kravitz, Brown & Dortch, LLC
65 E. State Street, STE 200
Columbus, Ohio 43215-4277
Ph: (614) 545-5359
Fx: (614) 545-5360