**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**VIRGINIA LeFEVER,**

       **Plaintiff,**                **Case No. 2:11-cv-935**
                                       **JUDGE GREGORY L. FROST**
     **v.**                       **Magistrate Judge E.A. Preston Deavers**

**JAMES FERGUSON, et al.,**

       **Defendants.**


**ALEX LeFEVER,**

       **Plaintiff,**                **Case No. 2:12-cv-664**
                                       **JUDGE GREGORY L. FROST**
     **v.**                       **Magistrate Judge E.A. Preston Deavers**

**JAMES FERGUSON, et al.,**

       **Defendants.**


<u>**OPINION AND ORDER**</u>

This matter is before the Court on the motion to dismiss Plaintiff Alex LeFever's amended complaint in Case No. 2:12-cv-664 (ECF No. 39),[1] filed by Defendants Dr. Robert Raker and Licking County, Ohio.  Also before the Court are Plaintiff's memorandum contra Defendants' motion (ECF No. 47), and Defendants' reply in support of their motion to dismiss (ECF No. 53).  For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion.

---

[1] Unless otherwise indicated, all electronic case filing references in this Opinion and Order are to the docket in Case No. 2:12-cv-664.

# I.    Background

Plaintiff Alex LeFever was four years old when his mother, Virginia LeFever (the

Plaintiff in Case No. 2:11-cv-935) was arrested and indicted for the murder of William LeFever

(Alex's father and Virginia's husband).  (Amended Compl., ECF No. 38 at PAGEID# 173.)

Virginia was convicted of the murder and sentenced to life in prison.  (*Id.*)  Almost two decades

after Virginia's conviction, the Licking County (Ohio) Court of Common Pleas granted a new

trial based upon newly discovered evidence suggesting that Virginia was convicted based on

perjured testimony of a key prosecution witness.  (*Id.* at ¶ 4, PAGEID# 174-75.)  The

circumstances surrounding Virginia's conviction and subsequent release from prison nearly two

decades later form the basis of the legal claims asserted in both Virginia's and Alex's lawsuit.

The allegedly wrongful arrest and conviction of Virginia occurred in 1988.  In August

1988, an Ohio domestic relations court awarded Virginia full custody of Alex and his siblings

during the pendency of a divorce case that Virginia had earlier filed against William.  (*Id.* at ¶

27, PAGEID# 178.)  Virginia also obtained a restraining order against William.  (*Id.* at ¶ 24.)

The final divorce hearing was scheduled to take place on September 27, 1988.  (*Id.* at ¶ 29,

PAGEID# 179.)

One week before the final divorce hearing, William came back to the family home to

have dinner with Alex and the other children, as authorized by an order of the domestic relations

court.  (*Id.* at ¶ 31.)  William fell asleep on the couch after dinner and remained at the house

overnight after Virginia could not get him to leave.  (*Id.*)  William acted strangely during the

night, similar to the manner in which he acted when he had used illegal drugs in the past.  (*Id.* at

¶ 33.)  The next day, Virginia discovered an old prescription bottle of amitriptyline, an anti-

depressant that had been prescribed to her in the past.  (*Id.* at ¶ 34.)  Only a half tablet remained

in the bottle even though there were approximately 20 pills left in the bottle the last time Virginia opened it.  (*Id.*)

Later that day, paramedics were called to the house after William became combative. (*Id.* at ¶ 35, PAGEID# 180.)  William went to the hospital, where he alternated between periods of calmness and lucidity to episodes of combativeness and incoherence.  (*Id.* at ¶ 36.)  William remained at the hospital the next day when his behavior worsened.  (*Id.* at ¶ 38.)  At some point, William admitted to a nurse that he had taken Virginia's prescription anti-depressant medication in an effort to kill himself.  (*Id.* at ¶ 39.)  Later that day, William went into cardio-pulmonary arrest and died.  (*Id.* at ¶40.)

After William died, the Newark (Ohio) police investigated the incident.  Dr. Patrick Fardahl of the Franklin County (Ohio) Coroner's Office performed an autopsy on William's body and found no physiological or pathological cause of death.  (*Id.* at ¶ 42.)  Dr. Fardahl delayed his conclusion as to the cause of death pending the results of toxicology tests.  (*Id.*)  At that time, Defendant James Ferguson was the chief toxicologist for the Franklin County Coroner's Office.  (*Id.* at ¶ 43, PAGEID# 181.)  Plaintiff alleges that Ferguson and the other individual defendants manufactured false evidence to support a concocted theory that Virginia murdered William by injecting him with amitriptyline and "rodent killing toxins."  (*Id.* at ¶¶ 44-45.)

