# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

VIRGINIA LeFEVER,

        Plaintiff,

        v.

JAMES FERGUSON, et al.,

        Defendants.

        Case No. 2:11-cv-935
        JUDGE GREGORY L. FROST
        Magistrate Judge E.A. Preston Deavers

ALEX LeFEVER,

        Plaintiff,

        v.

JAMES FERGUSON, et al.,

        Defendants.

        Case No. 2:12-cv-664
        JUDGE GREGORY L. FROST
        Magistrate Judge E.A. Preston Deavers

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment of Defendants Licking County, Ohio and Dr. Robert Raker (the "Licking County Defendants") on Plaintiff Virginia LeFever's claims.  (Case No. 2:11-cv-935, ECF No. 96.)[1]  Also before the Court are Virginia LeFever's combined memorandum in opposition to all Defendants' motions for summary judgment (ECF No. 114), and the Licking County Defendants' reply in support of their motion (ECF No. 130).  For the reasons explained below, the Court **GRANTS** the Licking County Defendants' motion.

---

[1] Unless otherwise indicated, all docket references in this Opinion and Order are to the docket in Case No. 2:11-cv-935.

# I.     Background

These consolidated cases arise out of Virginia LeFever's 1990 conviction for the aggravated murder of her husband, William LeFever in September 1988.  Twenty-two years after being sent to prison for the murder, the trial court judge vacated Virginia's conviction and released her from prison.  The basis for the trial court's ruling was the realization that Defendant James Ferguson, the forensic toxicologist in the Franklin County Coroner's Office who examined William LeFever's body in 1988, had lied at Virginia's trial about his credentials. Following the trial court's ruling ordering Virginia's release from prison, the Licking County (Ohio) Prosecutor dismissed the indictment against Virginia.  In the cases before the Court, Plaintiffs Virginia (Case No. 2:11-cv-935) and her son Alex LeFever (Case No. 2:12-cv-664) sue Ferguson, Newark police officers Ken Ballantine and Bill Hatfield, then-Licking County Coroner Robert Raker, the City of Newark, Ohio, Licking County, and Franklin County.

William LeFever's death occurred while his and Virginia's divorce case was pending in an Ohio domestic relations court.  In August 1988, the domestic relations court awarded Virginia full custody of the couple's minor children (Alex LeFever and his siblings) during the pendency of the divorce case.  Virginia also obtained a restraining order against William.  The final divorce hearing was scheduled to take place just six days after William's death.  Also during this time period, Virginia was finalizing arrangements to move to California with the couple's children in order to take a new job.

One week before the final divorce hearing, William came back to the family home to have dinner with Alex and the other children, as authorized by an order of the domestic relations court.  William fell asleep on the couch after dinner and remained at the house overnight. William acted strangely during the night, similar to the manner in which he acted when he had

used illegal drugs in the past.  (There is no dispute that William had problems with substance abuse.)  William was roaming around the house naked and acting as if he was hallucinating.  The next day, Virginia discovered an old prescription bottle of an antidepressant (Elavil) that had been prescribed to her in the past.  Only a half tablet remained in the bottle even though there were approximately 20 pills left in the bottle the last time Virginia opened it.

Later that day, paramedics were called to the house after William became combative. William was taken to Licking Memorial Hospital ("LMH"), where he alternated between periods of calmness and lucidity to episodes of combativeness and incoherence.  William remained at the hospital the next day when his behavior worsened.  At some point, William admitted to a nurse that he had taken Virginia's prescription anti-depressant medication in an effort to kill himself. Later that day, William went into cardio-pulmonary arrest and died.

Defendant Dr. Raker was the Licking County Coroner from 1979 through 2012.  Dr. Raker was present at LMH on when two nurses informed him that William was admitted with an overdose of amitriptyline.  Dr. Raker asked the nurses to notify him if it appeared William would die from an overdose because an overdose death fell within the jurisdiction of his office. Consistent with Dr. Raker's wishes, he was informed of William's death and arranged to have William's body transported to the morgue at LMH.  That same day, Dr. Raker spoke with Virginia to obtain information regarding the circumstances surrounding William's death.

At the LMH morgue, Dr. Raker visually examined William's body.  In his opinion, it was unusual in an overdose death to see as many bruises as were present on the body.  Accordingly, Dr. Raker thought additional investigation was necessary before the death certificate could issue. Dr. Raker contacted the Newark (Ohio) Police Department and also arranged for an autopsy to be performed on William's body.

In 1988, the Licking County Coroner's Office did not have a forensic facility and did not have the means to conduct a forensic autopsy or toxicological analysis. Dr. Raker therefore arranged to have the Franklin County (Ohio) Coroner's Office perform the autopsy. Dr. Raker had referred cases to the Franklin County Coroner's Office since 1979 or 1980. Dr. Raker was not present for the autopsy and neither performed nor observed any toxicological testing on William's body.

After the Franklin County Coroner's office completed the autopsy, William's body was returned to a funeral home in Licking County. On October 12, 1988, about three weeks after William died, Defendant Ferguson (chief toxicologist in the Franklin County Coroner's Office) asked Dr. Raker to look for any "intramuscular injection sites" on William's body. With the assistance of Detective Hatfield, Dr. Raker re-examined the body with a magnifying class and found a potential injection site on William LeFever's left buttock. Dr. Raker excised a biopsy of the area and gave it to Detective Hatfield to hand over to the Franklin County Coroner's Office. Dr. Raker performed a similar biopsy nine days later at Dr. Ferguson's request and gave those samples to Detective Hatfield. A week later, William's body was transported back to the Franklin County Coroner's Office for further examination.

Two months after William died, Dr. Raker issued the death certificate, indicating that the investigation into the cause of death was still pending. Dr. Raker later received an official report from Dr. Patrick Fardal, then the Franklin County Coroner, stating that William died of exposure to amitriptyline and nortriptyline. Dr. Raker also received a toxicology report, which opined that there was an intramuscular injection of amitriptyline due to the high levels of amitriptyline found at the potential injection site in William's buttock. The toxicology report further opined that

amitriptyline had been administered rectally due to high levels of the drug in William's lower colon.

In January 1989, four months after William's death, Dr. Raker received a supplemental toxicology report from Ferguson and Daniel Couri, Ph.D. (then the Director of Forensic Toxicology at the Franklin County Coroner's Office).  Additional toxicology tests revealed the presence of arsenic and inorganic sulfate in William's body.  Ferguson concluded that chronic and acute poisonings by arsenic and sulfur oxides contributed to William's death.  The supplemental report indicated that the "immediate cause" of William's death was amitriptyline poisoning, but that chronic and acute poisonings by sulfur oxides and arsenic contributed to "the debilitated health of Mr. LeFever."  Based on the findings and conclusions of Dr. Fardal and Ferguson, Dr. Raker did not believe that the poisoning was self-inflicted.

Following Virginia's indictment for William's murder, Dr. Raker issued a supplemental death certificate, which listed "acute amitriptyline and nortriptyline poisoning" as the cause of death and classified the manner of death as a homicide.  The supplemental death certificate further stated that William (1) suffered from acute poisoning by sulfur oxide, arsenic, and strychnine and chronic poisoning by arsenic, (2) received amitriptyline by intramuscular injection, (3) received acute poisoning by "pulmonary and rectal route," and (4) received chronic poisoning "by oral route."

