UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

VIRGINIA LeFEVER,

        Plaintiff,                Case No. 2:11-cv-935
                                  JUDGE GREGORY L. FROST
      v.                      Magistrate Judge E.A. Preston Deavers

JAMES FERGUSON, et al.,

        Defendants.


ALEX LeFEVER,

        Plaintiff,                Case No. 2:12-cv-664
                                  JUDGE GREGORY L. FROST
      v.                      Magistrate Judge E.A. Preston Deavers

JAMES FERGUSON, et al.,

        Defendants.


## OPINION AND ORDER

       This matter is before the Court on the motion for summary judgment of Defendants City

of Newark, Ohio, Ken Ballantine, and William Hatfield (collectively, "Newark Defendants").

(Case No. 2:11-cv-935, ECF No. 94.)[1]  Also before the Court are Plaintiff Virginia LeFever's

combined memorandum in opposition to all Defendants' motions for summary judgment (ECF

No. 114), Plaintiff Alex LeFever's combined memorandum contra all Defendants' motions for

summary judgment (Case No. 2:12-cv-664, ECF No. 75), and the Newark Defendants' replies in

support of summary judgment (Case No. 2:11-cv-935, ECF No. 120; Case No. 2:12-cv-664, ECF

---

[1] Unless otherwise indicated, all docket references in this Opinion and Order are to the docket in Case No. 2:11-cv-935.

No. 85).  For the reasons explained below, the Court **GRANTS** the Newark Defendants' motion for summary judgment.  As a result, Newark, Ballantine, and Hatfield are no longer parties to this action.

## I.      Background

These consolidated cases arise out of Virginia LeFever's 1990 conviction for the aggravated murder of her husband, William LeFever in September 1988.  Twenty-two years after being sent to prison for the murder, the trial court judge vacated Virginia's conviction and released her from prison.  The basis for the trial court's ruling was the realization that Defendant James Ferguson, the forensic toxicologist in the Franklin County Coroner's Office who examined William LeFever's body in 1988, had lied at Virginia's trial about his credentials. Following the trial court's ruling ordering Virginia's release from prison, the Licking County (Ohio) Prosecutor dismissed the indictment against Virginia.  Though the indictment against Virginia was dismissed without prejudice, the Licking County Prosecutor has not, to date, elected to retry Virginia for William's murder.  In the cases before the Court, Plaintiffs Virginia (Case No. 2:11-cv-935) and her son Alex LeFever (Case No. 2:12-cv-664) sue Ferguson, Newark police officers Ken Ballantine and Bill Hatfield, then-Licking County Coroner Robert Raker, the City of Newark, Ohio, Licking County, and Franklin County.

William LeFever's death occurred while his and Virginia's divorce case was pending in an Ohio domestic relations court.  In August 1988, the domestic relations court awarded Virginia full custody of the couple's minor children (Alex LeFever and his siblings) during the pendency of the divorce case.  Virginia also obtained a restraining order against William.  The final divorce hearing was scheduled to take place just six days after William's death.  Also during this time

period, Virginia was finalizing arrangements to move to California with the couple's children in order to take a new job.

One week before the final divorce hearing, William came back to the family home to have dinner with Alex and the other children, as authorized by an order of the domestic relations court. William fell asleep on the couch after dinner and remained at the house overnight. William acted strangely during the night, similar to the manner in which he acted when he had used illegal drugs in the past. (There is no dispute that William had problems with substance abuse.) William was roaming around the house naked and acting as if he was hallucinating. The next day, Virginia discovered an old prescription bottle of an antidepressant (Elavil) that had been prescribed to her in the past. Only a half tablet remained in the bottle even though there were approximately 20 pills left in the bottle the last time Virginia opened it.

Later that day, paramedics were called to the house after William became combative. William was taken to Licking Memorial Hospital ("LMH"), where he alternated between periods of calmness and lucidity to episodes of combativeness and incoherence. William remained at the hospital the next day when his behavior worsened. At some point, William admitted to a nurse that he had taken Virginia's prescription anti-depressant medication in an effort to kill himself. Later that day, William went into cardio-pulmonary arrest and died.

Defendant Dr. Raker was the Licking County Coroner from 1979 through 2012. Dr. Raker was present at LMH when two nurses informed him that William was admitted with an overdose of amitriptyline. Dr. Raker asked the nurses to notify him if it appeared William would die from an overdose because an overdose death fell within the jurisdiction of his office. Consistent with Dr. Raker's wishes, he was informed of William's death and arranged to have

William's body transported to the morgue at LMH.  That same day, Dr. Raker spoke with Virginia to obtain information regarding the circumstances surrounding William's death.

At the LMH morgue, Dr. Raker visually examined William's body.  In his opinion, it was unusual in an overdose death to see as many bruises as were present on the body.  Accordingly, Dr. Raker thought additional investigation was necessary before the death certificate could issue. Dr. Raker contacted Defendant Ken Ballantine, then a detective with the Newark (Ohio) Police Department, and also arranged for an autopsy to be performed on William's body.

