# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**VIRGINIA LeFEVER,**

　　　　**Plaintiff,**　　　　　　　　**Case No. 2:11-cv-935**
　　　　　　　　　　　　　　　　　　**JUDGE GREGORY L. FROST**
　　**v.**　　　　　　　　　　　　**Magistrate Judge E.A. Preston Deavers**

**JAMES FERGUSON, et al.,**

　　　　**Defendants.**


**ALEX LeFEVER,**

　　　　**Plaintiff,**　　　　　　　　**Case No. 2:12-cv-664**
　　　　　　　　　　　　　　　　　　**JUDGE GREGORY L. FROST**
　　**v.**　　　　　　　　　　　　**Magistrate Judge E.A. Preston Deavers**

**JAMES FERGUSON, et al.,**

　　　　**Defendants.**


## <u>OPINION AND ORDER</u>

This matter is before the Court on the following filings:

1. Defendant James Ferguson's motion for summary judgment (Case No. 2:11-cv-935,

   ECF No. 95),[1]  Plaintiff Virginia LeFever's combined memorandum in opposition to

   all Defendants' motions for summary judgment (ECF No. 114), Plaintiff Alex

   LeFever's combined memorandum contra all Defendants' motions for summary

   judgment (Case No. 2:12-cv-664, ECF No. 75), and Defendant Ferguson's replies

   (ECF No. 124 and Case No. 2:12-cv-664 ECF No. 89);

---

[1] Unless otherwise indicated, all docket references in this Opinion and Order are to the docket in Case No.
2:11-cv-935.

2.  Plaintiff Virginia LeFever's motion for partial summary judgment on liability against Defendant James Ferguson (ECF No. 87), Defendant Ferguson's memorandum in opposition (ECF No. 108), and Plaintiff Virginia LeFever's reply memorandum (ECF No. 122).

For the reasons set forth in more detail below, the Court **DENIES** Virginia LeFever's motion for partial summary judgment on liability (ECF No. 87) and **GRANTS IN PART AND DENIES IN PART** Defendant Ferguson's motion for summary judgment (ECF No. 95).

## I.     Background

These consolidated cases arise out of Virginia LeFever's 1990 conviction for the aggravated murder of her husband, William LeFever in September 1988.  Twenty-two years after being sent to prison for the murder, the trial court judge vacated Virginia's conviction and released her from prison.  The basis for the trial court's ruling was the realization that Defendant James Ferguson, the forensic toxicologist in the Franklin County Coroner's Office who examined William LeFever's body in 1988, had lied at Virginia's trial about his credentials. Following the trial court's ruling ordering Virginia's release from prison, the Licking County (Ohio) Prosecutor dismissed the indictment against Virginia.  Though the indictment against Virginia was dismissed without prejudice, the Licking County Prosecutor has not, to date, elected to retry Virginia for William's murder.  In the cases before the Court, Plaintiffs Virginia (Case No. 2:11-cv-935) and her son Alex LeFever (Case No. 2:12-cv-664) sue Ferguson, Newark police officers Ken Ballantine and Bill Hatfield, then-Licking County Coroner Robert Raker, the City of Newark, Ohio, Licking County, and Franklin County.

William LeFever's death occurred while his and Virginia's divorce case was pending in an Ohio domestic relations court.  In August 1988, the domestic relations court awarded Virginia

full custody of the couple's minor children (Alex LeFever and his siblings) during the pendency of the divorce case.  Virginia also obtained a restraining order against William.  The final divorce hearing was scheduled to take place just six days after William's death.  Also during this time period, Virginia was finalizing arrangements to move to California with the couple's children in order to take a new job.

One week before the final divorce hearing, William came back to the family home to have dinner with Alex and the other children, as authorized by an order of the domestic relations court.  William fell asleep on the couch after dinner and remained at the house overnight. William acted strangely during the night, similar to the manner in which he acted when he had used illegal drugs in the past.  (There is no dispute that William had problems with substance abuse.)  William was roaming around the house naked and acting as if he was hallucinating.  The next day, Virginia discovered an old prescription bottle of an antidepressant (Elavil) that had been prescribed to her in the past.  Only a half tablet remained in the bottle even though there were approximately 20 pills left in the bottle the last time Virginia opened it.

Later that day, paramedics were called to the house after William became combative. William was taken to Licking Memorial Hospital ("LMH"), where he alternated between periods of calmness and lucidity to episodes of combativeness and incoherence.  William remained at the hospital the next day when his behavior worsened.  At some point, William admitted to a nurse that he had taken Virginia's prescription anti-depressant medication in an effort to kill himself. Later that day, William went into cardio-pulmonary arrest and died.

Defendant Dr. Raker was the Licking County Coroner from 1979 through 2012.  Dr. Raker was present at LMH when two nurses informed him that William was admitted with an overdose of amitriptyline.  Dr. Raker asked the nurses to notify him if it appeared William would

die from an overdose because an overdose death fell within the jurisdiction of his office.

Consistent with Dr. Raker's wishes, he was informed of William's death and arranged to have

William's body transported to the morgue at LMH.  That same day, Dr. Raker spoke with

Virginia to obtain information regarding the circumstances surrounding William's death.

At the LMH morgue, Dr. Raker visually examined William's body.  In his opinion, it was

unusual in an overdose death to see as many bruises as were present on the body.  Accordingly,

Dr. Raker thought additional investigation was necessary before the death certificate could issue.

Dr. Raker contacted Defendant Ken Ballantine, then a detective with the Newark (Ohio) Police

Department, and also arranged for an autopsy to be performed on William's body.

Per Dr. Raker's request, Ballantine came to the LMH morgue to view William's body.

Dr. Raker informed Ballantine that the injuries to William's body appeared excessive for a

suicide or drug overdose.  Following his viewing of the body and conversation with Dr. Raker at

the morgue, Ballantine asked Virginia to come to the police station to give a statement.  She gave

a written statement to police and consented to a search of her home.  Virginia's consent to search

was conditioned upon the police not searching her kitchen trash.