Plaintiff alleges that Defendants Ken Ballantine, Bill Hatfield, and Dr. Robert Raker examined William's body for injection markings and obtained various tissue samples to support their "false theory" that Virginia murdered William.  (*Id.* at ¶ 46.)  Ferguson then reported finding increased levels of amitriptyline in a sample taken from William's left buttock compared to other areas of his body.  (*Id.* at ¶ 47.)  The increased levels of amitriptyline were consistent

with the fact that hospital staff had injected him with Thiamine in the left buttock, causing blood to pool at that injection site over the many hours William lay on his back.  (*Id.*)  Plaintiff alleges that the pooled blood caused the amitriptyline to remain higher there than in other areas of the body—a fact that Ferguson knew but did not disclose to others.  (*Id.*) Ferguson also testified at Virginia's trial that William's amitriptyline levels increased during William's hospitalization, under a theory that Ferguson later admitted was "concocted."  (*Id.* at ¶ 48, PAGEID# 181-82.) William's amitriptyline levels actually decreased during his hospitalization, a fact that Defendant Raker documented in his notes, but one that was withheld from lawyers representing Virginia in her criminal trial.  (*Id.* at ¶ 50, PAGEID# 182.)  The decrease in amitriptyline levels in William's body is consistent with the body's normal elimination of the drug and, in turn, consistent with the theory that William committed suicide.  (*Id.* at ¶ 51.)

Plaintiff also alleges that Defendant Raker gave false testimony at Virginia's murder trial. (*Id.* at ¶ 71, PAGEID# 186.)  Like Ferguson, Raker testified that the amitriptyline levels in William's body increased during his hospital stay when those levels, in fact, decreased.  (*Id.*) Defendants also "hid" hospital records showing that amitriptyline levels actually decreased in William's body.  (*Id.* at ¶ 72.)  The prosecution emphasized the "fake scientific evidence" at trial and, in particular, the toxicology testimony of Ferguson to corroborate the prosecution theory that Virginia poisoned her husband to death.  (*Id.* at ¶ 73.)  Virginia was ultimately convicted of aggravated murder and sentenced to life in prison.  After Virginia's conviction, Ferguson wrote a "book or screen play" about the trial, portraying himself as hero whose toxicology analysis solved William's death and proved that Virginia murdered him.  (*Id.* at ¶¶ 77-79, PAGEID# 187.)

Virginia maintained her innocence throughout.  In 2005, she brought a civil action to have William's official cause of death changed to accurately reflect the actual cause of William's demise.  (*Id.* at ¶ 86, PAGEID# 188.)  It was through this civil action that Virginia was able to discover Defendants' lies and Ferguson's checkered past.  In addition to the "concocted" results of the toxicology test, Virginia discovered that Defendant Ferguson lied about his background and credentials to be a forensic toxicologist.  At Virginia's murder trial, Ferguson testified that he received a degree from The Ohio State University in 1972.  (*Id.* at ¶ 54, PAGEID# 183.)  In fact, Ferguson did not obtain his college degree until December 1987, less than a year before he began investigating William's death.  (*Id.* at ¶ 55.)  Yet, since the 1960s, Ferguson represented in various courts that he was a qualified forensic scientist and was permitted by Defendant Franklin County to testify as an "expert witness" at hundreds of criminal trials in which he lied about his qualifications.  (*Id.* at ¶¶ 55 and 59, PAGEID# 183-84.)

In 2010, Ferguson pleaded no contest to falsification charges and was convicted of lying under oath.  (*Id.* at ¶¶ 63-65, PAGEID# 184-85.)  Armed with evidence of Ferguson's lies and checkered past, Virginia sought a new trial.  (*Id.* at ¶¶ 83-85.)  In November 2010, the same judge who presided over her criminal trial two decades earlier granted Virginia's motion for a new trial and ordered Virginia's immediate release from prison.  (*Id.* at ¶ 87.)  In April 2011, the Licking County prosecutor dismissed the case against Virginia.  (*Id.* at ¶ 88.)  At the time of Virginia's release from prison, Alex was 26 years old.  (*Id.* at ¶ 89.)  Plaintiff alleges that he was wrongly separated from his mother during his formative years and that his mother's arrest and subsequent conviction caused him to be unlawfully seized and taken into custody by Licking County Children's Services.  (*Id.* at ¶¶ 89-119, PAGEID# 188-195.)

In Case No. 2:11-cv-935, Virginia filed suit against Ferguson, Officer Ken Ballantine, Officer Bill Hatfield, Dr. Robert Raker, the City of Newark, Franklin County, and Licking County, alleging federal and state causes of action arising out of her wrongful arrest and conviction for her husband's murder.  (ECF No. 2 in Case No. 2:11-cv-935.)[2]  In Case No. 2:12-cv-664, Alex followed suit, asserting federal and state claims against the same Defendants. Alex's amended complaint in this case alleges violation of his constitutional rights and tortious conduct by Defendants in connection with the injuries allegedly arising out of his mother's wrongful arrest and conviction for murdering William.