Virginia was ultimately convicted of aggravated murder and sentenced to life in prison. After Virginia's conviction, Ferguson wrote a "book or screen play" about the trial, titled "Angel of Mercy or Angel of Death?" and portraying himself as a hero whose toxicology analysis solved William's death and proved that Virginia murdered him.  Virginia contends that Defendants Ferguson, Ballantine, and Raker concealed exculpatory evidence and fabricated the theory of

poisoning that led to Virginia's conviction.  As to Dr. Raker, Virginia alleges that he (1) possessed a copy of "Angel of Mercy or Angel of Death?" before Virginia's criminal trial and failed to disclose it to prosecutors and (2) failed to reveal before trial his opinion that William ingested arsenic orally, and (3) failed to reveal that he could not opine definitively about how strychnine entered William's body.  (Pl.'s Opp'n, ECF No. 114 at PAGEID# 3942-46.)

In 2010, Ferguson pleaded no contest to falsification charges and was convicted of lying under oath.  Armed with evidence of Ferguson's lies and checkered past, Virginia sought a new trial.  In November 2010, the same judge who presided over her criminal trial two decades earlier granted Virginia's motion for a new trial and ordered Virginia's immediate release from prison. In April 2011, the Licking County prosecutor dismissed the case against Virginia.  At the time of Virginia's release from prison, Alex was 26 years old.  Alex's lawsuit alleges that he was wrongly separated from his mother during his formative years and that his mother's arrest and subsequent conviction caused him to be unlawfully seized and taken into custody by Licking County Children's Services.

In Case No. 2:11-cv-935, Virginia filed suit against Ferguson, Ballantine, Hatfield, Raker, the City of Newark, Franklin County, and Licking County, alleging federal and state causes of action arising out of her wrongful arrest and conviction for her husband's murder. (ECF No. 2 in Case No. 2:11-cv-935.)  In Case No. 2:12-cv-664, Alex followed suit, asserting federal and state claims against the same Defendants.   Virginia's Complaint alleges claims for (1) liability under 42 U.S.C. § 1983 for violation of her due process rights, (2) a § 1983 claim for violation of her Fourth Amendment rights, (3) a § 1983 claim for "malicious prosecution," (4) a § 1983 claim alleging "failure to intervene," (5) a § 1983 claim for a conspiracy to deprive

her of her constitutional rights, and (6) various state law claims.  Licking County and Dr. Raker move for summary judgment on all claims asserted against them.

## II.    Discussion

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### A.  *Virginia's Abandoned Claims*

Licking County moves for summary judgment in this action, including on all of the state-law claims alleged in Virginia's Complaint.  In her opposition to summary judgment, however,

Virginia states expressly that "she will no longer pursue" some of her claims against certain Defendants.  Included among these abandoned claims are the state law claims alleged against Franklin County, Licking County, and the City of Newark.  (ECF No. 114 at PAGEID# 3923.) The County is therefore entitled to summary judgment on Virginia's state law claims.

### B.  Virginia's Remaining Claims Against Licking County

Before proceeding to the merits of Virginia's federal claims against Licking County, the Court must first determine if Virginia pleaded any.  Licking County argues that Virginia's Complaint does not allege a § 1983 claim against it, therefore precluding Virginia from imposing § 1983 liability against the County.  (ECF No. 96 at PAGEID# 3204.)  Virginia disputes this in her opposition to summary judgment, maintaining that she has asserted Section 1983 claims against Licking County under the authority of *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).  (ECF No. 114 at PAGEID# 3961.)  If Licking County is correct that Virginia has not asserted a *Monell* claim against it, the Court may summarily grant summary judgment in favor of the County, as Virginia expressly abandoned all of her state-law claims against Licking County. (ECF No. 114 at PAGEID# 3923.)  *See Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787-88 (6th Cir. 2005) (affirming the district court's refusal to consider a claim raised in opposition to summary judgment when plaintiff failed to plead it in his complaint); *Spengler v. Worthington Cylinders*, 514 F. Supp. 2d 1011, 1017 (noting that a plaintiff may not defeat summary judgment by asserting a claim not pleaded in the complaint).[2]

---

[2] Indeed, this is what happened to Virginia's claims against Franklin County.  (Opinion and Order, ECF No. 136.)

### 1.  Did Virginia Plead a *Monell* Claim Against Licking County?

Virginia alleges Section 1983 claims in Counts I, II, III, IV, and V of the Complaint.[3]

Each of these counts is structured similarly in that the first few paragraphs under each of them

describe the alleged misconduct of the "Individual Defendants."  (Compl. ¶¶ 89-93, 98-101,

104-109, 112-115, 118-123, ECF No. 2 at PAGEID# 20-26.)  The final paragraphs under each

count then go on to allege "policy" and "practice" in such a manner as to give notice that

Virginia is asserting a *Monell* theory of liability.  In Count I, Virginia alleges:

> 95.     These widespread practices, so well-settled as to constitute *de facto* policy
> in the *Newark Police Department*, were able to exist and thrive because municipal
> policymakers with authority over the Department exhibited deliberate indifference
> to the problem, thereby effectively ratifying it.
>
> 96.     The widespread practices described in the preceding paragraphs were
> allowed to flourish because *the City of Newark* declined to implement sufficient
> training and/or any legitimate mechanism for oversight or punishment.

(*Id.* ¶¶ 95-96 (emphasis added).)

Counts II through V contain different language regarding "policy" and "practice," but

also make clear that Virginia is asserting a *Monell* claim in those counts.  Each of those counts

alleges verbatim--

> The misconduct described in this Count was undertaken pursuant to the policy
> and practice *of the Newark Police Department* in the manner described more fully
> in preceding paragraphs, and was tacitly ratified by policymakers *for the
> Defendant City of Newark* with final policymaking authority.

(*Id.* ¶¶ 102, 110, 116, 124 (emphasis added).)

Notably, the "policy" and "practice" allegations are against the *City of Newark* or its

police department only.  There is no policy or practice allegation against Licking County.  Thus,

---

[3] Virginia has since abandoned Claim IV, which alleged a Section 1983 "failure to intervene" claim.
(ECF No. 114 at PAGEID# 3923.)

the Licking County Defendants argue that "Plaintiff's Complaint does not allege any *Monell* claims against Licking County."  (ECF No. 96 at PAGEID# 3204.)

Despite the Complaint being devoid of express *Monell* liability allegations against Licking County, Virginia contends that there are Section 1983 claims pending against the County.  (ECF No. 114 at PAGEID# 3957-58.)  In support of her contention, Virginia argues that "Licking County had fair notice that Ms. LeFever would pursue a *Monell* claim."  (ECF No. 114 at PAGEID# 3961.)  Unfortunately for Virginia, the notice pleading standard is not as forgiving as she would like it to be in this case.