Per Dr. Raker's request, Ballantine came to the LMH morgue to view William's body. Dr. Raker informed Ballantine that the injuries to William's body appeared excessive for a suicide or drug overdose.  Following his viewing of the body and conversation with Dr. Raker at the morgue, Ballantine asked Virginia to come to the police station to give a statement.  She gave a written statement to police and consented to a search of her home.  Virginia's consent to search was conditioned upon the police not searching her kitchen trash.

Defendant Hatfield was the Newark police officer who led the search of Virginia's home, which took place the same day as Virginia's statement to police.  Ballantine and Assistant Licking County Prosecuting Attorney Kenneth Oswalt were also present during the search.  The following day, Ballantine obtained a warrant to search the kitchen trash.  Inspection of the kitchen trash revealed hypodermic needles, multiple syringes, poison peanuts and poison sunflower seeds for killing rodents, and some charred material.  Officer Hatfield later determined that the charred materials were remnants of a "Smoke'em" fumigation product.  Detective Ballantine later learned in his investigation that Virginia had purchased "Smoke'ems" at a local hardware store the day before William's death.  Through interviews with the LeFever children,

Ballantine learned that Virginia lit one of the "Smoke'ems" in a bedroom while William slept and left the house with the children and the family's cat.

In addition to searching Virginia's home, the Newark Police collected witness statements as part of the investigation into William's death. Deborah Howard, a nurse at LMH, indicated that William conceded he had consumed pills, but told her that Virginia had been forcing him to take pills. He also indicated to Howard that Virginia would beat him when he passed out.

Another witness, Anita Cullison, also gave a statement to the Newark Police. According to Cullison, Virginia called her two days before William's death to ask if Cullison knew of somebody who would "off someone" for money and a bus ticket. Cullison also indicated that Virginia called her later the same day to tell Cullison she was joking. Virginia also revealed to Cullison that William had a $20,000 life insurance policy, the beneficiary of which would be changed upon finalization of their divorce.

In 1988, the Licking County Coroner's Office did not have a forensic facility and did not have the means to conduct a forensic autopsy or toxicological analysis. Dr. Raker therefore arranged to have the Franklin County (Ohio) Coroner's Office perform the autopsy. Dr. Raker had referred cases to the Franklin County Coroner's Office since 1979 or 1980. Dr. Raker was not present for the autopsy and neither performed nor observed any toxicological testing on William's body.

Patrick Fardal, a pathologist, and Defendant Ferguson, the Chief Toxicologist, performed the autopsy on William's body. After the Franklin County Coroner's office completed the autopsy, William's body was returned to a funeral home in Licking County. On October 12, 1988, about three weeks after William died, Defendant Ferguson (chief toxicologist in the Franklin County Coroner's Office) asked Dr. Raker to look for any "intramuscular injection

sites" on William's body.  With the assistance of Detective Hatfield, Dr. Raker re-examined the body with a magnifying class and found a potential injection site on William LeFever's left buttock.  Dr. Raker excised a biopsy of the area and gave it to Detective Hatfield to hand over to the Franklin County Coroner's Office.  Dr. Raker performed a similar biopsy nine days later at Ferguson's request and gave those samples to Detective Hatfield.  A week later, William's body was transported back to the Franklin County Coroner's Office for further examination.

Two months after William died, Dr. Raker issued the death certificate, indicating that the investigation into the cause of death was still pending.  Dr. Raker later received an official report from Dr. Fardal, stating that William died of exposure to amitriptyline and nortriptyline.  Dr. Raker also received a toxicology report, which opined that there was an intramuscular injection of amitriptyline due to the high levels of amitriptyline found at the potential injection site in William's buttock.  The toxicologist further opined that amitriptyline had also been administered rectally due to high levels of the drug in William's lower colon.

Based on the evidence, witness statements, and autopsy report obtained from Newark Police and the Franklin County Coroner, the Licking County Prosecutor submitted the matter to a grand jury in November 1988.  On November 30, 1988, Virginia was indicted for murder and arrested the following day.

In January 1989, four months after William's death, Dr. Raker received a supplemental toxicology report from Ferguson and Daniel Couri, Ph.D., then the Director of Forensic Toxicology at the Franklin County Coroner's Office.  Additional toxicology tests revealed the presence of arsenic and inorganic sulfate in William's body.  Ferguson concluded that chronic and acute poisonings by arsenic and sulfur oxides contributed to William's death.  (Incidentally, the primary gas emitted in "Smoke'ems" is sulfur dioxide.)  Following Virginia's indictment, Dr.

Raker issued a supplemental death certificate, which listed amitriptyline and nortriptyline poisoning as the cause of death and classified the manner of death as a homicide.

Virginia was ultimately convicted of aggravated murder and sentenced to life in prison. After Virginia's conviction, Ferguson wrote a "book or screen play" about the trial, portraying himself as a hero whose toxicology analysis solved William's death and proved that Virginia murdered him.  Virginia contends that Defendants Ferguson, Ballantine, and Raker concealed exculpatory evidence and fabricated the theory of poisoning that led to Virginia's conviction.