Defendant Hatfield was the Newark police officer who led the search of Virginia's home,

which took place the same day as Virginia's statement to police.  Ballantine and Assistant

Licking County Prosecuting Attorney Kenneth Oswalt were also present during the search.  The

following day, Ballantine obtained a warrant to search the kitchen trash.  Inspection of the

kitchen trash revealed hypodermic needles, multiple syringes, poison peanuts and poison

sunflower seeds for killing rodents, and some charred material.  Officer Hatfield later determined

that the charred materials were remnants of a "Smoke'em" fumigation product.  Detective

Ballantine later learned in his investigation that Virginia had purchased "Smoke'ems" at a local

hardware store the day before William's death.  Through interviews with the LeFever children, Ballantine learned that Virginia lit one of the "Smoke'ems" in a bedroom while William slept and left the house with the children and the family's cat.

In addition to searching Virginia's home, the Newark Police collected witness statements as part of the investigation into William's death.  Deborah Howard, a nurse at LMH, indicated that William conceded he had consumed pills, but told her that Virginia had been forcing him to take pills.  He also indicated to Howard that Virginia would beat him when he passed out.

Another witness, Anita Cullison, also gave a statement to the Newark Police.  According to Cullison, Virginia called her two days before William's death to ask if Cullison knew of somebody who would "off someone" for money and a bus ticket.  Cullison also indicated that Virginia called her later the same day to tell Cullison she was joking.  Virginia also revealed to Cullison that William had a $20,000 life insurance policy, the beneficiary of which would be changed upon finalization of their divorce.

In 1988, the Licking County Coroner's Office did not have a forensic facility and did not have the means to conduct a forensic autopsy or toxicological analysis.  Dr. Raker therefore arranged to have the Franklin County (Ohio) Coroner's Office perform the autopsy.  Dr. Raker had referred cases to the Franklin County Coroner's Office since 1979 or 1980.  Dr. Raker was not present for the autopsy and neither performed nor observed any toxicological testing on William's body.

Patrick Fardal, a pathologist, and Defendant Ferguson, the Chief Toxicologist, performed the autopsy on William's body.  After the Franklin County Coroner's office completed the autopsy, William's body was returned to a funeral home in Licking County.  On October 12, 1988, about three weeks after William died, Defendant Ferguson (chief toxicologist in the

Franklin County Coroner's Office) asked Dr. Raker to look for any "intramuscular injection sites" on William's body.  With the assistance of Detective Hatfield, Dr. Raker re-examined the body with a magnifying glass and found a potential injection site on William LeFever's left buttock.  Dr. Raker excised a biopsy of the area and gave it to Detective Hatfield to hand over to the Franklin County Coroner's Office.  Dr. Raker performed a similar biopsy nine days later at Ferguson's request and gave those samples to Detective Hatfield.  A week later, William's body was transported back to the Franklin County Coroner's Office for further examination.

Two months after William died, Dr. Raker issued the death certificate, indicating that the investigation into the cause of death was still pending.  Dr. Raker later received an official report from the Franklin County Coroner's Office, stating that William died of exposure to amitriptyline and nortriptyline.  Dr. Raker also received a toxicology report, which opined that there was an intramuscular injection of amitriptyline due to the high levels of amitriptyline found at the potential injection site in William's buttock.  The toxicologist further opined that amitriptyline had also been administered rectally due to high levels of the drug in William's lower colon.

Based on the evidence, witness statements, and autopsy report obtained from Newark Police and the Franklin County Coroner, the Licking County Prosecutor submitted the matter to a grand jury in November 1988.  On November 30, 1988, Virginia was indicted for murder and arrested the following day.

In January 1989, four months after William's death, Dr. Raker received a supplemental toxicology report from Ferguson and Daniel Couri, Ph.D., then the Director of Forensic Toxicology at the Franklin County Coroner's Office.  Additional toxicology tests revealed the presence of arsenic and inorganic sulfate in William's body.  Ferguson concluded that chronic

and acute poisonings by arsenic and sulfur oxides contributed to William's death.  (Incidentally, the primary gas emitted in "Smoke'ems" is sulfur dioxide.)  Following Virginia's indictment, Dr. Raker issued a supplemental death certificate, which listed amitriptyline and nortriptyline poisoning as the cause of death and classified the manner of death as a homicide.

Virginia was ultimately convicted of aggravated murder and sentenced to life in prison.  At some point during this time period, Ferguson wrote a "book or screen play" about the trial, portraying himself as a hero whose toxicology analysis solved William's death and proved that Virginia murdered him.  Virginia contends that Defendants Ferguson, Ballantine, and Raker concealed exculpatory evidence, including the existence of Ferguson's "sensationalist" novel, and fabricated the theory of poisoning that led to Virginia's conviction.

In 2010, Ferguson pleaded no contest to falsification charges and was convicted of lying under oath.  Armed with evidence of Ferguson's lies and checkered past, Virginia sought a new trial.  In November 2010, the same judge who presided over her criminal trial two decades earlier granted Virginia's motion for a new trial and ordered Virginia's immediate release from prison.  In the judgment entry granting Virginia's motion for new trial, the trial judge made clear that he was compelled by fundamental fairness concerns despite his view that the prosecution had mounted a strong case against Virginia:

> On February 22, 1990 . . . the court found the defendant guilty.  The court explained at that time the circumstantial evidence supporting the decision.  The court referred to James Ferguson as "The key witness in the State's case . . .".  [sic]  Ferguson's testimony was directly linked to the Licking County Coroner, Dr. Raker, and the Forensic Pathologist from the Franklin County Coroner's office, Dr. Fardal.  They relied heavily on testing done by Ferguson in making their findings.  Ferguson was the linchpin holding the State's case together.  Without his testimony, the State's case would have fallen apart.
>
> This is not about guilt or innocence.  This judge was convinced of defendant's guilt on February 22, 1990.  I don't know if I feel any differently today.  This is about fairness.  Is it fair to let a verdict stand, when it is based in

> large part on the testimony of a proven liar?  And the proven liar was the key witness in the case!  The prosecutor has fought the good fight in resisting the motion for new trial.  But knowing what he knows now, he should stand aside and let it happen.

*State v. LeFever*, Licking Cnty. C.P. No. 1988 CR 17117 (Ohio C.P. Ct. Nov. 22, 2010)

(Judgment Entry granting new trial).

 In April 2011, the Licking County prosecutor dismissed the case against Virginia.  The dismissal was without prejudice to future prosecution of Virginia for William's death.  At the time of Virginia's release from prison, Alex was 26 years old.  Alex's lawsuit alleges that he was wrongly separated from his mother during his formative years and that his mother's arrest and subsequent conviction caused him to be unlawfully seized and taken into custody by Licking County Children's Services.