Defendants Raker and Licking County have moved to dismiss Alex's amended complaint in its entirety under Fed. R. Civ. P. 12(b)(6).  (ECF No. 38.)  That motion is fully briefed and ripe for this Court's adjudication.

## II.    Discussion

Dismissal under Fed. R. Civ. P. 12(b)(6) is proper if a complaint fails to state a claim upon which a court can grant relief.  To survive a motion to dismiss, a complaint must provide fair notice of what the claim is and the grounds upon which it rests, and it must set forth sufficient factual allegations suggesting that the plaintiff is entitled to relief under those claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Considering the well-pleaded facts, a complaint must "state a claim to relief that is plausible on its face."  *Id.*

A court, in ruling on a Rule 12(b)(6) motion, must construe the complaint in the light most favorable to the plaintiff and treat all well-pleaded allegations contained therein as true.  *Id*. at 555–56.  The defendant bears the burden of demonstrating that the plaintiff has failed to state a

---

[2] Virginia's Complaint also named unknown employees of the City of Newark, Franklin County, and Licking County as John Doe defendants.

claim for relief.  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  The purpose of a motion to dismiss under Rule 12(b)(6) "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  If there is an absence of law to support the type of claim made, or if the facts alleged are insufficient to state a valid claim, or if on the face of the complaint there is an insurmountable bar to relief, dismissal of the action is proper.  *Little v. UNUM Provident Corp.,* 196 F. Supp. 2d 659, 662 (S.D. Ohio 2002) (citing *Ranch v. Day & Night Mfg. Corp.,* 576 F.2d 697 (6th Cir.1978)).

### A. First Claim:  § 1983 Substantive Due Process

In his first claim, Alex alleges a violation of 42 U.S.C. § 1983.  In order to survive dismissal under Fed. R. Civ. P. 12(b)(6), the amended complaint must assert (1) that Defendants were acting under color of state law and (2) that Defendants violated Alex's constitutional or statutory rights secured by federal law.  *See Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982)).  Here, there is no question raised as to the allegations that Defendants Raker and Licking County acted under color of state law.  The focus of Defendants' motion to dismiss is on the second element—whether Alex has alleged a violation of a constitutional right that is cognizable in a § 1983 action.

Alex's first claim alleges Defendants' alleged violation of his substantive due process right to be raised by his mother.  In other words, Alex alleges that the wrongful arrest and conviction of Virginia caused him to be removed from his home and separated from his mother, therefore violating his "constitutional right to family integrity," which he alleges to be guaranteed him by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  (Amended Compl. ¶¶ 95-99, ECF No. 38 at PAGEID# 190.)  Defendants argue

that Alex fails to state a valid claim for relief because the Sixth Circuit Court of Appeals does not recognize this theory as a valid basis for § 1983 relief.  Defendants characterize Alex's allegations in the First Claim as pleading a "derivative claim" – one that seeks damages for "collateral injuries" to Alex resulting from constitutional violations against Virginia – that the Sixth Circuit declined to recognize as recently as last year.

In *Foos v. City of Delaware*, No. 10-4234, 2012 U.S. App. LEXIS 14842 (6th Cir. July 16, 2012), the Sixth Circuit confronted a claim similar to the one that Alex asserts here.  In that case, the parents of a decedent sued for damages after their son died following an altercation with police.  Among other claims, the parents asserted a claim under § 1983 for "deprivation of familial relationships."  *Id.* at *12.  The Sixth Circuit affirmed this Court's grant of summary judgment to the defendants on this claim.  Citing the "well established" principle that "'a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort,'" *id.* at *28 (quoting *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000)), the Court held that the parents could not invoke § 1983 to recover damages for deprivation of their rights to "familial relationships."  *Foos* at *29.  The Court repeated the oft-cited rule that Section 1983 does not provide a remedy "'for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members.'"  *Id.* at *28-29 (quoting *Claybrook*, 199 F.3d at 357).

Defendants argue that the same principles set forth in *Foos* and *Claybrook* (among other cases) dictate dismissal of Alex's deprivation of familial association claim.  Because the allegations of the Amended Complaint demonstrate that Alex is trying to recover for injuries that are purely "derivative" of the alleged constitutional violations committed directly against Virginia LeFever, Defendants argue that Alex cannot establish a substantive due process claim

cognizable under § 1983.  In other words, Virginia was "the party injured" by the alleged

constitutional violation (*i.e.*, her allegedly wrongful arrest, prosecution, and conviction for her

husband's murder) and is therefore the only person for whom a § 1983 claim lies.  *See Jaco v.*

*Boechle*, 739 F.2d 239, 241 (6th Cir. 1984).