The Court fails to see how the Complaint can give fair notice that Virginia sought to hold Licking County liable under Section 1983.  In the factual recitation preceding Counts I through V of the Complaint, and then in Counts I through V themselves, the Complaint is meticulous in laying out the facts underlying Virginia's claims.  And significantly, Virginia employed language in Counts I through V that made it quite clear she was asserting Section 1983 *Monell* liability. That language, however, specified that she was pursuing *Monell* liability *against the City of Newark only*: she did not identify Licking County as a Defendant being sued in the Section 1983 claims asserted in Counts I though V.  Nor did she specify that she was suing Dr. Raker in his official capacity as a "policymaker" in order to invoke *Monell* liability; to the contrary, Virginia made clear that Dr. Raker "is sued in his individual capacity."  (Compl. ¶ 11, ECF No. 2 at PAGEID# 5.)  In light of the omission of Licking County as a Defendant in Counts I through V—when Virginia demonstrated the ability to detail her claims so meticulously—Licking County could not possibly be on notice that Virginia was asserting a *Monell* claim against it.

Undaunted by her own pleading, Virginia argues that Licking County had "fair notice" of an unpleaded *Monell* claim because the Complaint "alleged that Dr. Raker violated her

constitutional rights when acting as the Licking County Coroner." (ECF No. 114 at PAGEID# 3961.) But these allegations against Dr. Raker could not fairly inform Licking County that it was being sued on a Section 1983 *Monell* claim when the County was not identified as one of the defendants being sued in Counts I through V. *Cf. Everson v. Leis*, 556 F.3d 484, 494-95 (6th Cir. 2009) (finding that the mere mention of the word "train" once in factual allegations was not enough to put defendant on notice of a failure-to-train claim under Section 1983). Just because Virginia identified Dr. Raker as a bad actor does *not* give notice that Virginia was pursuing a *Monell* claim, particularly in light of the fact that the Complaint sued Dr. Raker solely in his *individual* capacity. And since there is no *respondeat superior* liability in Section 1983, allegations against Dr. Raker did not put Licking County on notice that Virginia intended to sue on a *Monell* claim. *See Everson*, 556 F.3d at 495 (reciting the rule that "Section 1983 liability must be premised on more than mere respondeat superior"). For these reasons, the Court finds that Virginia's Complaint does not give fair notice of a *Monell* claim against Licking County.

The cases Virginia relies upon do not change this Court's view. She cites *Spengler* as support for the proposition that she need not have pleaded the specific legal theory upon which she was suing Licking County so long as she fairly apprised the County of her claim. As set forth above, however, her allegations did *not* fairly apprise Licking County that Virginia was asserting a Section 1983 *Monell* claim against it. In any event, *Spengler* is readily distinguishable. In *Spengler*, the plaintiff sued the defendant for age discrimination under the Age Discrimination in Employment Act ("ADEA"), but did not allege his theory of "retaliatory discharge" in a separate count of the complaint. *Spengler*, 514 F. Supp. 2d at 1017. Despite the plaintiff's failure to allege a separate count of retaliatory discharge under the ADEA, the Court

nonetheless found that the plaintiff's allegations were sufficient to apprise the defendant of a retaliatory discharge claim.  *Id.*

In *Spengler*, however, it was readily obvious from the allegations in the Complaint that the plaintiff was asserting a retaliatory discharge claim.  Indeed, the Court cited a number of paragraphs of the plaintiff's complaint that made it impossible *not* to discern that plaintiff was alleging an ADEA claim under retaliatory discharge theory.  *Id.* at 1017-18.  And, significantly, the *Spengler* plaintiff expressly pleaded an ADEA claim against the defendant.  These circumstances stand in stark contrast to the present case, where Virginia's Section 1983 *Monell* claims failed to name Licking County as a defendant being sued under that legal theory. Accordingly, *Spengler* does not help Virginia's attempt to assert unpleaded *Monell* claims against Licking County.

### 2.  Licking County's Litigation Conduct

Virginia also argues that the County's course of conduct in this lawsuit demonstrates that "it was on notice of the *Monell* claim," even though she conspicuously failed to plead it in the Complaint.  (ECF No. 114 at PAGEID# 3961.)  Virginia points to the following circumstances:

- Licking County signed the parties' joint Fed. R. Civ. P. 26(f) report, which acknowledged that discovery would proceed on the "policies" of the county defendants;

- Virginia's deposition notice served on Licking County in November 2012 under Fed. R. Civ. P. 30(b)(6) identified County Coroner "policies and procedures" as a deposition topic; and

- Licking County did not object to the "*Monell*-related topics" and produced Dr. Raker as the witness to testify about them.  (*Id.* at 3961-62.)

By focusing on the litigation conduct of Licking County, Virginia is apparently relying upon the "course of proceedings test," which the Sixth Circuit has applied "to determine whether defendants in a § 1983 action have received notice of the plaintiff's claims where the complaint is ambiguous."  *Cummings v. City of Akron*, 418 F.3d 676, 681 (6th Cir. 2005) (citing *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc)).  Virginia cannot, however, rely on this "course of proceedings" test to inject an unpleaded *Monell* claim against Licking County into this case.

First, the "course of proceedings" test applies, by its terms, when the plaintiff's complaint is *ambiguous* as to the nature of the Section 1983 claim asserted.  Virginia's Complaint in this case, however, is not ambiguous.  As described above, the Complaint describes the nature of Virginia's claims, including the Section 1983 claims, in considerable detail.  There is no ambiguity concerning the nature of the *Monell* claims asserted in the Complaint: Virginia alleged them as against the City of Newark and no other entity.

Even if this Court were to indulge the "course of proceedings" test in this case, the Court would not allow Virginia to press a *Monell* claim against Licking County.  The circumstances cited above do not necessarily demonstrate an understanding on the part of Licking County that Virginia was pursuing a *Monell* claim against the County.  The scope of discovery under the civil rules is liberal: simply because Virginia was not asserting a *Monell* claim does not mean the policies and procedures of the Licking County Coroner's Office were not discoverable.  *See* Fed. R. Civ. P. 26(b)(1) (scope of relevant information in discovery is that which is "reasonably calculated to lead to the discovery of admissible evidence").  The Court cannot say that the "policies and procedures" of the Licking County Coroner's Office were wholly irrelevant to the claims brought against Dr. Raker in his individual capacity.  Moreover, Licking County had

good reason not to object to discovery regarding *Monell* issues.  Alex LeFever's complaint, unlike Virginia's, alleged *Monell* claims against Licking County *and* Franklin County.  Thus, even if Licking County knew that Virginia did not sue it under *Monell*, it also knew that it could not evade *Monell* discovery entirely due to the claims Alex pleaded.

For these reasons, the Court rejects Virginia's course-of-proceedings argument.  There is simply no basis upon which to conclude that Virginia has any *Monell* claims pending against Licking County.  If Virginia wanted to assert such claims, she should have sought to amend her Complaint under Fed. R. Civ. P. 15.  *See Tucker*, 407 F.3d at 788.

With the Court concluding that there are no *Monell* claims pending, Virginia has no claims remaining against Licking County.  The only claims pleaded against Licking County in the Complaint are state-law claims, which Virginia has expressly abandoned against Licking County, Franklin County, and the City of Newark.  (ECF No. 114 at PAGEID# 3923.)  With no further claims pending against, Licking County, the Court grants the County's motion for summary judgment.