In 2010, Ferguson pleaded no contest to falsification charges and was convicted of lying under oath.  Armed with evidence of Ferguson's lies and checkered past, Virginia sought a new trial.  In November 2010, the same judge who presided over her criminal trial two decades earlier granted Virginia's motion for a new trial and ordered Virginia's immediate release from prison. In April 2011, the Licking County prosecutor dismissed the case against Virginia.  At the time of Virginia's release from prison, Alex was 26 years old.  Alex's lawsuit alleges that he was wrongly separated from his mother during his formative years and that his mother's arrest and subsequent conviction caused him to be unlawfully seized and taken into custody by Licking County Children's Services.

In Case No. 2:11-cv-935, Virginia filed suit against Ferguson, Ballantine, Hatfield, Raker, the City of Newark, Franklin County, and Licking County, alleging federal and state causes of action arising out of her wrongful arrest and conviction for her husband's murder. (ECF No. 2 in Case No. 2:11-cv-935.)  In Case No. 2:12-cv-664, Alex followed suit, asserting federal and state claims against the same Defendants.   The Newark Defendants move for summary judgment on all claims asserted against them.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

## III.    Discussion: Virginia LeFever's Complaint in Case No. 2:11-cv-935

### A.  *Virginia's Abandoned Claims*

Virginia's Complaint alleges claims for (1) liability under 42 U.S.C. § 1983 for violation of her due process rights, (2) a § 1983 claim for violation of her Fourth Amendment rights, (3) a § 1983 claim for "malicious prosecution," (4) a § 1983 claim alleging "failure to intervene," (5) a

§ 1983 claim for a conspiracy to deprive her of her constitutional rights, and (6) various state law claims.  In her opposition to summary judgment, Virginia states expressly that "she will no longer pursue" some of her claims against certain Defendants.  As relevant to the Newark Defendants, Virginia states that she will not pursue (1) her "failure to intervene" claim, (2) state law claims against the City of Newark, (3) state law claims against Defendant Ballantine, and (4) any claims whatsoever against Defendant Hatfield.

In light of the abandonment of these claims, all that remains against Newark and Ballantine are Virginia's federal claims alleged under 42 U.S.C. § 1983 (with the exception of the "failure to intervene" claim).  The Court therefore grants summary judgment in their favor on Virginia's state law claims.  And insofar as Virginia has abandoned all claims against Defendant Hatfield, the Court grants summary judgment to Hatfield on the entirety of Virginia's Complaint.

### B.  Virginia's Section 1983 Claims Against City of Newark

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

It is well established that a municipality such as Newark may not be held vicariously liable under Section 1983 for the actions of its employees.  *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978).  Local governments are responsible only for "their own illegal acts."  *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665-83.  Thus, a Section 1983 plaintiff can establish liability on local governments through proof that an official policy or custom caused his or her injury.  *Monell*, 436 U.S. at 691.  "In limited

circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

A city's culpability for a deprivation of rights "is at its most tenuous where a claim turns on a failure to train." *Thompson*, 131 S. Ct. at 1359 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985) (plurality opinion)). Section 1983 imposes liability for a city's failure to train its employees only when such failure amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989). The standard of "deliberate indifference" is a stringent one, proof of which requires a plaintiff to show that "a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 407.

Virginia rests her claim of Section 1983 liability against Newark solely on a "failure to train" theory. More specifically, Virginia argues in her opposition to summary judgment that the City should be liable under Section 1983 because it failed to train its officers in how to "handle exculpatory evidence." (Pl.'s Opp'n, ECF No. 114 at PAGEID# 3967.) Citing deposition testimony in which Newark Police Chief Steven Sarver testified that he was unaware of any policy or training with respect to *Brady* compliance for the Newark Police Department in 1988, Virginia contends that there is evidence of "a complete failure to train" Newark police officers in how to handle exculpatory evidence. (*Id.* at PAGEID# 3968.) Relying on the Sixth Circuit's decision in *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006), Virginia posits that

Newark's failure to train officers in *Brady* compliance amounts to deliberate indifference for purposes of Section 1983 liability.

*Gregory* provides some support for Virginia's theory of liability against Newark.   In *Gregory*, the Sixth Circuit found summary judgment inappropriate when there was evidence of a city's failure to train police officers on the proper handling of *Brady* material.  *Id.* at 753-54. The Sixth Circuit found that the failure to train officers on the proper handling of exculpatory materials carried the "'highly predictable consequence' of constitutional violations" that satisfied the deliberate indifference standard for imposing Section 1983 liability on a failure-to-train theory.  *Id.* at 754 (citing *Brown v. Bd. of Comm'rs*, 520 U.S. at 409).