In Case No. 2:11-cv-935, Virginia filed suit against Ferguson, Ballantine, Hatfield, Raker, the City of Newark, Franklin County, and Licking County, alleging federal and state causes of action arising out of her wrongful arrest and conviction for her husband's murder. (ECF No. 2 in Case No. 2:11-cv-935.)  In Case No. 2:12-cv-664, Alex followed suit, asserting federal and state claims against the same Defendants.   This Court has previously granted summary judgment in favor of all other Defendants, leaving Ferguson the lone remaining Defendant in these consolidated cases.  Ferguson moves for summary judgment on both of these consolidated cases, while Virginia asks for partial summary judgment on the issue of Ferguson's liability.  (ECF Nos. 87, 95.)

## II.     Summary Judgment Standard

This matter is before the Court on cross motions for summary judgment: Defendant Ferguson seeks summary judgment on the entirety of these consolidated cases; Virginia seeks partial summary judgment on Ferguson's liability for violating her rights under *Brady v. Maryland*, 373 U.S. 83 (1963). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

## III.     Discussion: Virginia LeFever's Complaint in Case No. 2:11-cv-935

Virginia's Complaint alleges (1) liability under 42 U.S.C. § 1983 for violation of her due process rights, (2) a § 1983 claim for violation of her Fourth Amendment rights, (3) a § 1983 claim for "malicious prosecution," (4) a § 1983 claim alleging "failure to intervene," (5) a § 1983 claim for a conspiracy to deprive her of her constitutional rights, and (6) various state law claims. In her omnibus opposition to all Defendants' motions for summary judgment, Virginia states expressly that "she will no longer pursue" some of her claims.  What remains against Ferguson are (1) Section 1983 claims based on violation of due process, Fourth Amendment, malicious prosecution, and conspiracy and (2) state law claims for intentional infliction of emotional distress, malicious prosecution, and false imprisonment.

### A.  *Virginia's Section 1983 Claims Against Ferguson*

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Virginia argues in her motion for partial summary judgment that Ferguson is liable as a matter of law for a violation of her due process rights.  Specifically, Virginia argues that Ferguson withheld exculpatory and/or valuable impeachment evidence from the defense, thereby resulting in a violation of Ferguson's obligations under *Brady* and its progeny.  (Pl.'s Mot., ECF No. 87.)  For his part, Ferguson opposes Virginia's entitlement to partial summary judgment and also argues that *he* is entitled to summary judgment on Virginia's claims on the basis of either absolute or qualified immunity.  (Def.'s Mot., ECF No. 95.)

### 1. Absolute Immunity

The doctrine of "absolute immunity" applies to the performance of certain functions "integral to the functioning of our adversarial legal system."  *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006).  One of these functions is testifying at trial.  In other words, trial testimony (even if perjured) cannot serve as the basis of a claim of liability under Section 1983.  *Id.* at 737.  Based on this doctrine, Ferguson argues he is absolutely immune from liability for his testimony at Virginia's trial.  Ferguson frames Virginia's claims as being based solely upon the testimony Ferguson gave at trial; as such, absolute immunity would apply to bar Virginia's suit against him.

Virginia predictably frames the issue much differently than does Ferguson.  Absolute immunity does not apply, she argues, because she "is not suing him for committing perjury."  (ECF No. 114 at PAGEID# 3977.)  Rather, Virginia seeks to impose liability against Ferguson for (1) failing to disclose "countless prior acts of perjury" in previous cases, (2) concealing his "sensationalist dime-store novel," and (3) "fabricating scientific theories in his reports."  (*Id.*)  While absolute immunity applies to in-court testimony, the doctrine does not apply to pretrial acts.  *Gregory*, 444 F.3d at 739.  This is true despite any connection these acts might have to later testimony.  *Id.*

In light of the reach of the absolute immunity doctrine, the Court cannot find that Ferguson is cloaked with absolute immunity from liability on the claims Virginia asserts in this lawsuit.  Importantly, Virginia disclaims any notion that she is suing Ferguson for his trial testimony, expressly stating that she is not seeking to impose liability for Ferguson having committed perjury (*i.e.*, lying about this education and credentials) at the criminal trial.  Virginia's claims go further than Ferguson's trial conduct: Virginia seeks to impose liability for a

bevy of *pretrial* conduct (namely, alleged *Brady* violations) for which the doctrine of absolute immunity provides no protection.  For these reasons, the Court finds that Ferguson is not entitled to absolute immunity.

### 2.   Qualified Immunity from Section 1983 Liability

Ferguson also argues that the doctrine of qualified immunity entitles him to summary judgment and demands denial of Virginia's motion for partial summary judgment on liability. Generally speaking in Section 1983 cases, government officials performing discretionary functions are immune from liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The burden is on the plaintiff to demonstrate that an official is not entitled to qualified immunity.  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004)). When evaluating a qualified immunity defense as a basis for summary judgment, the Court must examine two prongs (in either order): (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right and (2) whether the constitutional right alleged to have been violated was "clearly established."  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling *Katz* to the extent that *Katz* required the prongs to be analyzed in order).

The main thread running through each of Virginia's claims—and, indeed, the basis upon which she seeks partial summary judgment on Ferguson's liability—is the theory that Ferguson committed a *Brady* violation by failing to withhold valuable exculpatory or impeachment evidence from the defense.   Specifically, Virginia excoriates Ferguson for violating *Brady* in three ways: Ferguson failed (1) to tell the prosecutor that he had lied under oath in "countless

trials" before Virginia's murder trial, (2) to tell the prosecutor he had "no opinion" on how the arsenic detected in toxicology tests entered William LeFever's body, and (3) to disclose the manuscript of his "sensationalist dime-store novel" he wrote about the case.  (ECF No. 87 at PAGEID# 1586, 1591-96.)

Regardless of the merits underlying the alleged *Brady* violation, Ferguson argues that he is entitled to qualified immunity from Section 1983 liability.  (Def.'s Mot., ECF No. 95 at PAGEID# 3118.)  Ferguson argues that to the extent a forensic examiner is subject to a *Brady* obligation to disclose exculpatory evidence, such an obligation was not "clearly established" during the relevant time period in this case (*i.e.* between 1988 to 1990.)  By its own terms, the *Brady* obligation to disclose exculpatory evidence to the defendant applies only to *prosecutors*. *Brady*, 373 U.S. at 87-88; *see also Lindsay v. Bogle*, 92 F. App'x 165, 170 (6th Cir. 2004) (holding that a police chief's refusal to disclose an arrestee's internal investigation file did not violate *Brady* because *Brady* applies only to prosecutors).  And even though the Sixth Circuit has intimated that the *Brady* obligation extends to police officers or state-retained forensic experts, *see Moldowan v. City of Warren*, 578 F.3d 351, such a constitutional rule was not in effect at the time that Ferguson allegedly withheld the evidence of which Virginia complains.