   In his opposition to the motion to dismiss, Alex disputes Defendants' characterization of

his Fourteenth Amendment claim as "derivative."  While acknowledging that his claims are

related to Virginia's claims against the same Defendants, Alex contends that *he* was deprived of

*his own* personally-held constitutional right to family integrity because of Defendants'

unconstitutional conduct.  (Pl.'s Memo. Contra., ECF No. 47 at PAGEID# 272.)  Alex also notes

that there are "many examples" of cases in which a plaintiff has a cognizable claim under § 1983

for violating the "right of family integrity" even though the unconstitutional conduct in question

was directed at someone other than the plaintiff.  (*Id.*)  For example, Alex cites cases in which

parents were found to have a § 1983 claim when their children are unconstitutionally removed

from the family home.  (*Id.*)  *See, e.g., Vinson v. Campbell County Fiscal Court*, 820 F.2d 194,

200-01 (6th Cir. 1987) (finding a cognizable § 1983 claim based on deprivation of a parent's

Fourteenth Amendment right "in the custody of her children").  Alex also cites a number of cases

from other jurisdictions (most notably *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987))

that recognize the ability of a plaintiff to assert a § 1983 claim for deprivation of the

"fundamental right to family integrity," even though the unconstitutional conduct was not

directed at them personally.  (ECF No. 47, at PAGEID# 273.)  Alex also urges this Court to

follow the lead of *Doswell v. City of Pittsburgh*, No. 07-761, 2007 U.S. Dist. LEXIS 735127

(W.D. Pa. Oct. 2, 2007), where the court denied a Rule 12(b)(6) motion to dismiss a § 1983

claim similar to the one alleged here.  *Id.* at \*13 (finding plaintiff son had stated a § 1983 claim

for deprivation of his right to support, companionship, and parenting from his father, who had been wrongfully imprisoned for 19 years).

Based upon the briefs of the parties and the Court's own research, it does not appear that the Sixth Circuit has recognized a § 1983 claim based upon a minor child's Fourteenth Amendment right to family integrity, at least in the manner that Alex would have this Court recognize it (*i.e.*, a constitutional right to be raised by his natural mother). In fact, more than 20 years ago, the Sixth Circuit declined to address the merits of a similar (if not identical) issue raised in the context of whether children could bring a § 1983 action based on the allegedly wrongful death of their father at the hands of government actors. *See Purnell v. City of Akron*, 925 F.2d 941, 949 n.6 (6th Cir. 1991) (expressly avoiding the "difficult question" of whether children could state a § 1983 claim for deprivation of parent-child relationship based on allegedly wrongful killing of their father). Though acknowledging that other circuits had recognized such claims, the Sixth Circuit noted that it had not done so because of its precedent holding that § 1983 claims are "*personal* to the injured party." *Id.* (citing *Jaco*, 739 F.2d at 241).

Since *Purnell*, the Sixth Circuit has not revisited the issue. Indeed, there does not appear to be any case (and the parties cite none) in which the Sixth Circuit allowed a child to pursue a § 1983 claim for damages based upon a government actor having deprived the child of a constitutional right to be raised by the child's natural parent. Though Alex relies on several cases from *other* jurisdictions, he points to no case from the Sixth Circuit (or from this Court for that matter) that endorses the § 1983 theory of liability he alleges in the first claim of the amended complaint.[3] If anything the court's holdings in *Claybrook* and *Foos* cut firmly *against* the notion that such a claim exists in this Circuit. *See Foos*, 2012 U.S. App. LEXIS 14842, at

---

[3] One of the cases upon which Alex relies, *Doswell v. City of Pittsburgh*, 2007 U.S. Dist. LEXIS 73527, is of little help to Alex's argument in light of the case's subsequent history. *Doswell* involved a plaintiff

*29 (affirming dismissal of § 1983 claim based on "deprivation of familial relationships");

*Claybrook*, 199 F.3d at 357-58 (finding that decedent's children could assert § 1983 claim in

their representative capacities for *their father's* injuries but *not* for their *own* personal losses; "no

cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any

other consequent collateral injuries allegedly suffered personally by the victim's family

members").  Under this Circuit's precedent, injury to Alex's "family integrity" is considered a

"collateral injury" suffered as a consequence of the alleged constitutional violation committed

against Virginia.  As such, the injury alleged in Alex's first claim of the amended complaint is

not cognizable in a § 1983 claim.

      Accordingly, the Court **GRANTS** the motion to dismiss the first claim of the Amended

Complaint.