### C.  *Section 1983 Claims Against Dr. Raker*

Though Virginia failed to plead any Section 1983 claims against Licking County, she did so against Dr. Raker as one of the "Individual Defendants" named in the four remaining Section 1983 claims alleged in the Complaint.  Specifically, Virginia pleads Section 1983 claims alleging (1) a due process violation based on Dr. Raker having withheld exculpatory evidence and fabricated scientific theories, (2) a Fourth Amendment violation for seizure and detention without probable cause, (3) malicious prosecution, and (4) a conspiracy to frame her for murder and thereby deprive her of her constitutional rights.  (Compl., ECF No. 2 at PAGEID# 20-28.)  For his part, Dr. Raker argues that he is entitled to summary judgment on the Section 1983

claims against him because (1) he is cloaked by absolute immunity to the extent that Virginia is suing for "falsified testimony" at her criminal trial, (2) the doctrine of qualified immunity applies Virginia's claims in any event, and (3) even if immunity did not apply, Virginia has failed to establish a triable issue of fact on the merits of her claims against Dr. Raker.

### 1. Absolute Immunity

The doctrine of "absolute immunity" applies to the performance of certain functions "integral to the functioning of our adversarial legal system." *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006). One of these functions is testifying at trial. In other words, trial testimony (even if perjured) cannot serve as the basis of a claim of liability under Section 1983. *Id.* at 737. Thus, Dr. Raker argues he is absolutely immune from liability for his testimony at Virginia's trial.

In response, Virginia does not dispute the notion that she cannot sue Dr. Raker for his trial testimony. Absolute immunity does not apply, she argues, because she "is not suing him for committing perjury." (ECF No. 114 at PAGEID# 3977.) Rather, Virginia seeks to impose liability against Dr. Raker for (1) withholding exculpatory evidence and (2) his role in creating "false evidence" against her. (*Id.*) While absolute immunity applies to in-court testimony, the doctrine does not apply to pretrial acts. *Gregory*, 444 F.3d at 739. This is true despite any connection these acts might have to later testimony. *Id.*

In light of the reach of the absolute immunity doctrine, Dr. Raker is not entitled to summary judgment on this ground. Virginia disclaims any notion that she is suing Dr. Raker for his trial testimony. Rather, the gravamen of her claims against Dr. Raker has to do with his pretrial conduct. For this reason, Dr. Raker is not entitled to absolute immunity in this case.

### 2.  Qualified Immunity from Liability for Alleged *Brady* Violations

While the nature of Virginia's claims forecloses the applicability of an absolute immunity defense, Dr. Raker may be able to invoke the qualified immunity doctrine.  Generally speaking in Section 1983 cases, government officials performing discretionary functions are immune from liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The burden is on the plaintiff to demonstrate that an official is not entitled to qualified immunity.  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004)).  When evaluating a qualified immunity defense as a basis for summary judgment, the Court must examine two prongs (in either order): (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right and (2) whether the constitutional right alleged to have been violated was "clearly established."  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling *Katz* to the extent that *Katz* required the prongs to be analyzed in order).

The Sixth Circuit has deemed it "well established" that a person's constitutional rights are violated "when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury" in a criminal case.  *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006).   But evidence fabrication is not the only basis of Virginia's claim against Dr. Raker.  In her Complaint, Virginia alleges a single constitutional violation on the part of Dr. Raker—his failure to disclose allegedly "crucial exculpatory notes" showing that William's amitriptyline levels decreased while he was at the hospital.  (Compl. ¶ 49, ECF No. 2.)  These notes were inconsistent with Defendant Ferguson's (allegedly concocted)

finding that William's amitriptyline levels increased, which was consistent with Ferguson's theory that William was poisoned.  Virginia alleged in the Complaint that the notes were "exculpatory" and that Dr. Raker should have disclosed them to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963).  In opposition to the Licking County Defendants' motion for summary judgment, Virginia has clarified (if not changed) the basis of her theory of liability with regard to "exculpatory evidence."  Rather than challenging the failure of Dr. Raker to turn over the notes described in the Complaint, Virginia complains that Dr. Raker withheld (1) a copy of Defendant Ferguson's "dime-store novel"; and (2) his opinion that William LeFever ingested arsenic orally and that it was "impossible" to tell how strychnine entered William's body.  (ECF No. 114 at PAGEID# 3942.)

Regardless of the merits underlying the alleged *Brady* violation, Dr. Raker argues that he is entitled to qualified immunity from Section 1983 liability.  Dr. Raker's argument is simple: in 1988, it was not "clearly established" that a coroner had a *Brady* duty to turn over exculpatory evidence.  Indeed, by its own terms, the *Brady* obligation to disclose exculpatory evidence to the defendant applies only to *prosecutors*.  *Brady*, 373 U.S. at 87-88; *see also Lindsay v. Bogle*, 92 F. App'x 165, 170 (6th Cir. 2004) (holding that a police chief's refusal to disclose an arrestee's internal investigation file did not violate *Brady* because *Brady* applies only to prosecutors).  And even though the Sixth Circuit has intimated that the *Brady* obligation extends to police officers or state-retained forensic experts, *see Moldowan v. City of Warren*, 578 F.3d 351, such a constitutional rule was not in effect at the time that Dr. Raker allegedly withheld the evidence of which Virginia complains.

Less than a year ago, our sister Court in the Northern District of Ohio faced a similar issue.  In *D'Ambrosio v. Marino*, No. 1:11-cv-933, 2012 U.S. Dist. LEXIS 141516 (N.D. Ohio

Oct. 1, 2012), a plaintiff sought damages from two county prosecutors, the lead investigator, and the county coroner for the 21 years he spent on death row.  The *D'Ambrosio* plaintiff had been released after the district court's finding (affirmed by the Sixth Circuit) that the prosecution had withheld a significant amount of exculpatory evidence from the plaintiff's criminal defense counsel.  *Id.*, 2012 U.S. Dist. LEXIS 141516 at *2.  As against the coroner, Dr. Elizabeth Balraj, the plaintiff alleged that she withheld a trace evidence report that, in conjunction with other evidence, called into question the version of events that the prosecution's eyewitness testified to. *Id.* at *6.

The district court disposed of the claim against Dr. Balraj on a motion for judgment on the pleadings.  In dismissing the claims against the coroner, Judge Polster led with the premise that *Brady*, by its own terms, applies to *prosecutors* only.  *Id.* at *11 (citing *Brady*, 373 U.S. at 87-88).  And while the United States Supreme Court has extended the *Brady* obligation to exculpatory evidence known only to police officers, the responsibility for obtaining and disclosing such evidence remains with the prosecutor.  *Id.* at *12 (citing *Kyles v. Whitley*, 514 U.S. 419, 437-38).  Thus, the Court concluded that "the duty of prosecutors to disclose exculpatory or impeachment evidence to criminal defendants does not extend to coroners."  *Id.* at *12-13.