Were *Gregory* the latest pronouncement regarding a city's potential liability for failure to train in the proper handling of exculpatory evidence under *Brady*, Virginia might have a chance at overcoming Newark's motion for summary judgment.  But even though none of the parties cites it, the United States Supreme Court's recent decision in *Connick v. Thompson*, 131 S. Ct. 1350 (2011), is instructive on the issue.  Unfortunately for Virginia, the Supreme Court's analysis cuts in favor of summary judgment in Newark's favor.

In *Thompson*, the plaintiff (Thompson) was convicted of armed robbery.  As part of the robbery investigation, police recovered a swatch of fabric from the victim's clothes, stained with the robber's blood.  A crime lab report showing the robber's blood type was not turned over to Thompson's defense counsel.  After Thompson was convicted of the armed robbery, he chose not to testify in his own defense in his trial for an unrelated murder charge.  Thompson was convicted of the murder and sentenced to death.  *Thompson*, 131 S. Ct. at 1356.

After 14 years in prison and a few weeks before Thompson's execution, a private investigator assisting Thompson discovered the crime lab report showing the robber's blood

type.  Blood testing revealed that Thompson's blood type did *not* match the blood on the fabric swatch; thus, Thompson could not have committed the armed robbery for which he was convicted.  *Id.*  Thompson's armed robbery conviction was vacated and his murder conviction reversed.  As to the latter, the Louisiana state courts found that the armed robbery conviction (which was tainted by the prosecution's failure to turn over exculpatory evidence) unconstitutionally deprived Thompson of his right to testify on his own behalf at his murder trial. Thompson was later retried on the murder charge and acquitted.  *Id.* at 1357.

Thompson filed a Section 1983 action against the district attorney's office and others, alleging that the defendants' conduct caused him to be wrongfully convicted, incarcerated for 18 years, and nearly executed.  At issue at the Supreme Court was Thompson's claim that the district attorney's office violated *Brady* by failing to disclose the crime lab report in his armed robbery trial.  Thompson alleged liability under a theory that his wrongful conviction resulted from the district attorney's deliberate indifference to an obvious need to train the prosecutors in proper *Brady* protocol in order to avoid such constitutional violations.  *Id.* The district attorney's office conceded that there was a *Brady* violation, but argued that it was nevertheless entitled to judgment as a matter of law because "because Thompson did not prove that [the District Attorney] was on actual or constructive notice of, and therefore deliberately indifferent to, a need for more or different *Brady* training."  *Id.* at 1358.

The Supreme Court agreed with the district attorney's office and rejected Thompson's claim.  In doing so, the Supreme Court noted that "[a] *pattern* of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Id.* at 1360 (citing *Bryan Cnty.*, 520 U.S. at 409) (emphasis added). Absent some notice that its course of training is deficient in a particular respect, "decisionmakers

can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Under this standard, Virginia's claim cannot survive, as she cites to no evidence of a "pattern" of similar *Brady* violations by "untrained employees" in the Newark Police Department prior to 1988.

Nor can Virginia rely simply on the single *Brady* violation in her case (assuming that there has been a *Brady* violation) to establish liability. In *Canton v. Harris*, as the Supreme Court itself acknowledged in *Thompson*, the Court left open the possibility that a single incident could form the basis of "failure to train" liability under Section 1983 when the violation of constitutional rights would be the "highly probable" consequence of a failure to train. *See Thompson*, 131 S. Ct. at 1361 (citing *Canton*, 489 U.S. at 390 n.10); *see also Bryan Cnty.*, 520 U.S. at 409. In *Thompson*, the Supreme Court rejected the "single incident" theory of liability in the context of an admitted *Brady* violation by prosecutors. In light of the extensive legal training and professional responsibility obligations that attorneys have, the Court found it far from obvious that a district attorney's office's failure to provide *Brady* training would lead to recurring constitutional violations. *Id.* at 1363.

Even though this case deals with the consequences of failing to train *police officers* in *Brady* obligations instead of prosecutors, that difference does not command a different result here. As the Supreme Court has made clear, the obligation to comply with *Brady* ultimately falls upon the *prosecutor* and not on police officers, despite the fact that it is the police who are on the front line of gathering evidence, whether it be inculpatory or exculpatory. In order to comply with *Brady*, it is the *prosecutor* who "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). While the Sixth Circuit has held that police officers have "an

analogous or derivative obligation" under *Brady*, the obligation upon police officers is to disclose exculpatory evidence *to the prosecutor*, not necessarily to defense counsel directly. *Moldowan v. City of Warren*, 578 F.3d 351, 377-81 (6th Cir. 2009).