Less than a year ago, our sister Court in the Northern District of Ohio faced a similar issue.  In *D'Ambrosio v. Marino*, No. 1:11-cv-933, 2012 U.S. Dist. LEXIS 141516 (N.D. Ohio Oct. 1, 2012), a plaintiff sought damages from two county prosecutors, the lead investigator, and the county coroner for the 21 years he spent on death row.  The *D'Ambrosio* plaintiff had been released after the district court's finding (affirmed by the Sixth Circuit) that the prosecution had withheld a significant amount of exculpatory evidence from the plaintiff's criminal defense counsel.  *Id.*, 2012 U.S. Dist. LEXIS 141516 at *2.  As against the coroner, Dr. Elizabeth Balraj,

the plaintiff alleged that she withheld a trace evidence report that, in conjunction with other evidence, called into question the version of events that the prosecution's eyewitness testified to. *Id.* at *6.

The district court disposed of the claim against Dr. Balraj on a motion for judgment on the pleadings.  In dismissing the claims against the coroner, Judge Polster led with the premise that *Brady*, by its own terms, applies to *prosecutors* only.  *Id.* at *11 (citing *Brady*, 373 U.S. at 87-88).  And while the United States Supreme Court has extended the *Brady* obligation to exculpatory evidence known only to police officers, the responsibility for obtaining and disclosing such evidence remains with the prosecutor.  *Id.* at *12 (citing *Kyles v. Whitley*, 514 U.S. 419, 437-38).  Thus, the Court concluded that "the duty of prosecutors to disclose exculpatory or impeachment evidence to criminal defendants does not extend to coroners."  *Id.* at *12-13.

Virginia urges the Court not to follow the same course charted by the *D'Ambrosio* court in assessing whether Ferguson can claim the protection of qualified immunity in this case.  She argues that the Sixth Circuit's decision in *Moldowan* shows that a forensic examiner has a duty under *Brady* to disclose exculpatory evidence to the accused.  And even though *Moldowan* was not decided until 2009, Virginia emphasizes the Sixth Circuit's observation that prior cases (particularly *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) and *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999)) established a forensic expert's duty to disclose exculpatory information:

> In *Gregory*, we reasoned that expert forensic examiners "act in an investigatory fashion when they interpret and document physical evidence," and thus we determined that "the intentional fabrication of a forensic report" is subject to the same considerations applied to the intentional fabrication of evidence by a police officer or prosecutor. 444 F.3d at 740. Under that framework, *Gregory* concluded that a forensic expert may be subject to suit under § 1983 for deliberately

> withholding the existence of exculpatory forensic evidence or fabricating forensic evidence. *Id.* at 744. Relying on *Spurlock*, *Gregory* reaffirmed that a forensic expert defendant "'cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional . . . rights.'" *Id.* at 744 (quoting *Spurlock*, 167 F.3d at 1005) (alteration in *Gregory*). *Gregory*'s reliance on *Spurlock* is significant because we determined in that case that this legal norm was clearly established at least as early as April or May of 1990. 167 F.3d at 998-99, 1006.

*Moldowan*, 578 F.3d at 397 (footnote omitted).

But even this analysis does not help Virginia escape Ferguson's qualified immunity defense to her *Brady*-based claims. The *D'Ambrosio* court, when faced with the same argument that Virginia raises in this case with respect to the Sixth Circuit's analysis in *Moldowan*, gave a convincing explanation of why *Moldowan* did not demonstrate that a coroner's *Brady* obligation was clearly established (if established at all) in 1988, the date of the trial in *D'Ambrosio*.

> [T]he Moldowan court extended this *Brady*-derivative obligation to include a state-retained forensics consultant who intentionally fabricated evidence and simultaneously withheld patently exculpatory evidence from the county prosecutor. In extending this derivative obligation to a forensic examiner, the court relied on two other cases where police or forensic examiners intentionally fabricated evidence. *See Moldowan*, 578 F.3d at 397 (citing *Gregory*, 444 F.3d 725 (a forensics examiner who intentionally fabricated findings in a forensics report) and *Spurlock*, 167 F.3d 995 (an officer who fabricated probable cause, coerced informant into testifying falsely and paid him for doing so)). The cases following *Moldowan* have confined this derivative *Brady* obligation to police officers or state-retained experts who fabricate evidence. *See, e.g., Army v. Collins*, No. 11-1791, 488 Fed. Appx. 957, 2012 U.S. App. LEXIS 14946, 2012 WL 2913736, (6th Cir. Jul 18, 2012) (police officers); *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) (police officer); *Rodriguez v. City of Cleveland*, 439 Fed. Appx. 433 (6th Cir. 2011).
>
> *Moldowan* was decided 21 years after Dr. Balraj's autopsy. Even that case does not extend *Brady* to a coroner. In 1988, there was no constitutional duty, let alone a firmly established one, for a police officer, let alone a coroner, to evaluate and disclose exculpatory and/or impeachment evidence to criminal defendants or prosecutors.

*D'Ambrosio*, 2012 U.S. Dist. LEXIS 141516 at *13-14.  The reasoning of the *D'Ambrosio* court applies with equal force in this case.  Even by February 1990, when Virginia's criminal trial took place, there was no case that clearly established *Brady*'s applicability to coroners or forensic toxicologists employed by coroners.

To be sure, Virginia attacks the reasoning of the *D'Ambrosio* court, arguing indignantly that Judge Polster "does not even acknowledge, let alone analyze, the Sixth Circuit's reliance on decisions dating back to the 1960s."  (ECF No. 114 at PAGEID# 3954.)  To bolster her view of Dr. Raker's "clearly established" *Brady* obligation, Virginia cites *Elkins v. Summit Cnty.*, 615 F.3d 671 (6th Cir. 2010), as a case that "further confirms that it was clearly established before 1990 that police and forensic investigators have a duty to disclose exculpatory evidence."  (ECF No. 114 at PAGEID# 3951.)  In particular, Virginia hones in on *Elkins*' reliance on *Moldowan*'s observation that "'at least three circuits recognized prior to August 1990 … this right was clearly established,' . . . and that the right may have been clearly established as early as 1964."  *Elkins*, 615 F.3d at 676 (quoting *Moldowan*, 578 F.3d at 382).  Virginia's righteous indignation aside, her argument cannot overcome the legal reality that the cases she cites do not go as far as she would like.