---

who was exonerated after 19 years in prison for a rape that DNA testing showed conclusively that he did
not commit. *Id.* at *1-2.  In the decision Alex cites in his memorandum contra, Judge Ambrose denied the
City's motion to dismiss the § 1983 claim of the co-plaintiff son (who was four years old at the time of
his father's wrongful conviction), finding that the parties had cited no authority to foreclose the son's
claim that the wrongful conviction violated his "familial and associational rights guaranteed by the 14th
Amendment." *Id.* at *11-14.  In a later decision, however, Judge Ambrose granted the defendants'
motion for summary judgment on the son's "right to familial association" claim.  *Doswell v. City of
Pittsburgh*, No. 07-761, 2009 U.S. Dist. LEXIS 51435, at *39-43 (W.D. Pa. June 16, 2009).  Even though
Judge Ambrose was "inclined to find" that the son had a constitutionally protected right to the
companionship with his father, the court nevertheless found that the son could not establish a § 1983
violation because the Fourteenth Amendment Due Process Clause forbids only *deliberate* decisions by
government officials to deprive a person of a protectable interest.  *Id.* at *41.  Because the plaintiff son
could not demonstrate that the state action at issue "was specifically aimed at interfering with protected
aspects of the parent-child relationship," he could not sustain his § 1983 claim.

### B.  Second Claim:  § 1983 Based on Fourth Amendment Violation

Defendants Raker and Licking County also move to dismiss the amended complaint's second claim, which alleges a § 1983 claim based upon the violation of Alex's Fourth Amendment right to be free from unreasonable seizure.  (Am. Compl., ECF No. 38 at PAGEID# 193-195.)[4]  Alex alleges that the wrongful arrest and conviction of his mother led directly to *him* being seized without a warrant or court order by Licking County Children's Services.  (*Id.*)

### 1.  Fourth Amendment Claim as a "Derivative" Claim

In their first argument for dismissal of this claim under Rule 12(b)(6), Defendants rely on the same rationale underlying their motion to dismiss the Fourteenth Amendment claim analyzed above: Defendants characterize Alex's Fourth Amendment claim as "derivative" of Virginia's constitutional claim.  (Mot. to Dismiss, ECF No. 39 at PAGEID# 205.)  Defendants argue that the Fourth Amendment claim is but another way of vindicating the "right to family integrity." (*Id.*)  Because the "family integrity" claim is not cognizable under the Fourteenth Amendment theory advanced by Alex in the first claim, Defendants argue that Alex's Fourth Amendment claim should likewise be barred.

The Court is not persuaded by Defendants' repackaging of Alex's claim.  The allegations in the second claim are substantively different from those in the first claim analyzed above. Alex's second claim does not allege simply a violation of his right to "family integrity."  Under a fair reading of his allegations in the second claim, Alex is pursuing an entirely different theory of liability under § 1983.  He is arguing that Licking County Children's Services (through its unidentified employees) seized him without a warrant and unjustifiably removed him from his

---

[4] The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" and that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

home, in violation of his Fourth Amendment rights.  (Am. Compl. ¶ 112, ECF No. 38 at PAGEID# 194.)  This claim is not "derivative" in the sense that Defendants posit.  Alex's allegations establish that he is seeking to vindicate his *own* right to be free from unreasonable seizure under the Fourth Amendment.  While the issue of whether Alex's seizure was reasonable might be related to the issue of whether there existed valid reasons to arrest and convict Virginia for murder, it remains true that Alex's second claim is seeking to impose liability for a violation of *his* personal Fourth Amendment rights.  And numerous cases have held that the seizure of children by social workers implicates the Fourth Amendment.  *See, e.g., Krantz v. City of Toledo Police Dep't*, 197 F. App'x 446, 453 n.5 (6th Cir. 2006) (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000)); *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 809 F. Supp. 2d 754, 771 (N.D. Ohio 2011); *Walsh v. Erie Cnty. Dept. of Jobs and Family Servs.*, 240 F. Supp. 2d 731, 747 n.3 (N.D. Ohio 2003).

### 2.  Was Alex "Seized"?

Defendants argue that no Fourth Amendment claim exists as a matter of law because Alex was not "seized unlawfully" by Licking County Children's Services.  In support of this contention, Defendants attach a juvenile court complaint and a motion for ex parte emergency custody order filed in 1989.  These documents, say Defendants, show conclusively that Virginia entered into a temporary custody agreement with the foster parents with whom Alex and his siblings were placed.  (ECF No. 39 at PAGEID# 208; ECF No. 39-1 at PAGEID# 218-22.)  The Court rejects this argument as an invalid basis upon which to grant a Rule 12(b)(6) motion to dismiss.