Virginia urges the Court not to follow the same course charted by the *D'Ambrosio* court in assessing Dr. Raker's entitlement to qualified immunity in this case.  She argues that the Sixth Circuit's decision *Moldowan* shows that a forensic examiner has a duty under *Brady* to disclose exculpatory evidence to the accused.  And even though *Moldowan* was not decided until 2009, Virginia emphasizes the Sixth Circuit's observation that prior cases (particularly *Gregory v. City*

*of Louisville*, 444 F.3d 725 (6th Cir. 2006) and *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999) established a forensic expert's duty to disclose exculpatory information:

> In *Gregory*, we reasoned that expert forensic examiners "act in an investigatory fashion when they interpret and document physical evidence," and thus we determined that "the intentional fabrication of a forensic report" is subject to the same considerations applied to the intentional fabrication of evidence by a police officer or prosecutor. 444 F.3d at 740. Under that framework, Gregory concluded that a forensic expert may be subject to suit under § 1983 for deliberately withholding the existence of exculpatory forensic evidence or fabricating forensic evidence. *Id.* at 744. Relying on *Spurlock*, *Gregory* reaffirmed that a forensic expert defendant "'cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional . . . rights.'" *Id.* at 744 (quoting *Spurlock*, 167 F.3d at 1005) (alteration in *Gregory*). *Gregory*'s reliance on *Spurlock* is significant because we determined in that case that this legal norm was clearly established at least as early as April or May of 1990. 167 F.3d at 998-99, 1006.

*Moldowan*, 578 F.3d at 397 (footnote omitted).

But even this analysis does not help Virginia escape Dr. Raker's qualified immunity defense. The *D'Ambrosio* court, when faced with the same argument that Virginia raises in this case with respect to the Sixth Circuit's analysis in *Moldowan*, gave a convincing explanation of why *Moldowan* did not demonstrate that a coroner's *Brady* obligation was clearly established (if established at all) in 1988, the date of the trial in *D'Ambrosio*.

> [T]he Moldowan court extended this *Brady*-derivative obligation to include a state-retained forensics consultant who intentionally fabricated evidence and simultaneously withheld patently exculpatory evidence from the county prosecutor. In extending this derivative obligation to a forensic examiner, the court relied on two other cases where police or forensic examiners intentionally fabricated evidence. *See Moldowan*, 578 F.3d at 397 (citing *Gregory*, 444 F.3d 725 (a forensics examiner who intentionally fabricated findings in a forensics report) and *Spurlock*, 167 F.3d 995 (an officer who fabricated probable cause, coerced informant into testifying falsely and paid him for doing so)). The cases following *Moldowan* have confined this derivative *Brady* obligation to police officers or state-retained experts who fabricate evidence. *See, e.g., Army v. Collins*, No. 11-1791, 488 Fed. Appx. 957, 2012 U.S. App. LEXIS 14946, 2012 WL 2913736, (6th Cir. Jul 18, 2012) (police officers); *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) (police officer); *Rodriguez v. City of Cleveland*, 439 Fed. Appx. 433 (6th Cir. 2011).

> *Moldowan* was decided 21 years after Dr. Balraj's autopsy. Even that case does not extend *Brady* to a coroner. In 1988, there was no constitutional duty, let alone a firmly established one, for a police officer, let alone a coroner, to evaluate and disclose exculpatory and/or impeachment evidence to criminal defendants or prosecutors.

*D'Ambrosio*, 2012 U.S. Dist. LEXIS 141516 at *13-14. The reasoning of the *D'Ambrosio* court applies with equal force in this case. Even by February 1990, when Virginia's criminal trial took place, there was no case that clearly established *Brady*'s applicability to coroners.

To be sure, Virginia attacks the reasoning of the *D'Ambrosio* court, arguing indignantly that Judge Polster "does not even acknowledge, let alone analyze, the Sixth Circuit's reliance on decisions dating back to the 1960s." (ECF No. 114 at PAGEID# 3954.) To bolster her view of Dr. Raker's "clearly established" *Brady* obligation, Virginia cites *Elkins v. Summit Cnty.*, 615 F.3d 671 (6th Cir. 2010), as a case that "further confirms that it was clearly established before 1990 that police and forensic investigators have a duty to disclose exculpatory evidence." (ECF No. 114 at PAGEID# 3951.) In particular, Virginia hones in on *Elkins*' reliance on *Moldowan*'s observation that "'at least three circuits recognized prior to August 1990 … this right was clearly established,' . . . and that the right may have been clearly established as early as 1964." *Elkins*, 615 F.3d at 676 (quoting *Moldowan*, 578 F.3d at 382). Virginia's indignation, however, cannot mask the legal reality that the cases she cites do not go as far as she would like.

For one thing, *Elkins* does not hold (as Virginia represents) that *forensic investigators* have a duty to disclose exculpatory evidence. *Elkins* dealt only with the denial of qualified immunity to *police officers* who allegedly withheld *Brady* material. *See Elkins*, 614 F.3d at 673-74. And for another thing, none of the cases "dating back to the 1960s" that the Sixth Circuit relied upon in *Moldowan* had to do with any supposed *Brady* obligation *of a coroner*. *See*

*Moldowan*, 578 F.3d at 382.  Rather, all of the pre-1990 cases cited by *Moldowan* had to do with the *Brady* obligations *of police*.  *See, e.g., Geter v. Fortenberry*, 882 F.2d 167, 171 (5th Cir. 1989); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964).

In evaluating whether a right was "clearly established" during the relevant time period, "we must determine whether the right has been recognized 'in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Moldowan*, 578 F.3d at 382 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  At best, *Moldowan* established that a forensic examiner may be subject to suit under Section 1983 for "deliberately withholding the existence of exculpatory evidence or fabricating forensic evidence" and that the "legal norm" for such liability was established "at least as early as April or May of 1990."  *Id.* at 397 (citing *Gregory*, 444 F.3d at 744 and *Spurlock*, 167 F.3d at 998-99, 1006).[4]  *Moldowan* does not help Virginia establish that Dr. Raker's duty to disclose the evidence complained of in this case was "clearly established" as of the time Virginia stood trial for her husband's murder.

For these reasons, the Court finds that Dr. Raker is entitled to invoke the doctrine of qualified immunity from liability on Virginia's Section 1983 claim based upon the theory that Dr. Raker withheld *Brady* material in violation of her due process rights.  In light of the Court's ruling that Dr. Raker is entitled to qualified immunity, the Court need not determine whether the

---

[4] The Sixth Circuit in *Gregory* relied on *Spurlock* for the notion that a reasonable forensic expert would have known that withholding exculpatory evidence violated an accused's constitutional rights.  *Gregory*, 444 F.3d at 744 (citing *Spurlock*, 167 F.3d at 1005).  Later, in *Moldowan*, Sixth Circuit found *Gregory*'s reliance on *Spurlock* to be significant, for it signaled that the *Brady* obligation of a "forensic expert" was clearly established as of "April or May of 1990."  It is worth noting, however, that *Spurlock* was not a case about a coroner or "forensic expert."  At issue in *Spurlock* was whether a *sheriff's deputy* was entitled to qualified immunity for allegedly fabricating the evidence used to establish probable cause for an arrest.  *Spurlock*, 167 F.3d at 1005-07.

evidence Dr. Raker allegedly withheld was exculpatory material within the meaning of *Brady* and its progeny.