The fact that the police officer's *Brady* obligation is "analogous" to or "derivative" of the prosecutor's duty is an important qualifier that brings the Supreme Court's *Thompson* rationale into play.  While the police officer may have a duty to disclose exculpatory evidence to the prosecutor, the Supreme Court has made clear that the buck stops with the prosecutor: it is the prosecutor's duty to learn of any evidence favorable to the accused that is known to police officers.  *Kyles*, 514 U.S. at 437.  In light of the prosecutor's proactive duty to track down *Brady* material, the Court cannot say that a failure to train *police officers* in *Brady* would lead to the "highly probable" consequence a constitutional violation.  Prosecutors are subject to a "regime of legal training and professional responsibility," *Thompson*, 131 S. Ct. at 1363, that should lead them to carry out their obligations to learn of exculpatory evidence, as *Kyles* instructs.  So even if police officers may not have been trained in the nuances of *Brady*, prosecutors' legal training and professional responsibility (as described in *Thompson*) are a buffer against recurring constitutional violations.  Accordingly, Newark's alleged failure to train officers in *Brady* before Virginia's arrest and conviction cannot support a Section 1983 "failure to train" claim based on a single-incident theory of liability.

The City of Newark is therefore entitled to summary judgment in its favor on Virginia's Section 1983 claims.

### C.  *Virginia's Claims Against Officer Ballantine*

In addition to suing the City of Newark, Virginia also sues Officer Ballantine, a Newark police officer who was the lead investigator into William's death in 1988.  Virginia seeks to hold Officer Ballantine liable for constitutional violations under Section 1983.

### 1.  **Qualified Immunity from Section 1983 Liability**

Officer Ballantine urges that the Court apply the doctrine of qualified immunity to bar the Section 1983 claims against him.  Generally speaking in Section 1983 cases, government officials performing discretionary functions are immune from liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The burden is on the plaintiff to demonstrate that an official is not entitled to qualified immunity.  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004)).  When evaluating a qualified immunity defense as a basis for summary judgment, the Court must examine two prongs (in either order): (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right and (2) whether the constitutional right alleged to have been violated was "clearly established."  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling *Katz* to the extent that *Katz* required the prongs to be analyzed in order).

### a.  *Due Process Claim Based on* **Brady** *Violation*

Virginia claims that Officer Ballantine violated her constitutional rights by withholding exculpatory evidence, in violation of his *Brady* obligation.  Specifically, Virginia complains of three items of evidence that Ballantine supposedly failed to disclose to the prosecutor:

- A copy of Defendant Ferguson's "sensationalist dime-store novel" titled "Angel of Mercy or Angel of Death?";

- A witness statement from Susan Nickerson concerning the type and serial numbers of syringes stocked at the nurse staffing office where Virginia worked; and

- Notes of a conversation Ballantine had with the Franklin County Coroner, Dr. Fardal, who said he could not tell whether the strychnine-based rodent killer found in William LeFever's colon was ingested orally or rectally.

(ECF No. 114 at PAGEID# 3937.)

As noted above, the Sixth Circuit has recognized that police officers have at least an "analogous" or "derivative" obligation under *Brady* to turn over exculpatory evidence to prosecutors. *See Moldowan*, 578 F.3d at 377-81. But even assuming that a police officer's *Brady* obligation was clearly established as of 1989, the time when Office Ballantine was investigating William's death and Virginia's possible involvement in it, the facts taken in a light most favorable to Virginia do not reveal an arguable constitutional violation committed by Ballantine. The Court is not convinced that any of the materials supposedly withheld by Ballantine is *Brady* material.

With respect to the copy of Ferguson's "dime-store novel" manuscript, it is unclear whether Ballantine saw a copy of it prior to Virginia's trial. Though Ballantine testified at his deposition in this case that he does not remember seeing the novel before the trial, a copy of it appears in the Newark Police Department's case file, which Ballantine maintained before the trial. These circumstances, Virginia argues, could lead a reasonable jury to conclude that the novel was in Ballantine's file before trial and that he failed to disclose it to the prosecutor. And because Defendant Ferguson's credibility was "critical" due to his forensic testimony, Virginia

16

argues that the manuscript would have been valuable impeachment material because it showed a
that Ferguson may have harbored a bias toward inculpating her for the murder.  (ECF No. 114 at
PAGEID# 3927, 3938.)

  "There are three components of a true *Brady* violation: The evidence at issue must be
favorable to the accused, either because it is exculpatory, or because it is impeaching; that
evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice
must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 282 (1999).  In this case, even assuming
the first two elements are present, Virginia does not provide a convincing argument as to the
final element.  Though she argues that the Ferguson manuscript is valuable "impeachment
material," she does not elucidate how she was prejudiced by the absence of that evidence at trial.

  In order to establish the requisite prejudice from an alleged *Brady* violation, Virginia
must show "there is a reasonable probability" that the result of the trial would have been
different if the evidence had been disclosed to the defense.  *Strickler*, 527 U.S. at 289.
Elaborating on this standard, the Supreme Court has stated that " '[t]he  question is not whether
the defendant would more likely than not have received a different verdict with the evidence, but
whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy
of confidence.'"  *Id.* at 289-90 (quoting *Kyles*, 514 U.S. at 434).  Based on this standard, the
Court finds prejudice lacking.  The strength of the prosecution's case against Virginia was the
physical evidence against her, including the forensic conclusions of Ferguson.  Without
impeaching the forensic analysis itself—the science behind Ferguson's testimony—the Court
cannot say that the availability of the "dime-store novel" would have made a difference in the
jury's assessment of the case.  In other words, even if Virginia had been given the opportunity to
impeach Ferguson with his manuscript by allowing Virginia to argue some sort of "bias" on his

part, the manuscript did not have strong impeachment value absent some evidence that called into question Ferguson's scientific conclusions.