For one thing, *Elkins* does not hold (as Virginia represents) that *forensic investigators* have a duty to disclose exculpatory evidence.  *Elkins* dealt only with the denial of qualified immunity to *police officers* who allegedly withheld *Brady* material.  *See Elkins*, 614 F.3d at 673-74.  For another thing, none of the cases "dating back to the 1960s" that the Sixth Circuit relied upon in *Moldowan* had to do with any supposed *Brady* obligation *of a forensic scientist*.  *See Moldowan*, 578 F.3d at 382.  Rather, all of the pre-1990 cases cited by *Moldowan* had to do with the *Brady* obligations *of police*.  *See, e.g., Geter v. Fortenberry*, 882 F.2d 167, 171 (5th Cir.

16

1989); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964).

In evaluating whether a right was "clearly established" during the relevant time period, "we must determine whether the right has been recognized 'in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Moldowan*, 578 F.3d at 382 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). At best, *Moldowan* established that a forensic examiner may be subject to suit under Section 1983 for "deliberately withholding the existence of exculpatory evidence or fabricating forensic evidence" and that the "legal norm" for such liability was established "at least as early as April or May of 1990." *Id.* at 397 (citing *Gregory*, 444 F.3d at 744 and *Spurlock*, 167 F.3d at 998-99, 1006).[2] *Moldowan* does not help Virginia establish that Ferguson's duty to disclose the evidence complained of in this case was "clearly established" as of the time Virginia stood trial for her husband's murder.

For these reasons, the Court finds that Ferguson is entitled to invoke the doctrine of qualified immunity from liability on Virginia's Section 1983 claim based upon the theory that Ferguson withheld *Brady* material in violation of her due process rights. In light of the Court's ruling that Ferguson is entitled to qualified immunity, the Court need not determine whether the evidence the evidence he allegedly withheld from the prosecutor was exculpatory material within the meaning of *Brady* and its progeny.

---

[2] The Sixth Circuit in *Gregory* relied on *Spurlock* for the notion that a reasonable forensic expert would have known that withholding exculpatory evidence violated an accused's constitutional rights. *Gregory*, 444 F.3d at 744 (citing *Spurlock*, 167 F.3d at 1005). Later, in *Moldowan*, Sixth Circuit found *Gregory*'s reliance on *Spurlock* to be significant, for it signaled that the *Brady* obligation of a "forensic expert" was clearly established as of "April or May of 1990." It is worth noting, however, that *Spurlock* was not a case about a coroner or "forensic expert." At issue in *Spurlock* was whether a *sheriff's deputy* was entitled to qualified immunity for allegedly fabricating the evidence used to establish probable cause for an arrest. *Spurlock*, 167 F.3d at 1005-07.

On this basis, alone the Court denies Virginia's motion for partial summary judgment (ECF No. 87) on Ferguson's liability and grants Ferguson's motion for summary judgment as to Virginia's *Brady* claim.

### 3.  Section 1983 Due Process Claim Based on Fabricating Evidence

In addition to alleging *Brady* violations, Virginia claims that Ferguson fabricated scientific theories that led to her arrest and conviction.  To show that her right to be free from fabricated forensic evidence was "clearly established" in February 1990 (the date of Virginia's trial), Virginia relies on the same cases she relies upon in arguing that *Brady*'s application to forensic examiners was clearly established.  Most notably, *Gregory* holds that a forensic expert may be subject to suit under Section 1983 (*i.e.*, not qualifiedly immune) for fabricating forensic evidence.  *Gregory*, 444 F.3d at 737 and 745 n.9; *see also Moldowan*, 578 F.3d at 397 (citing *Gregory* with approval).  In turn, *Gregory* relied upon *Spurlock*, which held that allegations of fabricated evidence by police officers enabled a plaintiff to overcome a qualified immunity defense because a reasonable police officer would know that fabricating facts to demonstrate probable cause would violate a criminal suspect's Fourth Amendment rights to be free from an unreasonable seizure.  *Spurlock*, 167 F.3d at 1006.

The Court observes that none of the cases relied upon by Virginia states that it was clearly established by *February 1990* (the date of Virginia's trial) that a forensic examiner would have violated Virginia's constitutional rights by knowingly fabricating scientific evidence used against her at trial.  *Spurlock* itself dealt with the conduct of police officers in fabricating probable cause.  And though *Gregory* extended *Spurlock*'s rationale to forensic examiners, the Sixth Circuit only went as far as to say that it was clearly established *in 1992* that a forensic examiner violates an accused's constitutional rights by fabricating evidence when there is a

reasonable likelihood that the false evidence could have affected the trier of fact's judgment. *Gregory*, 444 F.3d at 745 n.9.[3]

In determining whether a right was "clearly established" at the relevant time, this Court may rely on decisions of the Supreme Court, decisions of the Sixth Circuit and courts within Sixth Circuit, and, in limited instances, on decisions of other circuits. *Spurlock*, 167 F.3d at 1006. "To be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 589 (6th Cir. 1994)); *see also Anderson v. Creighton*, 483 U.S. at 639. Despite the above-cited cases not squarely stating that a state-actor forensic examiner violates an accused's constitutional rights by fabricating evidence, the Court nonetheless finds that a reasonable official would have known during the relevant time period here (1988 to 1990) that fabricating scientific evidence was a violation of the accused's Fourth and Fourteenth Amendment rights.

In a similar context, the Tenth Circuit Court of Appeals observed in rejecting qualified immunity for a forensic chemist who allegedly fabricated scientific evidence: "The degree of specificity required from prior case law depends in part on the character of the challenged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004); *see also Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002) (noting that the "constitutional provision may be so clear and the conduct

---

[3] In *Gregory*, the Sixth Circuit stated: "Under the law that was clearly established in 1992, [the forensic examiner] would have violated Plaintiff's constitutional rights if she 'knowingly fabricated evidence against [him], and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Gregory*, 444 F.3d at 745 n.9 (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). Taken at face value, this quote from *Gregory* suggests that *Lochmondy* established the right in question as of 1989. An examination of *Lochmondy*, however, reveals no such quote.

so bad that case law is not needed to establish that this conduct cannot be lawful").  Here, Ferguson is accused of fabricating scientific conclusions that were then used as evidence against Virginia.  If true, the nature of this conduct is egregious enough such that a reasonable official would have known that it violated Virginia's constitutional rights.  *Cf. Spurlock*, 167 F.3d at 1006-07.