When ruling upon a Rule 12(b)(6) motion to dismiss, the Court typically cannot consider matters outside the pleadings without converting the motion into one for summary judgment

under Fed. R. Civ. P. 56.  Defendants try to get around this rule by pointing out that the Court may consider "public records" without converting a Rule 12(b)(6) motion into a Rule 56 motion. (ECF No. 39 at PAGEID# 208 n.1.)  Indeed, the Sixth Circuit has recognized that a court may take judicial notice of at least *some* documents of public record when ruling on a Rule 12(b)(6) motion.  *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005).  But even so, taking judicial notice of such documents "is proper only for the fact of the documents' existence, and not for the truth of the matters asserted therein."  *Id.  See also Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (noting that a court should not consider public records outside the pleadings when the evidence "captures only part" of an incident and "would provide a distorted view of the events at issue").

It is not appropriate for the Court to take judicial notice of the supposed fact that Licking County Children's Services placed Alex in foster care by agreement of his mother.  To do so would go behind taking judicial notice of a public record's existence; it would accept the truth of the matters asserted in the public record, which the Court should not do in this instance.

### 3.  Statute of Limitations

Defendants also argue that the statute of limitations bars Alex's § 1983 Fourth Amendment claim.  (ECF No. 39 at PAGEID# 206.)  There is no dispute that the statute of limitations for Alex's § 1983 claims is two years, the Ohio statute of limitations for personal injury actions.  *See Wilson v. Garcia*, 471 U.S. 261, 277-78 (1985).  The parties disagree, however, on the issue of when the statute of limitations for Alex's §1983 claims began to accrue.

The statute of limitations is an affirmative defense and a plaintiff, generally speaking, is not required to plead the lack of affirmative defenses to state a valid claim.  *See* Fed. R. Civ. P. 8(a) and 8(c).  As Alex points out in his opposition to Defendants' motion to dismiss, a motion

under Rule 12(b)(6), which considers only the allegations in the complaint, is generally not the proper vehicle for dismissing a claim based upon the affirmative defense of the statute of limitations.  (ECF No. 47 at PAGEID# 290-91.)  But when the allegations in the complaint affirmatively show that the claim is time-barred, dismissing the claim under Rule 12(b)(6) is appropriate.  *Jones v. Bock*, 549 U.S. 199, 215 (2007).  Thus, the Court must determine if the allegations in Alex's amended complaint affirmatively show that his § 1983 claim is time-barred.

The allegedly unlawful seizure of Alex occurred when he was four years old.  Under Ohio law, this means that the statute of limitations was tolled until Alex reached 18 years of age—the age of majority in Ohio.  Ohio Rev. Code § 2305.16.[5]  Defendants therefore argue that Alex had until 2004—two years after he turned 18 in 2002—to bring any § 1983 claim based upon the occurrences alleged in the Complaint.  (ECF No. 39 at PAGEID# 206.)  Alex responds, however, that the statute remained tolled until he "knew or had reason to know he needed to protect his rights."  (ECF No. 47 at PAGEID# 286.)  Alex therefore argues that the statute of limitations did not begin to run until after his mother was released from prison.  (*Id.* at PAGEID# 287.)  Then and only then, Alex argues, could he assert a § 1983 claim that was based on a premise that Virginia's conviction was unlawful.  (*Id.*)

The question of *when* a § 1983 claim accrues is a question of federal law that is not resolved by reference to state law.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  Under federal law, a cause of action accrues for statute of limitations purposes when a plaintiff knew or should have known of the injury that forms the basis of his claims.  *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991)).  The inquiry focuses on the harm incurred and not the plaintiff's knowledge of the facts underlying the harm.  *Id.*  In this case, Defendants argue that

_____

[5] For purposes of § 1983, federal courts generally look to the relevant state law for tolling rules.  *Wallace v. Kato*, 549 U.S. 384, 394 (2007).

Alex's § 1983 claim based on the allegedly illegal seizure of his person accrued in 2002, when Alex reached the age of majority.  Thus, the statute of limitations expired in 2004, two years after Alex turned 18 years of age.  (ECF No. 39 at PAGEID# 207.)

*Wallace* informs the statute of limitations analysis in this case.  In *Wallace*, the United States Supreme Court resolved the issue of when the statute of limitations accrued for a § 1983 claim based upon an unlawful arrest—in *Wallace*, an illegal seizure without a warrant.  *Wallace*, 549 U.S. at 389.  Looking to the common law tort of false imprisonment for guidance, the Supreme Court observed that a false imprisonment consists of "detention without legal process." *Id.*  Thus, a false imprisonment ends "once the victim becomes held *pursuant to such process*." *Id.*  Accordingly, the Supreme Court rejected the argument that the statute of limitations accrued earlier, when Wallace was released from custody.  *Id.* at 390.  Instead, the statute of limitations accrued when Wallace appeared before the magistrate and was bound over for trial (*i.e.*, the point at which he became detained pursuant to legal process).  *Id.* at 391.  Since more than two years elapsed since that event (even leaving out the period before Wallace reached the age of majority), the Supreme Court held that the § 1983 action was time-barred.