### 3.  Section 1983 Due Process Claim Based on Fabricating Evidence

In addition to alleging that Dr. Raker withheld exculpatory evidence, Virginia claims that Dr. Raker fabricated scientific theories that led to her arrest and conviction.  As noted above, the Sixth Circuit has deemed it "well established" that a person's constitutional rights are violated "when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury" in a criminal case.  *Gregory*, 444 F.3d at 737.   But even if the Court assumes that an accused's right to be free from a coroner's fabricated scientific theory was "clearly established" during the relevant time period in this case, thereby precluding qualified immunity, Virginia still cannot escape summary judgment in Dr. Raker's favor.

#### a.  Collateral Estoppel

Dr. Raker argues that Virginia's claim premised upon his supposed "fabricated" scientific theories regarding William's death are barred by the doctrine of collateral estoppel.  Under the doctrine of collateral estoppel, a final judgment on the merits in a prior case precludes relitigation in a later suit of issues that were actually litigated and determined in the first suit. For the doctrine to apply, the following elements must be present: (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in

the prior proceeding.  *Pfeil v. State St. Bank & Trust Co*., 671 F.3d 585, 601 (6th Cir. 2012)

(quoting *Kosinski v. Comm'r*, 541 F.3d 671, 675 (6th Cir. 2008)).

In this case, Dr. Raker argues that collateral estoppel arises from Virginia's previous state

court action (filed in 2005), in which Virginia sued to officially change the official cause of

William's death under Ohio Rev. Code § 313.19.[5]  That case proceeded to trial in July 2008,

where the Licking County Court of Common Pleas dismissed Virginia's lawsuit at the close of

her presentation of evidence, finding that Virginia failed to meet her burden of proof.  *LeFever v.*

*Licking Cnty. Coroner's Office*, No. 05-cv-409 (Aug. 15, 2008) (slip opinion).  Dr. Raker argues

that Virginia directly and actually litigated the cause of William's death in the state court action

and failed to convince the trial court, which issued detailed findings of fact and conclusions of

law, that the cause of death specified in the death certificate was inaccurate.  Thus, Dr. Raker

argues that Virginia is collaterally estopped from arguing in this case that the cause of death

specified by Dr. Raker was somehow "fabricated."

Virginia, of course, contends that collateral estoppel is inapplicable to her claim in this

case that Dr. Raker "fabricated" the scientific theory that led to the cause of death determination

listed on William's death certificate.  First, Virginia says that she "could not assert her § 1983

claims" in the prior state court action because "[t]hese constitutional claims do not relate to the

cause and manner reported on the death certificate—they instead show violations of Ms.

LeFever's due process rights."  (ECF No. 114 at PAGEID# 3985.)  But this argument is of no

---

[5] Ohio Rev. Code § 313.19 provides:  "The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death."

use to Virginia, as it confuses the concepts of claim preclusion collateral estoppel (a.k.a., "issue preclusion").

Under the doctrine of *claim* preclusion, "a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). "Issue preclusion, in contrast, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' *even if the issue recurs in the context of a different claim*." *Id.* (quoting *New Hampshire*) (emphasis added); *see also Moran v. Svete*, 366 F. App'x 624, 628 (6th Cir. 2010). While it may be true that Virginia could not litigate her § 1983 claims in the context of her prior action brought under Ohio Rev. Code § 313.19, that fact is relevant only to whether her current claims are barred by *claim* preclusion. The doctrine of *issue* preclusion (*i.e.*, collateral estoppel) could *still* bar her claim if the Court finds that she is re-litigating an issue previously determined in the state court's 2008 final judgment.

In an argument that squarely addresses the correct doctrine, Virginia also contends that the facts underlying her § 1983 due process claim "could not have been actually and directly litigated" in the state court case. (ECF No. 114 at PAGEID# 3985.) She argues that it was only upon taking the depositions of Ferguson and Dr. Raker in *this* case did she find out that neither man could conclude how arsenic and strychnine entered William LeFever's body. But this fact does not preclude the application of collateral estoppel in this case. In the previous state court action, Virginia had the full and fair opportunity to litigate whether Dr. Raker's determination on William's death certificate is accurate. This issue necessarily encompasses the issue that Virginia is attempting to raise in her due process claim here—the issue of whether Dr. Raker

"fabricated" the theories that underlie the cause of death determination listed on William's death certificate. Virginia failed to meet her burden of proof in the state court case, leading to the state court judgment that allowed Dr. Raker's official determination and decision as to the cause of William's death to remain unchanged. Virginia's due process claim in this case, insofar as it is based on the theory that Dr. Raker "fabricated" the scientific theory that led to his determination, seeks to relitigate the issue. As such, the claim is barred by collateral estoppel.

### b. *Insufficient Evidence of Fabrication*

Even if collateral estoppel did not bar Virginia's § 1983 claim premised upon Dr. Raker having "fabricated" scientific theories, summary judgment in Dr. Raker's favor remains appropriate. While Virginia relies on a number of allegations against Defendant Ferguson to demonstrate the nature of the "fabricated" scientific theories, the summary judgment evidence fails to create a genuine issue of material fact as to *Dr. Raker*'s liability.

Notably, it was not Dr. Raker who performed the autopsy or toxicology tests on William's body. Rather, those were tasks performed by the Franklin County Coroner's Office and Defendant Ferguson. The conclusions with which Virginia takes issue come from Defendant Ferguson's analysis. And according to the summary judgment evidence, Dr. Raker based his opinions upon reports and consultations with Ferguson and then-Franklin County Coroner Dr. Fardal. (Raker Aff. ¶ 30, ECF No. 96-1 at PAGEID# 3216.) Thus, even if Virginia can convince a jury that there were fabricated scientific theories with regard to the toxicological analysis involved in this case, the jury could reasonably find that they were Ferguson's fabrications, not Dr. Raker's.

For these reasons, Dr. Raker is entitled to summary judgment on Virginia's § 1983 claim based upon alleged violations of her due process rights.

### 4. Section 1983 Fourth Amendment and Malicious Prosecution Claims

Virginia also alleges § 1983 claims based on a Fourth Amendment violation and on a theory of malicious prosecution. Virginia bases her Fourth Amendment claim on the theory that she was detained "without probable cause" that she was responsible for William's death; similarly, she bases her malicious prosecution claim on the theory that the individual defendants (including Dr. Raker), "made, influenced and/or participated in the decision to prosecute her for murder" in the absence of probable cause. (Compl. ¶¶ 99, 105, ECF No. 2 at PAGEID# 22-23.) In her opposition to summary judgment, Virginia contends that the "same facts" that underlie her due process claims support her § 1983 Fourth Amendment and malicious prosecution claims.[6]

To succeed on a § 1983 malicious prosecution premised on a violation of the Fourth Amendment, a plaintiff must prove (1) the defendant made, influenced, or participated in the decision to criminally prosecute the plaintiff, (2) the prosecution lacked probable cause, (3) the plaintiff suffered a deprivation of liberty, apart from the initial seizure, as a consequence of the legal proceeding, and (4) the criminal proceeding must have been resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). Dr. Raker argues that Virginia cannot satisfy the first element as a matter of law because Dr. Raker did not "make, influence or participate" in the decision to prosecute Virginia for murder. The Court finds this argument well taken.