As to the supposed withholding of a statement by Nickerson, the Court finds no arguable *Brady* violation.  Even though the prosecution turned over to the defense two witness statements from Nickerson, Virginia contends there was a third one that Officer Ballantine failed to disclose to the prosecutor.  Virginia relies on deposition testimony in which Nickerson believed there may have been one more statement she gave regarding the types of syringes that were in the inventory of the nurse staffing agency where she and Virginia worked at the time.  Nickerson testified that she wrote down information about the syringes in this third statement in addition to giving that information to Ballantine verbally.

There is scant evidence that such a written statement ever existed.  At best, Nickerson's deposition indicates that she *may* have given a third written statement.[2]  But even assuming that such a statement might have existed, the most natural reaction to the statement is, "so what?"  Simply put, the statement (assuming its existence) is not *Brady* material.  At *most*, Nickerson's statement showed that William was not injected with a syringe that came from Virginia's work.  While it would surely be inculpatory if there were a match, the fact that there was not is not exculpatory.  The prosecution's theory that Virginia injected William with amitriptyline did not include any theory as to where the syringe came from.  To be sure, if there was a connection between the syringes found in Virginia's trash and the syringes available at her workplace, that would have been strong evidence against her.  The fact there may have been no such connection means only that Virginia did not use syringes from her work; it hardly suggests that she did not inject William at all.

---

[2] Nickerson testified at Virginia's criminal trial in 1990.  In the trial testimony, she made no mention of having given a third written statement.

As for the alleged notes from Ballantine's conversation with Dr. Fardal, the Court similarly finds them not to be *Brady* material.  The fact that Dr. Fardal may have told Ballantine that he could not say whether strychnine had been ingested orally or rectally does not carry the significance Virginia ascribes to it.  Defendant Ferguson was the one who performed the toxicological analysis, not Dr. Fardal.   Dr. Fardal did not perform any independent toxicology analysis, deferring to the work of Ferguson.  Although Dr. Fardal had a general understanding of Ferguson's theory of rectal administration of the strychnine, Dr. Fardal did not do the independent analysis necessary to form an opinion on the issue.  While Virginia makes much of the fact that Dr. Fardal is a medical doctor and Ferguson is not, the Court fails to see how the notes can be exculpatory or impeachment material when Dr. Fardal did not perform the analysis necessary to give an opinion that contradicted Ferguson's rectal administration theory.  Ballantine's notes are therefore of little evidentiary value—and certainly not *Brady* material.

For these reasons, the Court finds that Virginia has not established any conduct by Ballantine that demonstrates an arguable *Brady* violation, even if the Court assumes Virginia's facts to be true.  Having failed to show conduct that violates *Brady*, Ballantine is entitled to qualified immunity from liability on Virginia's Section 1983 due process claim.

### 2.  Section 1983 Fourth Amendment and Malicious Prosecution Claims

Virginia also alleges § 1983 claims based on a Fourth Amendment violation and on a theory of malicious prosecution.  Virginia bases her Fourth Amendment claim on the theory that she was detained "without probable cause" that she was responsible for William's death; similarly, she bases her malicious prosecution claim on the theory that the individual defendants (including Ballantine), "made, influenced and/or participated in the decision to prosecute her for murder" in the absence of probable cause.  (Compl. ¶¶ 99, 105, ECF No. 2 at PAGEID# 22-23.)

In her opposition to summary judgment, Virginia contends that the "same facts" that underlie her due process claims support her § 1983 Fourth Amendment and malicious prosecution claims.[3] As to Defendant Ballantine, his alleged withholding of "exculpatory evidence" forms the basis of the Fourth Amendment claim.  (ECF No. 114 at PAGEID# 3956.)  But because this Court has found no *Brady* violation committed by Ballantine, Ballantine is likewise entitled to qualified immunity on the Fourth Amendment claim.

But even if Virginia's *Brady* claim against Ballantine were still on the table, the Fourth Amendment claim would not succeed.  In a Section 1983 malicious prosecution action  premised on a violation of the Fourth Amendment, a plaintiff must prove (1) the defendant made, influenced, or participated in the decision to criminally prosecute the plaintiff, (2) the prosecution lacked probable cause, (3) the plaintiff suffered a deprivation of liberty, apart from the initial seizure, as a consequence of the legal proceeding, and (4) the criminal proceeding must have been resolved in the plaintiff's favor.  *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010).  Ballantine argues that the first element is lacking "make, influence or participate" in the decision to prosecute Virginia for murder.  The Court finds this argument well taken.