Having decided that Virginia's right to be free from evidence fabricated by a forensic examiner was clearly established, the Court finds that Ferguson is not entitled to qualified immunity because a genuine issue of material fact exists as to whether Ferguson fabricated his theories regarding William's poisoning.  Ferguson acknowledged in his deposition testimony that he could not determine how arsenic entered William's body.  But at trial, Ferguson testified that arsenic was administered rectally, a circumstance that was more indicative of homicide than suicide.  Though Ferguson tries to explain and reconcile the trial and deposition testimony by emphasizing the difference between "acute" arsenic poisoning (which he says he was explaining at trial) and "chronic" arsenic poisoning (which he says he was explaining at his deposition), it is not appropriate for the Court to resolve this conundrum at the summary judgment stage.  This is a matter for the trier of fact to resolve.

### 4.  Section 1983 Fourth Amendment and Malicious Prosecution Claims

Virginia also alleges § 1983 claims based on a Fourth Amendment violation and on a theory of malicious prosecution.  Virginia bases her Fourth Amendment claim on the theory that she was detained "without probable cause" that she was responsible for William's death; similarly, she bases her malicious prosecution claim on the theory that the individual defendants (including Ferguson), "made, influenced and/or participated in the decision to prosecute her for murder" in the absence of probable cause.  (Compl. ¶¶ 99, 105, ECF No. 2 at PAGEID# 22-23.)

In her opposition to summary judgment, Virginia contends that the "same facts" that underlie her due process claims support her § 1983 Fourth Amendment and malicious prosecution claims.[4]

To succeed on a § 1983 malicious prosecution premised on a violation of the Fourth Amendment, a plaintiff must prove (1) the defendant made, influenced, or participated in the decision to criminally prosecute the plaintiff, (2) the prosecution lacked probable cause, (3) the plaintiff suffered a deprivation of liberty, apart from the initial seizure, as a consequence of the legal proceeding, and (4) the criminal proceeding must have been resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010).

The Sixth Circuit has explained that to be liable for "participating" in a decision to prosecute an accused, "the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 308 n.5. Virginia's opposition to summary judgment makes no argument with respect to how Ferguson made, influenced, or participated in the decision to prosecute Virginia. Moreover, Virginia's claim is fatally undermined by the fact that a grand jury indicted Virginia for murder. A grand jury indictment conclusively demonstrates the existence of probable cause for purposes of a § 1983 malicious prosecution claim. *See Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (citing *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)). Though Virginia contends that "fraud" or "unlawful means" in securing a conviction may negate probable cause, the only case she cites in support of that proposition was one in which the court was applying Ohio law to an Ohio tort claim for malicious prosecution. *See Elkins v. Summit Cnty.*, No. 5:06-cv-3004, 2009 WL 1150114, at *11 (N.D. Ohio Apr. 29, 2009). In the federal context, an indictment "fair on its face" conclusively

---

[4] In her opposition to summary judgment, Virginia also clarifies that her § 1983 Fourth Amendment claim and her § 1983 malicious prosecution claims are "the same," even though she pleaded them as separate counts in the Complaint. (ECF No. 114 at PAGEID# 3955.) Taking Virginia's cue, the Court analyzes these claims together as though they are one and the same.

determines the existence of probable cause.  *Higgason*, 288 F.3d at 877.  Absent evidence of

perjured testimony or irregularity in the grand jury proceeding so as to indicate that the

indictment was somehow tainted, there is a conclusive presumption that probable cause

supported the prosecution of Virginia.  *See Bakos v. City of Olmstead Falls*, 73 F. App'x 152,

157 (6th Cir. 2003).   While Virginia alleges irregularities in the investigation of her husband's

death, she cites no evidence of irregularities *in the actual grand jury proceeding* that would

undermine the presumption of probable cause arising from an indictment.  *See id.*

Ferguson is therefore entitled to summary judgment on Virginia's § 1983 Fourth

Amendment and malicious prosecution claims.

### 5.  Section 1983 Conspiracy

Virginia also alleges a § 1983 conspiracy claim, theorizing that the individual defendants

"reached an agreement and plan amongst themselves to frame Plaintiff for the crime of murder."

(Compl. ¶ 118, ECF No. 2 at PAGEID# 25.)  A civil conspiracy claim under § 1983 requires a

plaintiff to show that (1) the defendants had a "single plan," (2) the defendants shared in the

"general conspiratorial objective," and (3) one or more of the defendants committed an overt act

in furtherance of the conspiracy.  *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).  Express

agreement among all the conspirators is not necessary and each conspirator need not have known

all of the details of the illegal plan or all of the participants involved.  *Id. See also Bazzi v. City of*

*Dearborn*, 658  F.3d 598, 602 (6th Cir. 2011).

Ferguson is entitled to summary judgment on the conspiracy claim.  Virginia's only

argument in support of her conspiracy claim is that a jury could conclude that Ferguson

distributed his "dime-store novel" to others (namely, Defendants Dr. Raker and Detective

Ballantine) before Virginia's trial, thereby supporting a finding that these defendants conspired

to violate her constitutional rights by not turning the novel over to the prosecutor (who, theorizes Virginia, would have turned it over to Virginia's criminal defense attorneys as *Brady* material). But this theory falls flat for a couple of reasons.  First, this Court has already determined that Ferguson enjoys qualified immunity with regard to any claimed *Brady* violation by him.  Thus, Virginia cannot show, as a matter of law, that there was a conspiracy to violate her constitutional rights under *Brady*.  *See Bauss v. Plymouth Twp.*, 233 F. App'x 490, 500 (affirming summary judgment in favor of defendants on § 1983 conspiracy claim when plaintiff failed to show deprivation of a constitutional right).

Second, Virginia has not raised a genuine issue of material fact with regard to the existence of a "single plan" to violate her constitutional rights by framing her for murder.  The mere fact that Ferguson *may* have given Dr. Raker or Ballantine a copy of his true crime novel manuscript is an exceedingly thin reed upon which to rest an allegation that there was a grandiose nefarious conspiracy to frame Virginia for murder.