A similar result follows here.  The amended complaint alleges that Licking County Children's Services seized Alex without a warrant when he was four years old.  Alex's "detention without legal process" ended, at the latest, when he reached the age of majority in 2002.  Thus, based on the rule of *Wallace*, the statute of limitation would have accrued in 2004. *Cf. Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007) (recognizing that the statute of limitation for a § 1983 claim based on false arrest begins to run at the time of arrest or, at the latest, when detention without legal process ends) (applying *Wallace*).  As a result, the face of the amended

complaint reveals that the § 1983 claim based upon an alleged Fourth Amendment violation is time-barred.

In opposing the motion to dismiss, however, Alex invokes *Shamaeizadeh v. Cunigan*, 182 F.3d 391 (6th Cir. 1999), which he cites for the proposition that he could not have brought his § 1983 claim based on an alleged Fourth Amendment violation until the criminal charges were dismissed in his mother's favor.  (ECF No. 47 at PAGEID# 287.)  In *Shamaeizadeh*, the Sixth Circuit had to decide when the statute of limitations accrued for a plaintiff who was neither tried nor convicted of a crime, but who asserted a § 1983 claim based on his false arrest.  To decide the issue, the Sixth Circuit evaluated whether the rule of *Heck v. Humphrey*, 512 U.S. 477 (1994), applied in the so-called "pre-conviction" context (*i.e.*, when the § 1983 plaintiff was not convicted).  In *Heck*, the Supreme Court held that a § 1983 claim that would, if successful, necessarily imply the invalidity of a conviction does not accrue until the conviction is invalidated.  *Id.* at 489-90.  The Sixth Circuit in *Shamaeizadeh* extended the *Heck* rule to the pre-conviction context, holding that the statute of limitations did not begin to run until the date of dismissal of the criminal charges against the *Shamaeizadeh* plaintiff.  *Shamaeizadeh*, 182 F.3d at 399.  In this case, Alex uses *Shamaeizadeh* to argue that the statute of limitations for his § 1983 claims could not begin to run until Virginia was released from prison and the criminal charges against her dismissed.  (ECF No. 47 at PAGEID# 288.)

The Court rejects Alex's position for two reasons.  For one, *Shamaeizadeh* is no longer good law.  The Sixth Circuit has recognized that the Supreme Court's decision in *Wallace* effectively abrogated the holding in *Shamaeizadeh*.  *Fox*, 489 F.3d at 233.  The statute of limitations for an unlawful seizure accrues at the time the defendant becomes detained pursuant to legal process, and no later.  *Id.*  Even if this Court were to indulge the possibility that the

17

accrual of Alex's § 1983 claim was somehow dependent upon the dismissal of charges against someone else—a proposition for which Alex cites no authority—he cannot rely on *Shamaeizadeh* to support that proposition.

Second, and perhaps more basic, the Court finds that the delayed accrual rule from *Heck* or *Shamaeizadeh* is not applicable in any event to the situation Alex presents in his Fourth Amendment claim. The premise of the *Heck* rule is that a § 1983 plaintiff does not have a damages claim based on an allegedly unconstitutional conviction unless the conviction has been reversed on direct appeal or otherwise invalidated. *Heck*, 512 U.S. at 486-87. "Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff *would necessarily imply the invalidity of his conviction or sentence*; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487 (emphasis added). Even assuming that a plaintiff could assert a cognizable § 1983 claim based upon the invalidity *of someone else's* conviction or sentence, the *Heck* rule is not implicated here because Alex's Fourth Amendment claim does not *necessarily* depend on the invalidity of his mother's conviction. As Alex himself argues, the Fourth Amendment claim is not "derivative" of his mother's constitutional claims, as it is based upon the allegedly unconstitutional seizure perpetrated upon him when he was four years of age. In other words, Alex could have pursued his claims against the county defendants who seized him without necessarily impugning the validity of his mother's arrest and conviction. *See Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 640 (6th Cir. 2007).