The Sixth Circuit has explained that to be liable for "participating" in a decision to prosecute an accused, "the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 308 n.5. Virginia's opposition to summary

---

[6] In her opposition to summary judgment, Virginia also clarifies that her § 1983 Fourth Amendment claim and her § 1983 malicious prosecution claims are "the same," even though she pleaded them as separate counts in the Complaint. (ECF No. 114 at PAGEID# 3955.) Taking Virginia's cue, the Court analyzes these claims together as though they are one and the same.

judgment makes no argument with respect to how Dr. Raker made, influenced, or participated in the decision to prosecute Virginia.  To the extent that Virginia seeks to bootstrap her theory that Dr. Raker *per se* "made, influenced, or participated" in the prosecution decision by virtue of his withholding *Brady* material or fabricating scientific evidence, the Court has already rejected those arguments *ante*.

Moreover, Virginia's claim is fatally undermined by the fact that a grand jury indicted Virginia for murder.  A grand jury indictment conclusively demonstrates the existence of probable cause for purposes of a § 1983 malicious prosecution claim.  *See Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (citing *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)).  Though Virginia contends that "fraud" or "unlawful means" in securing a conviction may negate probable cause, the only case she cites in support of that proposition was one in which the court was applying Ohio law to an Ohio tort claim for malicious prosecution.  *See Elkins v. Summit Cnty.*, No. 5:06-cv-3004, 2009 WL 1150114, at *11 (N.D. Ohio Apr. 29, 2009).  In the federal context, an indictment "fair on its face" conclusively determines the existence of probable cause.  *Higgason*, 288 F.3d at 877.  Absent evidence of perjured testimony or irregularity in the grand jury proceeding so as to indicate that the indictment was somehow tainted, there is a conclusive presumption that probable cause supported the prosecution of Virginia.  *See Bakos v. City of Olmstead Falls*, 73 F. App'x 152, 157 (6th Cir. 2003).   While Virginia alleges irregularities in the investigation of her husband's death, she cites no evidence of irregularities *in the actual grand jury proceeding* that would undermine the presumption of probable cause arising from an indictment.  *See id.*

Dr. Raker is therefore entitled to summary judgment on Virginia's § 1983 Fourth Amendment and malicious prosecution claims.

### 5.  Section 1983 Conspiracy

Virginia also alleges a § 1983 conspiracy claim, theorizing that the individual defendants "reached an agreement and plan amongst themselves to frame Plaintiff for the crime of murder." (Compl. ¶ 118, ECF No. 2 at PAGEID# 25.)  A civil conspiracy claim under § 1983 requires a plaintiff to show that (1) the defendants had a "single plan," (2) the defendants shared in the "general conspiratorial objective," and (3) one or more of the defendants committed an overt act in furtherance of the conspiracy.  *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).  Express agreement among all the conspirators is not necessary and each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  *Id. See also Bazzi v. City of Dearborn*, 658  F.3d 598, 602 (6th Cir. 2011).

Dr. Raker is entitled to summary judgment on the conspiracy claim.  Virginia's only argument in support of her conspiracy claim is that a jury could conclude that Defendant Ferguson distributed his "dime-store novel" to Dr. Raker and the police before Virginia's trial, thereby supporting a finding that these defendants conspired to violate her constitutional rights by not turning the novel over to the prosecutor (who, theorizes Virginia, would have turned it over to Virginia's criminal defense attorneys as *Brady* material).  But this theory falls flat for a couple of reasons.  First, this Court has already determined that Dr. Raker has qualified immunity with regard to any claimed *Brady* violation by him.  Thus, Virginia cannot show, as a matter of law, that Dr. Raker conspired to violate her constitutional rights.  *See Bauss v. Plymouth Twp.*, 233 F. App'x 490, 500 (affirming summary judgment in favor of defendants on § 1983 conspiracy claim when plaintiff failed to show deprivation of a constitutional right).

Second, Virginia has not raised a genuine issue of material fact with regard to the existence of a "single plan" to violate her constitutional rights by framing her for murder.  The

mere fact that Ferguson *may* have given Dr. Raker a copy of his true crime novel manuscript is an exceedingly thin reed upon which to rest an allegation that Dr. Raker was part of a grandiose civil conspiracy to frame Virginia for murder.  This is particularly true given the evidence in the record that Dr. Raker's role in determining the cause of death was minimal.  It was Defendant Ferguson and the Franklin County Coroner's Office that performed the autopsy of William's body and performed the toxicology tests.   Based on the record before the Court, a reasonable jury could not conclude that Dr. Raker was a conspirator, even if it could find a conspiracy involving other defendants.

The Court therefore grants summary judgment in favor of Dr. Raker on Virginia's Section 1983 claims.

### D.  State Law Claims Against Dr. Raker

In addition to her federal claims brought under Section 1983, Virginia alleges state law claims for malicious prosecution and false imprisonment against Dr. Raker in his individual capacity.  In addition to contesting these claims on the merits, Dr. Raker also argues that state law tort immunity under the Ohio Political Subdivision Tort Immunity Act precludes Virginia's claims against him.

### 1.   Immunity Under Ohio Rev. Code § 2744.03(A)(6)

Ohio provides immunity from suit to an employee of a political subdivision in connection with the performance of governmental or proprietary functions, unless (1) the employee's acts were outside the scope of employment or official responsibilities; (2) the employee acted with a malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) another section of the Ohio Revised Code expressly imposes liability. Ohio Rev. Code § 2744.03(A)(6).  This statute provides a presumption of immunity.  *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011)

(citing *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995)).

Virginia argues that Dr. Raker is not entitled to immunity under Ohio Rev. Code § 2744.03(A)(6) because there is a "question of fact as to whether . . . Dr. Raker acted with malice, in bad faith, or in a wanton or reckless manner." (ECF No. 114 at PAGEID# 3979.) "Malice" is the willful and intentional design to harm another through conduct that is unlawful or unjustified. *Morrison v. Bd. of Trs. of Green Twp.*, 529 F. Supp. 2d 807, 835 (S.D. Ohio 2007) (citing *Cook*, 103 Ohio App. 3d at 90). "Bad faith" involves a "dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Id.* "Wanton misconduct" is the "failure to exercise any care whatsoever." *Id.* Virginia contends that Dr. Raker's actions meet one or more of these descriptions because he "concealed exculpatory evidence," "fabricated his forensic conclusions," and "knew that as a natural consequence of [his] actions, Ms. LeFever could be sent to prison." (ECF No. 114 at 3978-79.)