The Sixth Circuit has explained that to be liable for "participating" in a decision to prosecute an accused, "the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating."  *Id.* at 308 n.5.  Virginia's opposition to summary judgment makes no argument with respect to how Ballantine made, influenced, or participated in the decision to prosecute Virginia.  While the implication is that Ballantine was influential in his

---

[3] In her opposition to summary judgment, Virginia also clarifies that her § 1983 Fourth Amendment claim and her § 1983 malicious prosecution claims are "the same," even though she pleaded them as separate counts in the Complaint.  (ECF No. 114 at PAGEID# 3955.)  Taking Virginia's cue, the Court analyzes these claims together as though they are one and the same.

role as the detective investigating the murder, the implication is not enough for Virginia to escape summary judgment.

Moreover, Virginia's claim is fatally undermined by the fact that a grand jury indicted Virginia for murder.  A grand jury indictment conclusively demonstrates the existence of probable cause for purposes of a § 1983 malicious prosecution claim.  *See Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (citing *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)). Though Virginia contends that "fraud" or "unlawful means" in securing a conviction may negate probable cause, the only case she cites in support of that proposition was one in which the court was applying Ohio law to an Ohio tort claim for malicious prosecution.  *See Elkins v. Summit Cnty.*, No. 5:06-cv-3004, 2009 WL 1150114, at *11 (N.D. Ohio Apr. 29, 2009).  In the federal context, an indictment "fair on its face" conclusively determines the existence of probable cause. *Higgason*, 288 F.3d at 877.  Absent evidence of perjured testimony or irregularity in the grand jury proceeding so as to indicate that the indictment was somehow tainted, there is a conclusive presumption that probable cause supported the prosecution of Virginia.  *See Bakos v. City of Olmsted Falls*, 73 F. App'x 152, 157 (6th Cir. 2003).   While Virginia alleges irregularities in the investigation of her husband's death, she cites no evidence of irregularities *in the actual grand jury proceeding* that would undermine the presumption of probable cause arising from an indictment.  *See id.*

Defendant Ballantine is therefore entitled to summary judgment on Virginia's § 1983 Fourth Amendment and malicious prosecution claims on the basis of qualified immunity.

### 3.  Section 1983 Conspiracy

Virginia also alleges a § 1983 conspiracy claim, theorizing that the individual defendants "reached an agreement and plan amongst themselves to frame Plaintiff for the crime of murder."

(Compl. ¶ 118, ECF No. 2 at PAGEID# 25.)  A civil conspiracy claim under § 1983 requires a plaintiff to show that (1) the defendants had a "single plan," (2) the defendants shared in the "general conspiratorial objective," and (3) one or more of the defendants committed an overt act in furtherance of the conspiracy.  *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).  Express agreement among all the conspirators is not necessary and each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  *Id. See also Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

Defendant Ballantine is entitled to summary judgment on the conspiracy claim. Virginia's only argument in support of her conspiracy claim is that a jury could conclude that Defendant Ferguson distributed his "dime-store novel" to Dr. Raker and the police before Virginia's trial, thereby supporting a finding that these defendants conspired to violate her constitutional rights by not turning the novel over to the prosecutor (who, theorizes Virginia, would have turned it over to Virginia's criminal defense attorneys as *Brady* material).  But this theory falls flat for a couple of reasons.  First, this Court has already determined that Virginia does not have a viable *Brady* claim against Ballantine for any alleged failure to disclose "Angel of Mercy or Angel of Death?" to the Licking County Prosecutor.   Thus, Virginia cannot show, as a matter of law, that Ballantine conspired to violate her constitutional rights.  *See Bauss v. Plymouth Twp.*, 233 F. App'x 490, 500 (affirming summary judgment in favor of defendants on § 1983 conspiracy claim when plaintiff failed to show deprivation of a constitutional right).

Second, Virginia has not raised a genuine issue of material fact with regard to the existence of a "single plan" to violate her constitutional rights by framing her for murder.  The mere fact that Ferguson *may* have given Dr. Raker and Ballantine a copy of his true crime novel manuscript is an exceedingly thin reed upon which to rest an allegation that there was a

grandiose civil conspiracy to frame Virginia for murder.  This is particularly true given that Virginia has no evidence that Ballantine fabricated any of the evidence that he unearthed during his investigation into William's suspicious death.

The Court therefore grants summary judgment in favor of Ballantine on Virginia's Section 1983 claims.

## IV.    Discussion: Alex LeFever's Claims in Case No. 2:12-cv-664

In Case No. 2:12-cv-664, Plaintiff Alex LeFever sues for damages for the deprivation of his rights that were caused by the allegedly wrongful conviction of his mother.  He asserts both federal and state law claims against the same Defendants, including the Newark Defendants. The Newark Defendants move for summary judgment on the entirety of Alex's Amended Complaint.