The Court finds no genuine issue of material fact with respect to the existence of a Section 1983 conspiracy.  Ferguson is entitled to summary judgment on this claim.

### B.  State Law Claims Against Ferguson

In addition to her federal claims brought under Section 1983, Virginia alleges state law claims for intentional infliction of emotional distress, malicious prosecution, and false imprisonment against Ferguson in his individual capacity.  In addition to contesting these claims on the merits, Dr. Raker also argues that state law tort immunity under the Ohio Political Subdivision Tort Immunity Act precludes Virginia's claims against him.

### 1.  Immunity Under Ohio Rev. Code § 2744.03(A)(6)

Ohio provides immunity from suit to an employee of a political subdivision in connection with the performance of governmental or proprietary functions, unless (1) the employee's acts were outside the scope of employment or official responsibilities; (2) the employee acted with a malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) another section of the Ohio Revised Code expressly imposes liability. Ohio Rev. Code § 2744.03(A)(6).  This statute provides a presumption of immunity.  *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011) (citing *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995)).

Virginia argues that Ferguson is not entitled to immunity under Ohio Rev. Code § 2744.03(A)(6) because there is a "question of fact as to whether  Mr. Ferguson . . . acted with malice, in bad faith, or in a wanton or reckless manner."  (ECF No. 114 at PAGEID# 3979.) "Malice" is the willful and intentional design to harm another through conduct that is unlawful or unjustified.  *Morrison v. Bd. of Trs. of Green Twp.*, 529 F. Supp. 2d 807, 835 (S.D. Ohio 2007) (citing *Cook*, 103 Ohio App. 3d at 90).  "Bad faith" involves a "dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another."  *Id.*  "Wanton misconduct" is the "failure to exercise any care whatsoever."  *Id.*  Virginia contends that Ferguson's actions meet one or more of these descriptions because he "concealed exculpatory evidence," "fabricated his forensic conclusions," and "knew that as a natural consequence of [his] actions, Ms. LeFever could be sent to prison."  (ECF No. 114 at 3978-79.)

The Court finds that Ferguson cannot claim the protection of political subdivision immunity.  As noted previously in analyzing Virginia's Section 1983 claim, there is a genuine

issue of fact for trial with regard to whether Ferguson fabricated scientific evidence that led to

Virginia's conviction for murder.  If a jury finds that Ferguson did so, the jury could likewise

find the requisite malice, recklessness, wantonness, or bad faith that removes the cloak of

immunity under Ohio Rev. Code § 2744.03(A)(6).

### 2.  Intentional Infliction of Emotional Distress

Virginia asserts a state law claim for intentional infliction of emotional distress ("IIED")

against Ferguson.  Under Ohio law, the elements of a claim of IIED are:

> [(1)] the defendant intended to cause emotional distress or knew or
> should have known that its conduct would result in serious emotional
> distress to the plaintiff; (2) defendant's conduct was outrageous and
> extreme and beyond all possible bounds of decency and was such that it
> can be considered as utterly intolerable in a civilized community;  (3)
> defendant's conduct was the proximate cause of plaintiff's psychic
> injury; and (4) plaintiff's emotional distress was serious and of such a
> nature that no reasonable person could be expected to endure it.

*Talley v. Family Dollar Stores of Ohio, Inc*., 542 F.3d 1099, 1110 (6th Cir. 2008) (quoting

*Ekunsumi v. Cincinnati Restoration, Inc.,* 698 N.E.2d 503, 506 (Ohio Ct. App. 1997)).  Courts in

Ohio have held that the tort of IIED is characterized by behavior, "so outrageous in character,

and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community."  *Hale v. Vance*, 267 F. Supp. 2d 725,

736 (S.D. Ohio 2003) (quoting *Yeager*); *Irving v. Austin*, 138 Ohio App. 3d 552, 557, 741

N.E.2d 931 (Ohio Ct. App. 2000).

Virginia has established a genuine issue of material fact with respect to whether Ferguson

fabricated key scientific evidence that led to her conviction.  The Court finds that this likewise

creates a genuine issue of material fact with respect to whether Ferguson acted in a manner that

is "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of

decency." A jury could find that Ferguson's conduct—if proven—was sufficiently shocking and outrageous so as to bring it within the realm of IIED under Ohio law. *See Ayers v. City of Cleveland*, No. 1:12-cv-753, 2013 U.S. Dist. LEXIS 25992, at *49 (N.D. Ohio Feb. 25, 2013). Summary judgment on Virginia's IIED claim is therefore denied.

### 3. Malicious Prosecution

As to the malicious prosecution claim, the elements of are (1) malice by the defendant in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused. *Froelich v. Ohio Dep't of Mental Health*, 114 Ohio St. 3d 286, 871 N.E. 2d 1159, 2007-Ohio-4161, at ¶ 9. In this case, the fact that a grand jury indicted Virginia for her husband's murder is prima facie evidence of probable cause, which Virginia can overcome only upon a showing of "evidence to the effect that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular." *Deoma v. Shaker Hts.*, 68 Ohio App. 3d 72, 77, 587 N.E. 2d 425 (Ohio Ct. App. 1990).

Absent from Virginia's opposition to summary judgment, however, is any citation to the record of the grand jury proceedings indicating what *was* presented to the grand jury. The Court is not in a position to decide whether Virginia has rebutted the prima facie evidence of a grand jury indictment without evidence of what was presented to the grand jury. Nor is this Court obligated to search the entire record on its own for evidence that would enable a party's claim to survive summary judgment. *See, e.g., Sagan v. Sumner Cnty. Bd. of Edn.*, 501 F. App'x 537, 540 (6th Cir. 2012).

Summary judgment is also appropriate on the basis that Virginia cannot satisfy the fourth element of malicious prosecution as a matter of law. In conclusory fashion, Virginia argues that

"her conviction was vacated and the indictment dismissed," thereby satisfying the requirement that proceedings be terminated in her favor. (ECF No. 114 at PAGEID# 3982.) But the dismissal of the indictment in Virginia's case was a *without prejudice* dismissal. Indeed, in the motion to dismiss the indictment without prejudice, the Licking County Prosecutor did not foreclose the possibility of seeking to re-indict Virginia if new technology allowed the prosecution to overcome myriad scientific evidence issues that hampered the current ability to re-try Virginia for murder. (ECF No. 114 Ex. 4 at PAGEID# 1462.) Accordingly, Virginia has not established for purposes of summary judgment that the criminal proceedings have been terminated in her favor, at least insofar as an Ohio tort claim for malicious prosecution is concerned. *See Ash v. Ash*, 72 Ohio St. 3d 520, 522, 651 N.E. 2d 945 (1995) ("A proceeding is 'terminated in favor of the accused' only when its final disposition indicates that the accused is innocent.") (quoting 3 Restatement of the Law 2d, Torts (1977) 420, Section 660, Comment a).[5]

### 4. False Imprisonment

Virginia also sues Ferguson for false imprisonment under Ohio law. An actionable tort claim for false imprisonment "occurs when a person confines another intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short." *Bennett v. Ohio Dep't of Rehab. & Corr.*, 60 Ohio St. 3d 107, 109, 573 N.E. 2d 633 (1991) (internal quotations omitted).