While Alex might have wanted to use the alleged invalidity of his mother's arrest and conviction to bolster his contention that he never should have been seized by Licking County

Children's Services, his Fourth Amendment claim did not *necessarily* rest upon establishing that his mother was wrongfully arrested and/or convicted.  Indeed, the Fourth Amendment allegations in the amended complaint target the unreasonableness of Alex's seizure by Children's Services, allegedly without probable cause, a warrant, or exigent circumstances.  (Am. Compl., ECF No. 38 at PAGEID# 194-95.)  Alex could have raised these issues without regard to the legality of Virginia's arrest and subsequent conviction.

The face of the amended complaint conclusively establishes that Alex's § 1983 claim based on an alleged Fourth Amendment violation is time-barred.[6]

### C.  §1983 Conspiracy

The Amended Complaint arguably alleges a claim for a § 1983 conspiracy to deprive Alex of his Fourth Amendment rights.  (Am. Compl. ¶ 107, ECF No. 38 at PAGEID# 193.)  Defendants argue that dismissal of this claim is appropriate because there is no underlying constitutional violation upon which it is based.  *See Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009).

The Court finds Defendants' argument well taken.  As analyzed above, Alex has failed to state a cognizable claim for relief with regard to either § 1983 claim alleged in the amended complaint.  Having failed to set forth an actionable constitutional violation, Alex cannot state a claim for § 1983 conspiracy.  The Court therefore dismissed Alex's conspiracy claim.

### D.  State Law Claims

The amended complaint also alleges state law claims for intentional infliction of emotional distress (against Dr. Raker and the other individual defendants only) and loss of

---

[6] In light of the Court's disposition of § 1983 Due Process claim on the merits and the § 1983 Fourth Amendment claim on statute of limitations grounds, the Court need not address Defendants' remaining arguments for dismissal of the § 1983 claims (*viz.*, qualified immunity for Dr. Raker and failure to allege a viable "policy or custom" claim for entity liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

consortium (against all defendants).  Defendants argue that each of these claims is barred by the statute of limitations.  Both claims are subject to Ohio's four-year statute of limitations.  *See* Ohio Rev. Code § 2305.09(D).

As an initial matter, the Court notes Defendants' argument that a *two-year*, rather than four-year, statute of limitations applies to Alex's claim for intentional infliction of emotional distress.  Citing *Wilson v. Garcia*, 471 U.S. 261, Defendants argue that Alex's claims are "premised on alleged constitutional violations," which are "classified as personal injury torts" and should therefore be subject to a two-year statute of limitations.  (ECF No. 39 at PAGEID# 215.)  In support of this position, Defendants cite Ohio authority standing for the proposition that "courts must look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded" in order to determine the applicable limitations period.  *Doe v. First United Methodist Church*, 68 Ohio St.3d 531, 536, 629 N.E. 2d 402 (1994).  Defendants cite no authority specific to whether the same principle obtains in a case in which the plaintiff is asserting a § 1983 claim *and* an intentional infliction of emotional distress claim based on the same conduct.  The Court need not decide that issue at this juncture, however, as its resolution is immaterial to resolution of Defendants' motion to dismiss.  Regardless of whether the Court applies a two- or four-year statute of limitations to the intentional infliction of emotional distress claim, the result is the same.

Alex contends that the discovery rule applies to his state-law claims, thereby preventing them from being time-barred.  Specifically, Alex argues that the statute of limitations did not begin to run until he discovered or reasonably should have discovered that his emotional distress and loss of consortium was caused by Defendants' tortious conduct.  (ECF No. 47 at PAGEID# 314.)  At the very least, Alex has pleaded facts to suggest that he did not know of his state-law

claims against Defendants until after the validity of his mother's conviction was called into question, and perhaps as late as April 2011 when the Licking County Prosecutor dismissed all charges against her. (*Id.* at PAGEID# 315.) And at least as to the loss of consortium claim, Defendants concede in their reply brief that this claim "is probably not time barred." (ECF No. 53 at PAGEID# 348.)

The Court finds that dismissal of the state-law claims under Rule 12(b)(6) based on the statute of limitations is inappropriate. As noted previously, to dismiss a claim based on the statute of limitations at the pleading stage, the complaint must *affirmatively show* that the claim is time-barred. *See, e.g., Duncan v. Leeds*, 742 F.2d 989, 991 (6th Cir. 1984). Because the Court cannot say beyond doubt that the state-law claims are time-barred based on the allegations in the amended complaint, the Court must **DENY** Defendants' motion to dismiss the third and fourth claims.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the motion to dismiss of Defendants Licking County and Dr. Raker (ECF No. 39). The Court hereby **DISMISSES** the 42 U.S.C. § 1983 claims alleged in the first and second claims of the amended complaint as to Defendants Raker and Licking County. The Court **DENIES** Defendants' motion with respect to the Ohio state-law claims alleged in the third and fourth claims of the amended complaint.

**IT IS SO ORDERED.**

/s/ Gregory L. Frost
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**