As against Dr. Raker, the record does not support Virginia's allegation of malice, bad faith, or wanton or reckless conduct. Dr. Raker based his opinions and reports and consultations with Dr. Fardal and Defendant Ferguson. Virginia has pointed to no evidence that would have led Dr. Raker to believe that the Franklin County Coroner's Office did not perform William's autopsy or forensic toxicology testing properly. Nor has Virginia identified evidence that would lead a reasonable jury to believe that Dr. Raker was involved in some sinister plot to frame Virginia for murder. According to the record before this Court, Dr. Raker performed his duties as Licking County Coroner by deferring, in part, to the expertise of the Franklin County Coroner's Office due to his office (at the relevant time) not having the facilities to perform a

forensic autopsy or toxicological analysis.  At *best*, Virginia could hope to show that Dr. Raker was not as thorough as he could have been in carrying out his responsibility as the Licking County Coroner by accepting the conclusions of Ferguson.  But this is not enough to remove the cloak of political subdivision immunity.  *See Radvansky v. City of New Olmstead*, 395 F.3d 291, 316 (6th Cir. 2005) (citing *Boyd v. Village of Lexington*, 2002-Ohio-1285, 2002 WL 416016, at *6 (Ohio Ct. App. 2002)).

### 2.  Malicious Prosecution

Even if Dr. Raker were not entitled to immunity, Virginia's claims would still be ripe for summary judgment in Dr. Raker's favor.  As to the malicious prosecution claim, the elements of are (1) malice by the defendant in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused.  *Froelich v. Ohio Dep't of Mental Health*, 114 Ohio St. 3d 286, 871 N.E. 2d 1159, 2007-Ohio-4161, at ¶ 9.  In this case, Dr. Raker argues that the fact that a grand jury indicted Virginia forecloses her from establishing the second element as a matter of law.  (ECF No. 96 at PAGEID# 3207.)   Under Ohio law, Dr. Raker contends that the return of an indictment by a grand jury is prima facie evidence of probable cause, which the plaintiff can overcome only upon a showing of "evidence to the effect that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular."  *Deoma v. Shaker Hts.*, 68 Ohio App. 3d 72, 77, 587 N.E. 2d 425 (Ohio Ct. App. 1990).

Virginia attempts to rebut the prima facie case for probable cause with her argument that "Dr. Raker fabricated his theories of how arsenic and strychnine entered Bill LeFever's body" and that if Dr. Raker had revealed his "true conclusions," those conclusions "could have destroyed the probable cause" against her.  (ECF No. 114 at PAGEID# 3982.)  Absent from

Virginia's opposition to summary judgment, however, is any citation to the record of the grand jury proceedings indicating what *was* presented to the grand jury.  The Court is not in a position to decide whether Virginia has rebutted the prima facie evidence of a grand jury indictment without evidence of what was presented to the grand jury.  Nor is this Court obligated to search the entire record on its own for evidence that would enable a party's claim to survive summary judgment.  *See, e.g., Sagan v. Sumner Cnty. Bd. of Edn.*, 501 F. App'x 537, 540 (6th Cir. 2012).

Summary judgment is also appropriate on the basis that Virginia cannot satisfy the fourth element of malicious prosecution as a matter of law.  In conclusory fashion, Virginia argues that "her conviction was vacated and the indictment dismissed," thereby satisfying the requirement that proceedings be terminated in her favor.  (ECF No. 114 at PAGEID# 3982.)  But as Dr. Raker notes in his reply, the dismissal of the indictment in Virginia's case was a *without prejudice* dismissal.  (ECF No. 130 at PAGEID# 4611 and ECF No. 114 Ex. 11.)  Indeed, in the motion to dismiss the indictment without prejudice, the Licking County Prosecutor did not foreclose the possibility of seeking to re-indict Virginia if new technology allowed the prosecution to overcome myriad scientific evidence issues that hampered the current ability to re-try Virginia for murder.  (ECF No. 114 Ex. 4 at PAGEID# 1462.)  Accordingly, Virginia has not established for purposes of summary judgment that the criminal proceedings have been terminated in her favor, at least insofar as an Ohio tort claim for malicious prosecution is concerned.  *See Ash v. Ash*, 72 Ohio St. 3d 520, 522, 651 N.E.2d 945 (1995) ("A proceeding is 'terminated in favor of the accused' only when its final disposition indicates that the accused is innocent.") (quoting 3 Restatement of the Law 2d, Torts (1977) 420, Section 660, Comment a).[7]

---

[7] Though Dr. Raker does not raise the issue as a ground for summary judgment, the Court also notes that Virginia does not cite authority for the proposition that Dr. Raker qualifies as a person who instituted criminal proceedings against her for purposes of satisfying the first element of a malicious prosecution claim under Ohio law.

### 3.  False Imprisonment

Virginia also sues Dr. Raker for false imprisonment under Ohio law.  An actionable tort claim for false imprisonment "occurs when a person confines another intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short." *Bennett v. Ohio Dep't of Rehab. & Corr.*, 60 Ohio St. 3d 107, 109, 573 N.E. 2d 633 (1991) (internal quotations omitted).  In the Licking County Defendants' motion for summary judgment, Dr. Raker argued that this claim is time-barred under the one-year statute of limitations set forth in Ohio Rev. Code § 2305.11(A).  (ECF No. 96 at PAGEID# 3207.)  Dr. Raker withdrew this argument, however, in the Licking County Defendants' reply brief after Virginia argued in her opposition that the one-year statute of limitations did not accrue until Virginia was released from confinement on November 22, 2010; hence, her action for false imprisonment was timely because she filed her Complaint on October 19, 2011.  (ECF No. 114 at PAGEID# 3984 and ECF No. 130 at PAGEID# 4611.)

Though acknowledging that the statute of limitations does not bar Virginia's false imprisonment claim, Dr. Raker contends in his reply that summary judgment remains appropriate on this claim because Virginia's arrest and imprisonment were supported by probable cause. (ECF No. 130 at PAGEID# 4611-12.)  Indeed, a finding of probable cause defeats a claim of false imprisonment.  *See Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 315 (6th Cir. 2005) (applying Ohio law).  Virginia opened the door to this issue in her opposition to summary judgment when she argued that the evidence supported her false imprisonment claim because Dr. Raker "had no privilege to cause Ms. LeFever's imprisonment."  (ECF No. 114 at PAGEID# 3982.)  But as noted above, a grand injury indicted Virginia for murder, conclusively demonstrating the existence of probable cause.  And in any event, as the Court found earlier, the

record evidence is insufficient to support the theory that Dr. Raker "fabricated" any scientific theories that formed the basis of the prosecution's case against Virginia.

More fundamentally, however, the Court notes that Virginia cites no case for the proposition that the tort of false imprisonment applies to Dr. Raker in this case.  Virginia states in conclusory fashion that Dr. Raker acted to "cause" her imprisonment, but she cites no Ohio case for the proposition that a false imprisonment claim can be maintained against a person who did not actually confine the plaintiff.

For all of these reasons, Dr. Raker is entitled to summary judgment on Virginia's state law claims.

### III.    Conclusion

For the foregoing reasons, the Court **GRANTS** the motion for summary judgment of Defendants Licking County and Dr. Raker (ECF No. 96).  Licking County and Dr. Raker are no longer parties to this action.

**IT IS SO ORDERED.**

**/s/ Gregory L. Frost                    **
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**