### A.   Section 1983 Claims

Alex alleges in his First Claim a Section 1983 claim based on the purported violation of his due process right to "family integrity," or, more specifically, the "fundamental constitutional right to live with and be raised by his mother."  (Am. Compl. ¶ 99, ECF No. 38 in Case No. 2:12-cv-664 at PAGEID# 191.)  Alex alleges in his Second Claim a purported violation of his Fourth Amendment rights, arguing that he was unlawfully seized and placed in foster care after his mother's arrest.  (*Id.* ¶¶ 110-119.)

As to both of these claims, this Court is not writing on a clean slate.  This Court previously granted in part the motion to dismiss Alex's claims brought by Defendants Dr. Raker and Licking County.  (Case No. 2:12-cv-664, ECF No. 80.)  The Court found that applicable Sixth Circuit precedent—namely *Foos v. City of Delaware*, No. 10-4234, 2012 U.S. App. LEXIS 14842 (6th Cir. July 16, 2012) and *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000)—

foreclosed Alex from bringing a viable Section 1983 claim for "deprivation of familial association." The Court accordingly dismissed Alex's First Claim as to Dr. Raker and Licking County. The Court likewise dismissed Alex's Section 1983 Fourth Amendment claim, finding it barred by the statute of limitations.

The Newark Defendants argue that the same analysis dictates summary judgment in its favor on Alex's due process familial association and Fourth Amendment claims against them. The Court agrees. For the same reasons the Court dismissed the Section 1983 claims as to Dr. Raker and Licking County, the Court likewise grants summary judgment to the Newark Defendants.

### B. Intentional Infliction of Emotional Distress

In the Third Claim of the Amended Complaint, Alex alleges a claim for IIED against Dr. Raker and individual defendants Ferguson, Ballantine, and Hatfield. Under Ohio law, the elements of a claim of IIED are:

> [(1)] the defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it.

*Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008) (quoting

*Ekunsumi v. Cincinnati Restoration, Inc.,* 698 N.E.2d 503, 506 (Ohio Ct. App. 1997)).

In the motion for summary judgment, Defendants argue that Alex LeFever's claim for IIED must fail because Alex has failed to show a genuine issue of fact regarding the Newark Defendants' actions being "extreme and outrageous." Indeed, courts in Ohio have held the

24

conduct necessary to establish the tort of IIED is behavior, "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hale v. Vance*, 267 F. Supp. 2d 725, 736 (S.D. Ohio 2003) (quoting *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983)); *Irving v. Austin*, 138 Ohio App. 3d 552, 557, 741 N.E.2d 931 (Ohio Ct. App. 2000).

In his memorandum contra Defendants' motion for summary judgment, Alex tries to escape summary judgment on his IIED claim by arguing that this claim is not barred by the statute of limitations. But while the statute of limitations was at issue in connection with the Licking County Defendants' motion to dismiss Alex's Amended Complaint, the Newark Defendants' motion for summary judgment does *not* raise the statute of limitations. Instead, the Newark Defendants argue for summary judgment on the IIED claim on the basis that Alex has not shown "extreme or outrageous" conduct as a matter of law. The Newark Defendants contend that the facts show that Officer Hatfield and Detective Ballantine simply performed their duties as police officers investigating a suspicious death. (ECF No. 94 at PAGEID# 2434.)

Alex's opposition does not come forward with evidence to rebut summary judgment on this basis. With Alex having failed to meet his summary judgment burden, the Newark Defendants are entitled to summary judgment on the IIED claim.

### C.  Loss of Consortium

Alex's Fourth Claim of the Amended Complaint pleads loss of consortium under Ohio law. Ohio law recognizes an action by an adult child for loss of consortium against a third party who injures the child's parent. Loss of consortium claims are derivative claims, and thus a

defense to the underlying action generally constitutes a defense to the loss of consortium claims.

*See Bowen v. Kil-Kare, Inc*., 63 Ohio St. 3d 84, 93, 585 N.E. 2d 384 (Ohio 1992).

The Newark Defendants are entitled to summary judgment on Alex's loss of consortium claim.  In his combined opposition to all of the Defendants' motions for summary judgment, Alex conceded that his loss of consortium claim is derivative of his mother's state law claims. (Case No. 2:12-cv-664, ECF No. 75 at PAGEID# 1216.)  Thus, Alex further conceded that his loss of consortium claim "cannot proceed independently of Virginia's state law claims."  (Id.)

Alex's concession in this regard compels summary judgment in favor of the Newark Defendants.  Virginia expressly abandoned her state law claims, including the loss of consortium claim, against the Newark Defendants.  (ECF No. 114 in Case No. 2:11-cv-935 at PAGEID# 3923.)  Alex's loss of consortium claim therefore cannot survive summary judgment.

## V.      Conclusion

For the foregoing reasons, the Court **GRANTS** the motion for summary judgment of Defendants City of Newark, Ken Ballantine, and William Hatfield.  (ECF No. 94.)  Newark, Ballantine, and Hatfield are no longer parties to these consolidated actions.

**IT IS SO ORDERED.**

                                             **/s/ Gregory L. Frost**
                                             **GREGORY L. FROST**
                                             **UNITED STATES DISTRICT JUDGE**