A finding of probable cause defeats a claim of false imprisonment. *See Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 315 (6th Cir. 2005) (applying Ohio law). As noted above, a grand injury indicted Virginia for murder, conclusively demonstrating the existence of

---

[5] Though Ferguson does not raise the issue as a ground for summary judgment, the Court also notes that Virginia does not cite authority for the proposition that Ferguson qualifies as a person who instituted criminal proceedings against her for purposes of satisfying the first element of a malicious prosecution claim under Ohio law.

probable cause.  More fundamentally, however, the Court notes that Virginia cites no case for the proposition that the tort of false imprisonment applies to Ferguson in this case.  Virginia states in conclusory fashion that Ferguson acted to "cause" her imprisonment, but she cites no Ohio case for the proposition that a false imprisonment claim can be maintained against a person who did not actually confine the plaintiff.

## IV.    Discussion: Alex LeFever's Claims in Case No. 2:12-cv-664

In Case No. 2:12-cv-664, Plaintiff Alex LeFever sues for damages for the deprivation of his rights that were caused by the allegedly wrongful conviction of his mother.  He asserts both federal and state law claims against the same Defendants, including Ferguson.  Ferguson argues that he is entitled to summary judgment on Alex's Amended Complaint.

### A.  Section 1983 Claims

Alex alleges in his First Claim a Section 1983 claim based on the purported violation of his due process right to "family integrity," or, more specifically, the "fundamental constitutional right to live with and be raised by his mother."  (Am. Compl. ¶ 99, ECF No. 38 in Case No. 2:12-cv-664 at PAGEID# 191.)  Alex alleges in his Second Claim a purported violation of his Fourth Amendment rights, arguing that he was unlawfully seized and placed in foster care after his mother's arrest.  (*Id.* ¶¶ 110-119.)

As to both of these claims, this Court is not writing on a clean slate.  This Court previously granted in part the motion to dismiss Alex's claims brought by Defendants Dr. Raker and Licking County.  (Case No. 2:12-cv-664, ECF No. 80.)  The Court found that applicable Sixth Circuit precedent—namely *Foos v. City of Delaware*, No. 10-4234, 2012 U.S. App. LEXIS 14842 (6th Cir. July 16, 2012) and *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000)— foreclosed Alex from bringing a viable Section 1983 claim for "deprivation of familial

association." The Court accordingly dismissed Alex's First Claim as to Dr. Raker and Licking County. The Court likewise dismissed Alex's Section 1983 Fourth Amendment claim, finding it barred by the statute of limitations.

For the same reasons the Court dismissed the Section 1983 claims as to Dr. Raker and Licking County, the Court likewise grants summary judgment to Ferguson.

### B. Intentional Infliction of Emotional Distress

Like his mother, Alex alleges a claim for IIED against Ferguson and other individual defendants. In his memorandum contra Defendants' motion for summary judgment, Alex tries to escape summary judgment on his IIED claim by arguing that this claim is not barred by the statute of limitations. But while the statute of limitations was at issue in connection with the Licking County Defendants' motion to dismiss Alex's Amended Complaint, Ferguson's motion for summary judgment does *not* raise the statute of limitations. Instead, Ferguson argues for summary judgment on the IIED claim on the basis that Alex (1) has not shown "malice, bad faith, or wanton and reckless conduct" as a matter of law and (2) has not shown any conduct by Ferguson that was directed at him. (ECF No. 95 at PAGEID# 3128.)

Alex's opposition does not come forward with evidence to rebut summary judgment on these bases. With Alex having failed to meet his summary judgment burden, Ferguson is entitled to summary judgment on the IIED claim.

### C.  Loss of Consortium

Alex's Fourth Claim of the Amended Complaint pleads loss of consortium under Ohio law.  Ohio law recognizes an action by an adult child for loss of consortium against a third party who injures the child's parent.  Loss of consortium claims are derivative claims, and thus a defense to the underlying action generally constitutes a defense to the loss of consortium claims.  *See Bowen v. Kil-Kare, Inc*., 63 Ohio St. 3d 84, 93, 585 N.E. 2d 384 (Ohio 1992).

In his combined opposition to all of the Defendants' motions for summary judgment, Alex conceded that his loss of consortium claim is derivative of his mother's state law claims.  (Case No. 2:12-cv-664, ECF No. 75 at PAGEID# 1216.)  This Court has found *ante* that one of Virginia's state law claims survives summary judgment: Virginia may proceed to trial on her claim for IIED against Ferguson.

Ferguson's motion for summary judgment does not address Alex's loss of consortium claim specifically.  His only argument that conceivably covers this claim is his contention that he is immune from state law tort liability under Ohio Rev. Code § 2744.03(A)(6).  But having found that Ferguson cannot claim state law tort immunity from liability on Virginia's claims, the Court likewise cannot find Alex's derivative claim to be barred by § 2744.03(A)(6).  Accordingly, the Court denies summary judgment as to Alex's claim for loss of consortium against Ferguson.

### V.    Conclusion

For the foregoing reasons, the Court **DENIES** the motion for partial summary judgment of Plaintiff Virginia LeFever (ECF No. 87) and **GRANTS IN PART AND DENIES IN PART** Defendant James Ferguson's motion for summary judgment (ECF No. 95).  The Court finds that Virginia's Complaint should proceed to trial against Ferguson on (1) her Section 1983 claim premised upon Ferguson's alleged fabrication of evidence against her and (2) her state law claim

for IIED.  Alex's Amended Complaint should proceed to trial against Ferguson on Alex's state law claim for loss of consortium.

**IT IS SO ORDERED.**

**/s/ Gregory L. Frost**
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**